UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:12-cv-1603 RLY-DML |
| | ) | |
| INDIANA SECRETARY OF STATE, in | ) | |
| her official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS

### INTRODUCTION

This case challenges the constitutionality of a unique scheme—imposed by Indiana statute—for electing judges to the Marion Superior Court.  This statutory scheme has the effect of dramatically curtailing individuals' ability to cast a meaningful vote for county judgeships and, as such, impinges on fundamental First Amendment rights.  The defendants ("State") nonetheless argue that this action is subject to dismissal under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for several reasons.

First, characterizing the issue both as an issue of standing and one of Eleventh Amendment immunity, they argue that the parties that have been named as defendants—the Indiana Secretary of State ("Secretary"), the Individual Members of the Indiana Election Commission ("Commission"), and the Governor of the State of Indiana ("Governor")—are improper parties insofar as they play no role in enforcing the challenged statute.  They do not contend that other state officials have any responsibility in this regard, but instead assert that the only proper defendants are local officials within Marion County, and it is more than a little curious that the State sees no apparent role for itself in the enforcement of state election law.

1

Regardless, the argument is erroneous: among other duties, the Secretary is statutorily designated as Indiana's "chief election official," the Commission is responsible for administering and supervising Indiana's election statutes, and the Governor is responsible for commissioning all elected judges. This more than suffices to render them proper defendants.

And second, the State asserts that the plaintiff does not state a claim upon which relief can be granted insofar as the outcome of this case is controlled by the U.S. Supreme Court's decision in *New York State Board of Elections v. Lopez-Torres*, 552 U.S. 196 (2008). Given that *Lopez-Torres* arose as a challenge to the age-old system of nominating candidates by a party convention rather than by an open primary election, the import of this case to the case at bar is not altogether clear. Regardless, the proper application of the "sliding scale" approach governing challenges to state electoral schemes, *see Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992)—which is wholly ignored by the State—reveals that the challenged statute is unconstitutional (or at least that its constitutionality cannot be determined on the basis of an empty record).

Accordingly, the State's Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) (ECF No. 18) must be denied.

### STANDARD OF REVIEW

As indicated, the State raises arguments under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In evaluating a Rule 12(b)(1) motion, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975). Additionally, "[w]hen a defendant raises standing as the basis for a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction . . .

2

the district court 'may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (internal citation omitted).  In adjudicating a Rule 12(b)(6) motion, the facts alleged in the complaint must again be accepted as true and viewed "in the light most favorable to the . . . non-moving party." *Guise v. BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004).  "It is enough if the complaint puts the defendants on notice of the claim and that some set of facts could be presented that would give rise to a right to relief." *Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895, 900 (7th Cir. 1997).  Moreover, "the factual allegations in the complaint 'must be enough to raise a right to relief above the speculative level.'" *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (citation omitted).  A complaint must thus "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation omitted).

## PROCEDURAL HISTORY AND LEGAL BACKGROUND

Indiana Code § 33-33-49-13, which delineates how judges are selected to the Marion Superior Court and which is challenged in this case, provides in its entirety as follows:

> (a)      Each judge of the court shall be elected for a term of six (6) years that begins January 1 after the year of the judge's election and continues through December 31 in the sixth year.  The judge shall hold office for the six (6) year term or until the judge's successor is elected and qualified.  A candidate for judge shall run at large for the office of judge of the court and not as a candidate for judge of a particular room or division of the court.

> (b)      At the primary election held in 2008 and every six (6) years thereafter, a political party may nominate not more than eight (8) candidates for judge of the court.  At the primary election held in 2006 and every six (6) years thereafter, a political party may nominate not more than ten (10) candidates for judge of the court.  The candidates shall be voted on at the general election.  Other candidates may qualify under IC 3-8-6 to be voted on at the general election.

> (c)      The names of the party candidates nominated and properly certified to the Marion County election board, along with the names of other candidates who

3

have qualified, shall be placed on the ballot at the general election in the form prescribed by IC 3-11.  At the 2008 general election and every six (6) years thereafter, persons eligible to vote at the general election may vote for sixteen (16) candidates for judge of the court.  Beginning with the 2006 general election and every six (6) years thereafter, persons eligible to vote at the general election may vote for twenty (20) candidates for judge of the court.

(d)     The candidates for judge of the court receiving the highest number of votes shall be elected to the vacancies.  The names of the candidates elected as judges of the court shall be certified to the county election board as provided by law.

Thus the statute contemplates that every single candidate for a judgeship on the Marion Superior Court that is nominated by his or her political party will be automatically elected to the Marion Superior Court.  (Amended Compl. for Decl. & Inj. Relief ["Amended Compl."], ¶ 17).  Absent the unusual circumstance in which a third-party or independent candidate successfully petitions to appear on the general-election ballot—a circumstance that has only occurred once under the challenged system—the only elections in which any meaningful vote is cast for the Marion Superior Court are the major parties' primary elections.  (*Id.*).

As such, a registered voter who does not wish to vote in a primary election, who is ineligible to vote in a primary election under Indiana Code § 3-10-1-6, or who does not desire to affiliate him- or herself with either the Democratic party or the Republican party by voting in its primary election, therefore has absolutely no opportunity to cast a meaningful vote for the Marion Superior Court.  (*Id.*, ¶ 18).  Similarly, even a registered voter who associates him- or herself with either the Democratic party or the Republican party and who therefore votes in one of those parties' primary elections, has absolutely no opportunity to cast a meaningful votes for half of the seats on the Marion Superior Court.  (*Id.*, ¶ 19).  Even when a third-party or independent candidate appears on the general-election ballot, this voter who associates with a

major political party is precluded by Indiana law from casting a ballot for a candidate belonging to his or her party of choice for half of the judgeships to be elected.

The plaintiff in this case is a non-profit, non-partisan public interest group that advocates in favor of ethics, good government, constitutional law, and the elimination of barriers to voting, and that is committed to ensuring that citizens have the right to cast meaningful votes and is dedicated to protecting the right to vote.  (*Id.*, ¶ 21–22).  It has approximately 1,200 members throughout Indiana, and approximately 250 members in Marion County.  (*Id.*, ¶ 25).  These members, including members who are registered voters eligible to vote in Marion County, are of every political stripe—Democratic, Republican, and Independent.  (*Id.*).

## ARGUMENT

The State raises three (3) arguments in support of dismissal: *first,* it argues that the plaintiff lacks standing to pursue its claims because its injuries are not caused by the State and would not be redressed by a favorable decision against the State (State Dfts' Mem. of Law in Supp. of their Mot. to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) (ECF No. 19) ("State's Br."), at 4–18); *second,* it argues that it is immune from suit by virtue of the Eleventh Amendment insofar as it plays no role in enforcing the challenged statutory scheme (*id.* at 18–20); *and third,* it argues that the plaintiff cannot prevail on the merits of its claim (*id.* at 20–26). None of these arguments is meritorious.

## I.  Standing and Eleventh Amendment Immunity

### A.  *The State's standing argument and its immunity argument are co-extensive with one another and need not be treated separately*

The State separately argues that the plaintiff lacks standing against each defendant (*id.* at 4–18) and that the plaintiff's claims are barred by Eleventh Amendment immunity (*id.* at 18–20). It appears, however, that these arguments are co-extensive with one another.  On the one hand,

the State's standing argument is premised on its assertion that the plaintiff's injury "cannot be traced to the action or inaction of any of the State Defendants and cannot be redressed by any of the State Defendants."  (*Id.* at 5).  On the other, its immunity argument is similarly premised on the assertion that "the State Defendants neither have the right nor the authority to enforce or nullify" the challenged statute.  (*Id.* at 20).

> One federal court has addressed the overlap between these two (2) defenses as follows:
>
> [The defendants] contend they are entitled to Eleventh Amendment immunity because they are not proper defendants in this action.  This argument is somewhat confusing because it improperly blends two distinct defenses.
>
> These officials contend they are not responsible for administering elections or registering voters.  If this were the case, these officials would be entitled to judgment for that reason alone just like any other purported defendant in any other case who had no role in causing the plaintiff's injury, and there would be no need to consider the Eleventh Amendment. . . .  This observation [that the defendants' "claim of noninvolvement lacks merits"] resolves the issue without necessitating consideration of the novel assertion that the Eleventh Amendment bars imposition of purely prospective equitable relief.

*Prye v. Carnahan*, No. 04-4248, 2006 WL 1888639, at *3 (W.D. Mo. July 7, 2006).  And, under circumstances similar to this case, the Fifth Circuit has characterized the standing and immunity issues as presenting "closely related—indeed overlapping—inquir[ies]."  *Okpalobi v. Foster*, 190 F.3d 337, 347 (5th Cir. 1999); *see also, e.g.*, *Culinary Workers Union v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999) ("We have no difficulty . . . concluding that the requisite 'connection' exists here [to bar an immunity defense] for the same reasons that the [plaintiff] has demonstrated that a case and controversy exists."); *Christensen v. Arizona Cent. Credit Union*, No. CV-08-0862, 2008 WL 4853414, at *4 (D. Ariz. Nov. 10, 2008) ("The Eleventh Amendment requisite connection and Article III standing analyses are closely related and often overlapping inquiries.").

For ease of presentation and purposes of economy, therefore, the standing and immunity arguments are treated simultaneously under the guise of "standing" or whether the defendants constitute "proper parties."

**B. *The plaintiff in this case is most likely prohibited by controlling case law from suing local officials***

The overarching theme of the State's standing and immunity arguments is that the plaintiff should be suing local election officials rather than state officials. (*See* State's Br., at 6, 9–11). This is so even though the plaintiff is challenging a duly passed state statute, rather than a local policy or ordinance. Given this, prevailing case law appears to preclude the plaintiff from seeking relief against local officials under the doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The effect of the State's arguments, therefore, is to completely immunize Indiana Code § 33-33-49-13 from constitutional challenge. This, of course, cannot be.

Under *Monell*, a municipality may only be held liable in a suit brought pursuant to 42 U.S.C. § 1983 when an unconstitutional act "may fairly be said to represent official policy" of that municipality and when the policy was the "moving force" behind the violation. *Id.* at 694. Stated another way, there must exist a "direct causal link," *City of Canton v. Harris*, 489 U.S. 378, 386, (1989), between the violation and a "deliberate choice [by the municipality] to follow a course of action . . . made from among various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In *Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991), the Seventh Circuit addressed whether a municipality could be held liable under *Monell* for an allegedly unconstitutional deprivation of property as a result of an alleged "'policy' of allowing or instructing its police officers to enforce" a state statute that permitted the deprivation without providing a hearing. *Id.* at 791. Said the court:

> It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the "policy" of enforcing state law.  If the language and standards from *Monell* are not to become a dead letter, such a "policy" simply cannot be sufficient to ground liability against a municipality.

*Id.* at 791–92.  This holding was subsequently reiterated in *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998), in which the Seventh Circuit again concluded that a plaintiff "who wants a judgment against [a] municipality under [§ 1983] must be able to trace the action of the employees who actually injured him to a policy or other action of the municipality itself.  When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." *Id.* at 718.[1]

It appears, therefore, that the Seventh Circuit has been clear: a municipality may not be forced to endure the Hobson's choice between acting in an allegedly unconstitutional manner and acting in a manner in direct violation of state or federal law.  Although the State does not admit as much, its suggestion that the only proper defendants in this action are local election officials, if accepted, likely means that there are no proper defendants in this action.  This cannot be so, and the State's standing and immunity arguments must be viewed against this backdrop.

### C.  The plaintiff is most assuredly seeking more than an advisory opinion

The State concludes its standing argument by asserting that the plaintiff is simply requesting the issuance of an advisory opinion.  (State's Br., at 14–15).  Because many of the State's arguments require an analysis into the specific relief that the plaintiff is seeking, and the

---

[1]      Both *Surplus Store* and *Bethesda Lutheran* arose in the context of claims for monetary damages.  The U.S. Supreme Court, however, has recently held that the distinction between claims for monetary relief and those for injunction relief has no effect on the *Monell* calculus.  *See Los Angeles County v. Humphries*, __ U.S. __, 131 S.Ct. 447, 452–53 (2010).

specific relief that may issue against each defendant, it is helpful to address this assertion at the outset.

The plaintiff is simply not seeking an advisory opinion.  This argument is typically reserved for instances in which a plaintiff's claim is not ripe or a plaintiff is not personally affected by a challenged action.  *See, e.g.*, *Harris v. Quinn*, 656 F.3d 692, 700–01 (7th Cir. 2011).  Regardless, the plaintiff is seeking very tangible relief in this case—it is seeking an injunction against the enforcement of Indiana Code § 33-33-49-13.  In practical terms, this includes the following:

- An injunction against the Secretary, in her capacity as Indiana's "chief election official" (IND. CODE § 3-6-3.7-1), broadly prohibiting the enforcement of the challenged statute.

- An injunction against the Commission prohibiting it from "administering" the challenged statute.  (IND. CODE § 3-6-4.1-14(a)(1)).

- An injunction against the Commission requiring it to instruct and ensure that no local election officials enforce the challenged statute.  (IND. CODE § 3-6-4.1-14(a)(4)).

- An injunction against the Secretary prohibiting her from certifying to the Governor the candidate(s) receiving the highest number of votes for Marion Superior Court, to the extent that this requires the enforcement of the challenged statute.  (IND. CODE § 3-12-5-7).

- An injunction against the Governor prohibiting the issuance of commissions to any judges elected under the unconstitutional statute.  (IND. CODE § 4-3-1-5(4)).

If and when the challenged statute is declared unconstitutional, and the requested relief (or some version thereof) issues, the State will be responsible for determining a permissible manner of selecting judges to the Marion Superior Court.[2]  Depending on the State's solution, this may impact other duties of the defendants, such as the Commission's duty to resolve issues

---

[2]     This rudimentary fact underscores a profound error in the State's argument: if only county officials were named as defendants, and if the plaintiff prevailed, then these county officials would be responsible for creating a replacement for an invalidated state statute.  Surely the State does not desire this result.

surrounding declarations of candidacy (IND. CODE § 3-8-2-18) or the Secretary's certification of candidates to be placed on the ballot (IND. CODE § 3-8-7-16).

    *D.   The State's standing and immunity arguments lack merit*

       1.   <u>The outcome of the State's argument is not controlled by the fact that the defendants are not mentioned in the specific statute challenged</u>

The State argues, in pertinent part, that each of the defendants is an improper party to this lawsuit such that standing does not exist.   While the specific duties of each defendant are addressed below, the State's attempt to find relevance in the fact that none of the defendants are mentioned in the actual language of Indiana Code § 33-33-49-13 (*see* State's Br., at 15–16) deserves mention at the outset.

The notion that a defendant's duties to enforce a statutory scheme must be evident from the challenged statute was rejected in *Ex parte Young*, 209 U.S. 123 (1908), itself:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.
>
> It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced.   In some cases, it is true, the duty of enforcement has been so imposed, but that may possibly make the duty more clear; if it otherwise exist it is equally efficacious.   The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.

*Id.* at 157 (internal parenthetical omitted).   In this case, the challenged statute broadly describes the manner in which judges are to be elected to the Marion Superior Court.   The statute is given effect by a lengthy and detailed statutory scheme governing the administration and supervision of elections—and the ascertainment of election results—in Indiana.   In this regard, the statutory duties of each of the defendants render them proper parties to this action.

## 2. Secretary of State

By statute, the Indiana Secretary of State ("Secretary") "is the state's chief election official." IND. CODE § 3-6-3.7-1.   Among other duties, this means that the Secretary is responsible for "perform[ing] all ministerial duties related to the administration of elections by the state," IND. CODE § 3-6-4.2-2(a),[3] for "certify[ing] to the governor the candidate receiving the highest number of votes for each office," IND. CODE § 3-12-5-7, and specifically for certifying "[e]ach justice or judge retained or removed" at an election, IND. CODE § 3-12-5-1(d)(2).[4]  The Office of the Secretary of State also contains the Indiana Election Division ("Election Division"), see IND. CODE § 3-6-4.2-1, which is responsible for "instruct[ing]" county officials "as to their duties under" Title 3 of the Indiana Code (governing elections), IND. CODE § 3-6-4.2-14(a).[5]  The Election Division within the Secretary's office is also responsible for certifying the name and place of residence of each judicial candidate nominated for election to local officials before a general election, IND. CODE § 3-8-7-16(b), and for printing election ballots, IND. CODE § 3-8-7-25.  At the very least, given that the plaintiff in this case is challenging the constitutionality of a state statute governing the manner in which judges are elected, it would seem self-evident that

---

[3]    The State appears to assert that this statute merely "convey[s] the chapter's purpose and elucidate[s] the various ministerial functions of the Secretary."  (State's Br., at 7).  This assertion flows from the contention that the statutory section is titled "Purpose."  Initially, this is simply incorrect: the statute is titled "Administration."  Even were that not so, "descriptive headings" in the Indiana Code "are intended for organizational purposes only and are not intended to affect the meaning, application, or construction of the statute they precede."  IND. CODE § 1-1-1-5(f).  More importantly, however, the statute clearly delineates the Secretary's statutory responsibilities and cannot be characterized as a provision simply elucidating the purpose of the chapter.

[4]    The State appears to assert that Indiana Code § 3-12-5-1(d)(2) only applies to retention votes for the Indiana Supreme Court, Court of Appeals, and Tax Court.  (See State's Br., at 11 [erroneously citing Indiana Code § 5-12-5-1]).  Given the statute's reference to a justice or judge "retained or removed," this may be so.  However, the difference is inconsequential insofar as Indiana Code § 3-12-5-7 bestows unto the Secretary the responsibility for certifying victorious candidates even for local offices (or at least those requiring a declaration of candidacy, which includes judges, see IND. CODE § 3-8-2-5(4)(A)).

[5]    The Secretary's role in advising and instructing local election officials on election administration is also manifested by the Secretary's own manual.  See Indiana Secretary of State, Election Administrator's Manual, at 6, available at http://www.in.gov/sos/elections/files/2012_Election_Administrators_Manual_Draft_Final__11-16-11_.pdf (last visited Feb. 11, 2013).

the state's "chief election official" is a proper defendant. Regardless, the State's arguments to the contrary are unavailing.

a. The Secretary's duties under Indiana law render her a proper party

"The Secretary's argument is at odds with numerous cases in which plaintiffs have sued secretaries of state when challenging voter registration laws even though states commonly delegate . . . responsibilities to county officials." *Voting for America, Inc. v. Andrade*, __ F. Supp. 2d __, No. G-12-44, 2012 WL 3155566, at *10 (S.D. Tex. Aug. 2, 2012). Thus, under similar statutory schemes, numerous courts have determined state secretaries of state to be proper defendants in challenges to election laws. For instance, in *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011), the plaintiffs challenged a Georgia nepotism statute "that preclude[d] relatives of certain employees of a school system from serving as members of that district's board of education." *Id.* at 1316. Addressing the defendants' assertion that, because the Georgia Secretary of State could not "qualify, challenge or certify candidates for local boards of education . . . he [wa]s not a proper party" to the action, the Eleventh Circuit held as follows:

> Although the Secretary of State cannot directly qualify or challenge candidates for local boards of education or certify the results of those elections, as a member and the chairperson of the State Election Board, he has both the power and the duty to ensure that the entities charged with those responsibilities comply with Georgia's election code in carrying out those tasks. . . . [H]is power by virtue of his office sufficiently connect[s] him with the duty of enforcement to make him a proper party to a suit of the nature of the one now before this Court.

*Id.* at 1319. A similar result was reached by the Sixth Circuit in *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), which arose as a challenge to allegedly "non-uniform" and "wholly inadequate" voting systems in Ohio. *Id.* at 466. Although both the Secretary of State and the Governor contended that they were not proper defendants insofar as any alleged errors were the fault of local officials, the court held that "[t]he district court

properly rejected this argument" because "[t]he Secretary of State of Ohio is the state's chief election officer" and "[t]he Governor of Ohio is the state's chief executive officer" such that "[b]oth officials have the authority to control the [local officials] and are proper parties here." *Id.* at 475 n.16.  This case law is the natural consequence of the U.S. Supreme Court's holding that a statute providing that a state official is responsible for the "general supervision" of local officials' administration of state law presents a sufficient nexus to the alleged violation so as to render the state official a proper party.  *See Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986).[6]

Indiana cases are not to the contrary.  For instance, in *Indiana Democratic Party v. Rokita*, 375 F. Supp. 2d 788 (S.D. Ind. 2005), Indiana's Secretary of State argued that he was not a proper defendant in a constitutional challenge to the requirement that most voters show a photo identification before being permitted to cast an in-person ballot.  *Id.* at 789.  While this Court (through Judge Barker) indicated that it appeared that the Secretary "ha[d] no direct role in enforcing the" statute, it proceeded to note as follows:

> However, that [then-Secretary] Rokita, as Indiana Secretary of State, is the state's chief election official for all purposes, is broadly charged with performing all ministerial duties related to the administration of elections by the state, and serves as one of the three members of the Indiana State Recount Commission makes us less certain that he has no role in this litigation.

*Id.* (internal parentheticals omitted).  Ultimately, Judge Barker determined that the issue need not be reached insofar as local officials were also named as defendants, and the state itself had intervened to defend the constitutionality of the statute.  However, the notion that the Secretary is a proper party in a challenge to a state statute governing elections—even if primarily enforced at

---

[6] Numerous other federal courts have reached similar conclusions on the basis of statutes generally establishing the Secretary of State's status as a state's "chief election officer."  *See, e.g.*, *Missouri Protection & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007); *Brooks v. Gant*, No. 12-5003, 2012 WL 4482984, at *6 & n.10 (D.S.D. Sept. 27, 2012); *Am. Broad. Cos., Inc. v. Ritchie*, No. 08-5285, 2011 WL 665858, at *3 (D. Minn. Feb. 14, 2011); *Minnesota Majority v. Mansky*, No. 10-4401, 2010 WL 4450798, at *3 (D. Minn. Nov. 1, 2010); *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1267–68 (W.D. Wash. 2006).

the local level—is underscored by the fact that the Indiana Supreme Court reached the merits of a subsequent state-constitutional challenge to the voter identification statute in a case in which the Secretary was the *only* defendant. *See League of Women Voters of Indiana, Inc. v. Rokita*, 929 N.E.2d 758 (Ind. 2010). This recent jurisprudence follows on the heels of nearly a century's worth of Indiana case law permitting actions against the Secretary in matters pertaining to elections. *See, e.g.*, *State ex rel. Handley v. Superior Court of Marion County*, 238 Ind. 421, 151 N.E.2d 508, 510 (1958) (action seeking to direct Secretary to declare that a declaration of candidacy was void); *Harrison v. Alexander*, 224 Ind. 450, 68 N.E.2d 784, 785 (1946) (action against Secretary challenging the election date for the judgeship of the Lake Juvenile Court); *State ex rel. Custer v. Schortemeier*, 197 Ind. 507, 151 N.E. 407, 408 (1926) (action seeking writ of mandamus against Secretary requiring him to accept certain declarations of candidacy and to place names on the election ballot); *State v. Jackson*, 192 Ind. 497, 137 N.E. 51, 51 (1922) (action to compel Secretary to certify individual's name to the circuit court clerk as a candidate for judge of the Marion Superior Court).[7]

> b. Even were the Secretary's duties merely ministerial—which they are not—she would still be a proper party

The State ultimately admits that the Secretary does administer portions of the challenged scheme to the extent that she is responsible for certifying election results. (State's Br., at 11). However, it contends that the mandatory nature of the statutory scheme—and the Secretary's purportedly "ministerial" role therein—immunizes her from suit. Even were the Secretary's duties merely "ministerial," which they most assuredly are not (she is, after all, Indiana's "chief election official"), the State's argument is erroneous. That a governmental official "could not

---

[7]    The Secretary is also routinely named as a party in federal-court actions challenging aspects of Indiana's election laws. *See, e.g.*, *Paul v. State of Ind. Election Bd.*, 743 F. Supp. 616, 617–18 (S.D. Ind. 1990) (action challenging constitutionality of Indiana's complete prohibition on write-in voting); *Stout v. Bottorff*, 249 F. Supp. 488, 489 (S.D. Ind. 1965) (action challenging reapportionment plan).

exercise discretion does not necessarily bar an action against him [or her]." *Peterson v. Lacabe*, No. 10-cv-00059, 2010 WL 4220024, at *4 (D. Colo. Oct. 20, 2010) (citing *Finberg v. Sullivan*, 635 F.2d 50, 54 (3d Cir. 1980) (*en banc*)).  Rather, "[u]nder *Ex Parte Young* the inquiry is not the nature of an official's duties but into the effect of the official's performance of his duties on the plaintiff's rights," and "courts often have allowed suits to enjoin the performance of ministerial duties in connection with allegedly unconstitutional laws." *Finberg*, 635 F.2d at 54 (citing cases).[8]  *See also, e.g.*, *Summers v. Adams*, 669 F. Supp. 2d 637, 653–55 (D.S.C. 2009) (rejecting an official's argument, in a challenge to the contents of state license plates, that he was not a proper party because "his role is limited to the 'ministerial' duty of producing plates"); *Shipley v. First Fed. Savings & Loan Ass'n of Delaware*, 619 F. Supp. 421, 431 (D. Del. 1985) (quoting and citing *Finberg*, 635 F.2d at 54); *Donahue v. Board of Election*, 435 F. Supp. 957, 963 (E.D.N.Y. 1976) (holding that, "[a]lthough the function performed by both officials . . . is seemingly ministerial . . . [s]ince both play a part in the enforcement of the scheme . . . both are clearly proper parties and subject to suit"); *cf. Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) (holding that governmental officials were properly named as defendants when, "although not specifically empowered to ensure compliance with the statute at issue, clearly have assisted or currently assist in giving effect to the [challenged] law").

\*          \*          \*

The State's argument that the Secretary has no role to play in the enforcement of the challenged statutory scheme cannot be squared either with precedent or with the nature of the Secretary's role as Indiana's chief election officer.  Any argument to the contrary is unavailing.

---

[8]     To be sure, both *Peterson* and *Finberg* addressed arguments by municipal defendants that they were not proper parties insofar as their role in enforcing state statutes appeared to be ministerial (and they did not address the applicability of *Monell* and its progeny).  This distinction is inconsequential for present purposes, although it does underscore the fact that the State here is seeking to be relieved of the obligation of defending a constitutional challenge to a state statute.

3. Indiana Election Commission

The State concedes that "the Indiana Legislature has given the responsibilities of administration, certification, and enforcement of Indiana's judicial elections and laws to the Indiana Election Commission" ("Commission"). (State's Br., at 5 [citing, *inter alia*, IND. CODE § 3-6-4.1-14]). This is a necessary concession, for the Commission is statutorily obligated to "[a]dminister Indiana election laws" and "[a]dvise and exercise supervision over local election and registration officers." IND. CODE § 3-6-4.1-14(a)(1), (4).

The State's argument that the Commission is an improper defendant in this case is somewhat confusing: it appears to assert that the Commission cannot be sued because it is obligated to follow Indiana's election rules as written. (*See* State's Br., at 9 ["{T}he Commission can only do what the Legislature has statutorily committed to its limited purview."]). In other words, the State appears to insist that the Commission cannot be said to have caused the plaintiff's constitutional injury simply because it was statutorily required to cause the plaintiff's constitutional injury. Of course, that is the very nature of a constitutional challenge to the enforcement of a state statute: the plaintiff is insisting that, by following the terms of a duly enacted statute, a state official is violating its constitutional rights. *Cf. Ex parte Young*, 209 U.S. 123, 155–56 (1908) ("The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state . . . may be enjoined by a Federal court of equity from such action."). Given the Commission's clear statutory duty to "[a]dminister Indiana election laws," the plaintiff's constitutional injury is certainly traceable to the Commission and the State's argument to the contrary cannot carry the day.

First, and most importantly, the plaintiff has detailed above numerous cases in which a secretary of state's statutory designation as a state's "chief election officer" created a sufficient nexus to the administration of election laws to render him or her a proper party.  If this somewhat generic designation creates this nexus, then certainly the more specific duties to "[a]dminister Indiana election laws" and "[a]dvise and exercise supervision over local election and registration officers" suffice.  Indeed, in *Grizzle v. Kemp*, *supra*, the Eleventh Circuit held that a statutory scheme instilling a state official (there the secretary of state) with "both the power and the duty to ensure that the [local] entities charged with [certain] responsibilities comply with [the] election code in carrying out those tasks" represented a "sufficient[] connect[ion] . . . to make him a proper party."  634 F.3d at 1319.  Here, it is the Commission that is statutorily responsible for both administering Indiana's election laws and for exercising supervision over local election officials.  These duties are indistinguishable from those at issue in *Grizzle*, and the same result must issue.

Nonetheless, the State insists that "[a]dvising local authorities that a statute is not to be enforced" is not within the Commission's purview.  (State's Br., at 9).  In so insisting, the State cites several cases that broadly describe the responsibilities and authority of the Commission.  (*See id.* at 8–9).  In *State ex rel. Welsh v. Marion Superior Court*, 243 Ind. 307, 185 N.E.2d 18 (1962), for instance, the plaintiff sought an order compelling the Commission to reapportion districts for the Indiana General Assembly.  *Id.* at 18–19.[9]  The Indiana Supreme Court held that jurisdiction did not exist insofar as reapportionment did not fall within the Commission's statutory "duty of supervising all elections and administering the election laws of the state."  *Id.* at 20.  In so doing, the court distinguished a case seeking to have the Commission independently

---

[9]     As the State notes, the Commission was previously known as the State Election Board.  (State's Br., at 8).  For clarity and ease of presentation, the term "Commission" is utilized throughout.

reapportion legislative districts from one in which a court was asked to "merely rule[] upon the constitutionality of reapportionment acts[] previously passed by the legislature." *Id.* And, in *Dickinson v. Indiana State Election Bd.*, 740 F. Supp. 1376 (S.D. Ind. 1990), *rev'd*, 933 F.2d 497 (7th Cir. 1991), which is also cited by the State—this Court simply reiterated the holding of *Welsh*: that, although the Commission is empowered to "administer the election laws of the state" it "is not empowered to engage in reapportionment." *Id.* at 1380. The State quotes *Dickinson*'s statement that the Commission "is merely an administrative body created by the legislature and as such has no power either to enact the law or declare a law unconstitutional or unenforceable for any reason." (State's Br., at 9 [quoting *Dickinson*, 740 F. Supp. at 1380]).[10] This quotation is misleading in isolation, however, and the State omits both the sentence before the quotation and the sentence after it: "These provisions [establishing the duties of the Commission] do not supplant the General Assembly's constitutionally decreed responsibility for conducting periodic reapportionments"; and "[w]hile the Board certainly is entitled to its opinion on whether an existing apportionment plan violates voting rights, it is not constitutionally empowered to grant relief." 740 F. Supp. at 1380. Read in context, *Dickinson* says nothing more than did *Welsh*: that reapportionment is not one of the Commission's various responsibilities. This, of course, is not a reapportionment case.[11]

---

[10]     Of course, the plaintiff here is not asking the Commission to "declare a law unconstitutional": it is asking the Court to declare a law unconstitutional and enjoin the Commission from enforcing the unconstitutional law. The Commission's duties to comply with the U.S. Constitution are independent from and supersede its duties to comply with Indiana law. *See* U.S. CONST. art. VI, cl. 2. However, it is certainly noteworthy that the Commission has been statutorily instilled with the duty to promulgate emergency rules "to implement a court order requiring the commission, the election division, or an election board or official to administer an election in a manner not authorized by" Indiana's election laws. IND. CODE § 3-6-4.1-14(a)(2)(A)(i).

[11]     The State also cites the Indiana Supreme Court's decision in *State ex rel. Socialist Labor Party v. State Election Bd.*, 251 Ind. 260, 241 N.E.2d 69 (1968). (*See* State's Br., at 8). Although this case quoted the *Welsh* court's description of the Commission's duties, it did not hold that the Commission was an improper party. *Id.* at 75–76. Rather, the court in *Socialist Labor Party* addressed the merits of the plaintiff's claim that it had been unlawfully excluded from the ballot, holding that mandatory affidavits submitted by the party were faulty (for failure to swear a loyalty oath). *Id.* at 74–75. (Of course, the statute at issue in *Socialist Labor Party* has since been

Rather, this case challenges the constitutionality of a state statute governing the manner in which superior court judges are elected in Marion County.  Even though much of the electoral framework may transpire at the local level, the Commission is statutorily obligated to advise and supervise the local officers and, more generally, to administer Indiana election laws.  IND. CODE § 3-6-4.1-14(a)(1), (4).  Against this statutory backdrop, the State cannot successfully argue that the Commission has no role to play in the administration or supervision of the challenged statutory scheme.  Indeed, this argument is at odds with Judge Barker's decision in *Marion County Committee of Indiana Democratic Party v. Marion County Election Board*, No. 00-1169, 2000 WL 1206740 (S.D. Ind. Aug. 3, 2000), in which the plaintiff challenged a statutory deadline for major political parties to fill certain electoral vacancies:

> The defendants in this case include the Indiana Election Commission and the Secretary of State.  These defendants are each responsible for some part in preparing the general election ballot.  Each must comply with and enforce the deadline in Ind. Code § 3-13-1-7(a). . . .  The election division of the Secretary of State's office is charged with certifying legislative candidates to county election boards no later than August 20, 2000.

*Id.* at *2 (internal parenthetical omitted). Here, too, the Commission's electoral responsibilities render it a proper party.

As with the Secretary, then, it is wholly unsurprising that the Commission (or its predecessor) is routinely named as a defendant in challenges to Indiana's electoral schemes.  *See, e.g.*, *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 443–44 (1974); *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 504 (7th Cir. 1998); *Fulani v. Hogsett*, 917 F.2d 1028, 1029–30 (7th Cir. 1990); *Ogden v. Marendt*, 264 F. Supp. 2d 785, 786–87 (S.D. Ind. 2003); *Marion County Comm. of Ind. Democratic Party v. Marion County Election Bd.*, No. 00-1169, 2000 WL 1206740, at *1 (S.D. Ind. Aug. 3, 2000); *Stewart v. Taylor*, 953 F. Supp. 1047,

---

declared unconstitutional by the U.S. Supreme Court.  *See Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 447–50 (1974).)

1049–50 (S.D. Ind. 1997); *Bradley v. Indiana State Election Bd.*, 797 F. Supp. 694, 695 (S.D. Ind. 1992); *Paul v. State of Ind. Election Bd.*, 743 F. Supp. 616, 617–18 (S.D. Ind. 1990).  With the exception of *Whitcomb* itself—in which the Commission had specifically rejection the Communist Party's application to appear on the ballot, *see* 414 U.S. at 443—each of these cases appears to have relied only on the Commission's general roles in administering election laws and supervising local election officials for it to be named as a party.  Indeed, *Bradley* specifically concerned a challenge under the Voting Rights Act to the statutory scheme for obtaining judgeships on the Lake County Superior Court.  *See* 797 F. Supp. at 695–96.

4. Governor

Finally, the State argues that the Governor is not a proper party to this action, even though he is statutorily responsible for issuing commissions to all judges in Indiana, IND. CODE § 4-3-1-5(4).  (State's Br., at 12–14).  Given this statutory authority, the relief the plaintiff seeks against the Governor is simple: an injunction prohibiting him from issuing commissions to any judges elected under the unconstitutional statutory scheme.  It would seem, therefore, self-evident that he is a proper party, and the State's several arguments to the contrary are unavailing.

First, the State argues that "the right to occupy offices requiring a commission from the [G]overnor does not depend on the issuance of a commission from him."  (State's Br., at 12). The plaintiff concurs that, under Indiana law, a gubernatorial commission is simply "a convenient form of evidence that the title to an elective office has been vested in a person by the votes of the people" and "is not conclusive evidence of anything except its own existence." *Shuck v. Cope*, 136 Ind. 63, 35 N.E. 993, 995 (1893).  To the contrary, the commission itself "is in some respects something like a deed to land, the mere evidence of such title." *Glascock v. Lyons*, 20 Ind. 1, 1863 WL 2091, at *1 (1863).  It does not follow, however, that the issuance of

20

a commission to a would-be judge who has been elected under an unconstitutional scheme is an act that cannot be enjoined.  Nor does it follow that the issuance of a commission—or the declination to issue a commission—is an empty gesture.  For instance, in *Hovey v. State*, 127 Ind. 588, 27 N.E. 175 (1891), the Indiana Supreme Court addressed an occasion in which a governor decided not to issue any commission to the candidate who had received the highest number of votes:

> We think the governor's decision in this matter must be taken as final.  The case is not one where the governor is acting as the member of a board created by legislative enactment in a matter wholly disconnected with his functions as governor of the state, but it is a case where he is required to act as governor.  It is his office as chief executive of the state that gives force and validity to the commission.  He executes it as the governor of the state of Indiana, and whether he derives his power to do so from the constitution of the state or by legislative enactment, without the office of chief executive behind it it is of no validity.

*Id.* at 178–79.  Indeed, if the analogy in *Glascock* between a commission and land deed is apt, it is noteworthy that Indiana courts have repeatedly recognized the authority of courts to enjoin the execution or transfer of a land deed.  *See, e.g.*, *Pfaff v. Terre Haute & I.R. Co.*, 108 Ind. 144, 9 N.E. 93, 93 (1886) (suit to enjoin the execution of a deed); *Hilgenberg v. Board of Comm'rs of Marion County*, 107 Ind. 494, 8 N.E. 294, 294 (1886) (suit to enjoin the issuance of a deed); And in *Beal v. Morton*, 18 Ind. 346, 1862 WL 2001 (1862), the court reached the merits of an action for mandate seeking to compel the Governor to issue a commission.  *Id.* at *1–2. Although a gubernatorial commission may not be necessary to vest in a judge the authority to exercise his or her judicial duties, it is also not a nullity.  At the very least, it constitutes evidence that an individual holds the office for which he or she has been commissioned.  If the plaintiff is

correct on the merits of its constitutional challenge to Indiana Code § 33-33-49-13, then this recognition itself violates the First Amendment and may be enjoined.[12]

The State next argues that this Court may not have jurisdiction to enjoin the Governor from issuing commissions to judges elected under the challenged statutory scheme. (State's Br., at 13–14). Its sole support for this contention is the decision of the district court nearly eight (8) decades ago in *Keogh v. Horner*, 8 F. Supp. 933 (S.D. Ill. 1934). In *Keogh*, the plaintiff sought a writ of prohibition against the governor seeking to prohibit the governor from issuing commissions to Illinois's newly elected congressional representatives as a result of the state's failure to redistrict after 1901. Of course, as the court noted, in order for a writ of prohibition to issue the action to be prohibited "must be judicial or quasi-judicial in nature," *Burnett v. Terrell*, 905 N.E.2d 816, 829 (Ill. 2009) (citation omitted); *Keogh*, 8 F. Supp. at 934, which is a test that the issuance of commissions clearly fails. Moreover, the ultimate holding of the *Keogh* court was premised on "[t]he general rule with reference to the jurisdiction of federal courts . . . as being of limited jurisdiction and without power to exercise any jurisdiction except that which is expressly, or necessarily by implication, conferred by Congress." 8 F. Supp. at 934. Here the plaintiff has clearly invoked this Court's congressionally conferred federal-question jurisdiction, *see* 28 U.S.C. § 1331, to resolve its First Amendment claim brought pursuant to 42 U.S.C. § 1983. The fact that the Illinois statute at issue in *Keogh* did not confer jurisdiction on the federal courts is neither surprising nor relevant to this case, and the distinctions between *Keogh* and this case cannot be appropriately characterized as a "technical distinction . . . without a difference"

---

[12]     The State cites the South Carolina court's recognition in *State ex rel. Coleman v. Lewis*, 186 S.E. 625 (S.C. 1936), that a governor acts "merely ministerially" in issuing a commission. (State's Br., at 13 [quoting *Lewis*, 186 S.E. at 637]). As indicated above, the fact that a government official acts in a ministerial capacity does not immunize him or her from suit under the doctrine of *Ex parte Young*.

(State's Br., at 14): *Keogh* rested its holding on the lack of a statute instilling jurisdiction in the federal courts, and did not otherwise rely on the nature of gubernatorial commissions.[13]

The Governor, too, is a proper party to this action, and the State's arguments to the contrary must be rejected.

## II.  The merits of the plaintiff's constitutional challenge may not be resolved on a motion to dismiss, and the plaintiff has stated a claim upon which relief can be granted

Next, the State argues that the plaintiff has not stated a claim upon which relief can be granted insofar as this action is controlled by the U.S. Supreme Court's decision in *New York State Board of Elections v. Lopez-Torres*, 552 U.S. 196 (2008).  (*See* State's Br., at 20–26).  This case, however, which arose as a challenge to the nomination of judges by party convention, has no applicability to the present circumstances.  The plaintiff has stated a claim upon which relief can be granted.[14]

### A. *New York State Board of Elections v. Lopez-Torres is no bar to the present suit*

---

[13]     *Keogh* was, of course, also decided prior to the U.S. Supreme Court's seminal decision in *Baker v. Carr*, 369 U.S. 186 (1962), which recognized that congressional apportionment schemes may present a judiciable case or controversy.

[14]     The State criticizes the plaintiff for "rais[ing] a purported First Amendment challenge" to Indiana Code § 33-33-49-13 without "proffer[ing] which clause or provision of the amendment provides the appropriate basis for its claim."  (State's Br., at 1 n.1).  Even were this necessary—which it most assuredly is not, *see, e.g.*, *Tolle v. Carroll Touch Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992) ("[A] complaint sufficiently raises a claim even if it points to no legal theory or even if it points to the wrong legal theory as a basis for that claim, as long as 'relief is possible under any set of facts that could be established consistent with the allegations.'") (citation omitted)—the plaintiff's operative complaint makes repeated reference to the manner in which the challenged statute precludes the plaintiff and its members from casting a "meaningful vote" (Amended Compl. for Decl. & Inj. Relief [ECF No. 12], ¶¶ 1, 17–19, 27, 30).  It is well-established that "the First Amendment protects the right to cast a meaningful vote for a candidate of one's choice."  *Rosen v. Brown*, 970 F.2d 169, 176 (6th Cir. 1992) (citing *Dart v. Brown*, 717 F.2d 1491, 1504 (5th Cir. 1983)).

It further deserves mentioned at the outset that the State's reliance on *Lopez-Torres* is somewhat at odds with its standing and immunity arguments.  After all, the state defendant in that case appears to have been named as a party as the result of a general "authority and responsibility for the execution and enforcement of all laws relating the elective franchise."  *Lopez-Torres v. New York State Bd. of Elections*, 411 F. Supp. 2d 212, 242 (E.D.N.Y.) (citation omitted), *aff'd*, 462 F.3d 161 (2d Cir. 2006), *rev'd*, 552 U.S. 196 (2008).  This, of course, is remarkably similar to some of the statutory duties of both the Secretary and the Commission here.

As indicated above, the system for electing judges to the Marion Superior Court is unique in the state, and perhaps in the nation. While each of the major parties conducts a primary election to select its nominees, state statute mandates that each party nominate exactly half of the candidates to be elected at the general election. The general election, therefore, is a mere formality: persons who are not authorized under Indiana law to vote in primary elections or who choose not to do so will *never* have an opportunity to cast a meaningful ballot for a single judgeship on the Marion Superior Court; and even those who do vote in primary elections will only be permitted to cast a meaningful ballot for half of the seats open on the Marion Superior Court. The relationship between this unique system and the far more typical system addressed in *Lopez-Torres* is not readily apparent, and the State's argument lacks merit.

In *Lopez-Torres*, voters and judicial candidates for the Supreme Court of New York challenged the constitutionality of a judicial election system whereby major-party candidates selected their judicial nominees by party convention rather than by open primary election. 552 U.S. at 200–01. These nominees then appeared automatically on the general election ballot, where they could be joined by independent and third-party candidates who submitted timely nominating petitions with a sufficient number of signatures from voters. *Id.* at 201. Following the major parties' refusal to nominate the candidate-plaintiffs, they (as well as voters who supported them) initiated a lawsuit challenging this electoral system, wherein "[t]hey contended that New York's election law burdened the rights of challengers seeking to run against candidates favored by the party leadership, and deprived voters and candidates of their rights to gain access to the ballot and to associate in choosing their party's candidates." *Id.* Of course, this characterization of the issue in *Lopez-Torres* alone casts doubt on the State's assertion that the disposition in that case controls the outcome in this one: although the U.S. Supreme Court

has been clear that the line between a ballot-access case and a meaningful-vote case is somewhat arbitrary, *see, e.g.*, *Bullock v. Carter*, 405 U.S. 134, 143 (1972), the burden on the right to vote in this case is not nearly co-extensive with the burden in *Lopez-Torres*.

Regardless, the U.S. Supreme Court ultimately addressed the plaintiffs' contention that the New York system "d[id] not give them a realistic chance to secure the party's nomination" and that "the [party] leadership effectively determines the nominees" as follows:

> [T]his says nothing more than that the party leadership has more widespread support than a candidate not supported by the leadership. No New York law compels election of the leadership's slate—or, for that matter, compels the delegates elected on the leadership's slate to vote the way the leadership desires. And no state law prohibits an unsupported candidate from attending the convention and seeking to persuade the delegates to support her. Our cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements. Here respondents complain not of the state law, but of the voters' (and their elected delegates') preference for the choices of the party leadership.
>
> . . . None of our cases establishes an individual's constitutional right to have a "fair shot" at winning the party's nomination. And with good reason. What constitutes a "fair shot" is a reasonable enough question for legislative judgment, which we will accept so long as it does not too much infringe upon the party's associational rights. . . . Party conventions, with their attendant "smoke-filled rooms" and domination by party leaders, have long been an accepted manner of selecting party candidates. . . . Selection by convention has never been thought unconstitutional, even when the delegates were not selected by primary but by party caucuses.

*Id.* at 205–06 (internal citations omitted). Nor did the Court find compelling the plaintiffs' contention that the fact that some general election races were "uncompetitive" rendered the nomination process unconstitutional. *Id.* at 207–08. After all, the uncompetitive nature of general-election races resulted from voters' approval "of the position and candidates that the [favored] party regularly puts forward," and the First Amendment "does not call on the federal courts to manage the market by preventing too many buyers from settling upon a single product." *Id.* at 208.

In *Lopez-Torres*, therefore, the major parties selected candidates—albeit through nominating convention rather than primary election—to *compete* with one another at a general election. Therefore, when voters proceeded to the polls on election day, they were given the opportunity to choose among judicial candidates appearing on the general-election ballot and, when they did so, their vote *mattered*. Although, as a practical matter, some races may have been uncontested, this resulted not from the electoral scheme itself but from the natural consequences of electoral politics: the Republican Party may not put forth a candidate for office in a heavily Democratic district, or vice versa, simply because of an assessment as to the candidate's chance of victory. Two important factors distinguish this case from *Lopez-Torres*: first, and most compellingly, the statutory scheme here does not permit for a contested general election in the manner permitted by the New York scheme at issue in *Lopez-Torres*; and second, the emphasis in *Lopez-Torres* on party associational rights renders the Court's holding in that case inapplicable to the case at bar, where these rights are not at issue.

Notwithstanding these distinctions, the State argues at length that Indiana's scheme of electing judges to the Marion Superior Court is saved by the fact that a third-party or independent candidate may petition to appear on the general-election ballot (which has occurred only once since this electoral scheme was adopted). (State's Br., at 23–26). Initially, Justice Kennedy was clear in his concurrence that even this alternative does not exempt a system "from all [First Amendment] scrutiny." 552 U.S. at 211 (Kennedy, J., concurring in the judgment). The application to this case of the appropriate scrutiny is addressed below. More importantly for present purposes are the precise limits that the challenged statute imposes on a voter's ability to elect persons to the Marion Superior Court. Judicial elections in Marion County proceed in two (2) cycles: one (1) in which sixteen (16) judgeships are selected, and one (1) in which twenty

26

(20) judgeships are selected.  *See* IND. CODE § 33-33-49-13(c).  During each cycle, each major political party nominates candidates to fill precisely half of the seats to be filled at the general election.  *See* IND. CODE § 33-33-49-13(b).  For ease of presentation, the cycle in which twenty (20) judges are elected (and ten [10] candidates from each major party nominated) is utilized herein.

In 2012, twenty (20) judicial candidates appeared on the ballot for the Marion Superior Court—ten (10) nominated by the primary voters of each party—to fill twenty (20) open seats. A voter with allegiance to the Democratic Party, therefore, will *never* have an opportunity to cast a ballot for a Democrat to fill ten (10) of the seats on the Marion Superior Court (for a Democratic candidate must be selected at the primary election and cannot petition to appear on the general election ballot, *see* IND. CODE § 3-8-6-1).  Unlike in *Lopez-Torres*, where this may have resulted from candidates' decisions not to run in certain districts, *see* 552 U.S. at 208, here this rudimentary fact results from the operation of the challenged statute.  This would certainly be a different case is the major political parties were permitted to nominate candidates to fill each seat on the Marion Superior Court but, for whatever reason, only ten (10) candidates came forward to seek each party's nomination.  In that instance, the effect on a voter's right to cast a meaningful ballot would result not from a state's statutory electoral scheme but from candidate self-selection—as where no Democratic candidates chooses to run in a heavily Republican district.  But, again, that is not this case.

Similarly, even where an independent or third-party candidate appears on the general-election ballot, the result is to permit a voter to cast a ballot that affects exactly one (1) seat on the Marion Superior Court: when twenty-one (21) candidates appear on the ballot, a ballot selecting twenty (20) potential judges only meaningfully impacts the election for the last

judgeship selected.  Thus, the potential for independent and third-party candidates to appear on the ballot does not alleviate the burden imposed by Indiana's electoral scheme: when a person proceeds to the ballot box on Election Day, he or she must be afforded an opportunity to vote for the judge who will fill Marion Superior Court #1, the judge who will fill Marion Superior Court #2, and so forth.  Indiana law does not permit this.  The New York law at issue in *Lopez-Torres* did.[15]

The State's reliance on *Lopez-Torres* is therefore unpersuasive, and the Court's holding in that case only underscores the distinctions between the electoral scheme at issue there and the one that is challenged in this case.

### B.  The State fails to apply the appropriate constitutional scrutiny to this case

#### 1.  The "sliding-scale" approach to evaluating the constitutionality of electoral regulations

Ultimately, the State's most noteworthy shortcoming in seeking dismissal of this action is that it does not even attempt to place the challenged statute into the framework of proper constitutional scrutiny.  This, too, is curious, for it repeatedly references Justice Kennedy's concurrence in *Lopez-Torres* without noting the language indicating that even the New York scheme there at issue is not exempt from this scrutiny.  552 U.S. at 211 (Kennedy, J., concurring in the judgment).  The appropriate level of scrutiny is derived from the U.S. Supreme Court's decision in *Burdick v. Takushi*, 504 U.S. 428 (1992), which is quoted at length given its foundational importance to this case:

> It is beyond cavil that "voting is of the most fundamental significance under our constitutional structure."  It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are

---

[15]        The State also cites *Dibbs v. Mazzarelli*, No. 09-Civ-5938, 2010 WL 3466920 (S.D.N.Y. Aug. 30, 2010). (*See* State's Br., at 23).  In *Dibbs*, a *pro se* voter brought suit to challenge the constitutionality of the exact same system that had been upheld in *Lopez-Torres*.  2010 WL 3466920, at *1–2.  The State's reliance on *Dibbs* therefore adds nothing to its argument.

absolute. . . .   [T]he Court . . . has recognized that States retain the power to regulate their own elections.   Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."

Election laws will invariably impose some burden upon individual voters. . . . Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently. . . .

Instead . . . a more flexible standard applies.   A court considering a challenge to a state election law must weight "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.   Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance."   But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Id.* at 433–34 (internal citations omitted).   This standard has been characterized as a "sliding scale" approach to election-law challenges, *see, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 210 (2008) (Souter, J., joined by Ginsburg, J., dissenting); *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006), in which "the court must carefully measure the burdens a state regulation imposes on constitutional rights and the state interests that may justify the regulation," *Marion County Comm. of Ind. Democratic Party v. Marion County Election Bd.*, No. 00-1169, 2000 WL 1206740, at *5 (S.D. Ind. Aug. 3, 2000).

Initially, it is not altogether clear that this balancing test may be resolved on a motion to dismiss (the plaintiff, after all, has properly pled that "[t]here is no justification for the

29

impingement on the right to cast a meaningful ballot that Indiana Code § 33-33-49-13 creates," Amended Compl., ¶ 20).  Regardless, the proper application of this standard to the present case reveals that the State cannot meet the heightened scrutiny demanded by *Burdick*'s "sliding-scale" approach to justify the challenged scheme.  However, even were deferential scrutiny applicable under *Burdick*, this scheme is still unconstitutional as it lacks even a rational justification.

2.   The challenged statute's effect on the constitutional rights of voters

First, the statute's impact upon the rights of voters is severe.  The manner and severity of this impact is described above, and so is only reiterated here.  When a voter appears at the polls to cast a ballot for judges on the Marion Superior Court, only two (2) things may occur: either the voter appears at the primary election (which not all voters are eligible to do, *see* IND. CODE § 3-10-1-6), in which case she will cast a meaningful ballot for ten (10) of the twenty (20) seats to be filled; or else the voter appears for the first time at the general election (whether because she chose not to vote at the primary or was ineligible to do so), in which case she does not cast a meaningful ballot for a single seat to be filled.  That voter will then be represented in the judicial branch by twenty (20) judges, at least half of which she was statutorily prohibited from playing a role in electing.  This disenfranchisement is, of course, a severe burden on the right to vote, for "[i]mplicit in the right to vote is the right to have that vote counted."  *Partnoy v. Shelley*, 277 F. Supp. 2d 1064, 1073 (S.D. Cal. 2003); *see also, e.g.*, *Davis v. Bandemer*, 478 U.S. 109, 124 (1986) ("[E]veryone ha[s] the right to vote and to have his vote counted.").

As indicated repeatedly, judicial elections in Marion County appear to be undertaken in an entirely unique manner, and there is therefore no case law of which the plaintiff is aware directly addressing the constitutionality of such a system.  However, guidance can be taken from jurisprudence that has addressed other unusual electoral schemes.  For instance, in *Ayers-*

*Schaffner v. Distefano*, 37 F.3d 726 (1st Cir. 1994), the First Circuit declared unconstitutional a municipality's attempt to condition the right to vote in a second (curative) election on an individual's having voted in the earlier, defective, election.  *Id.* at 727–28.  Held the court: "[T]he case is hardly worthy of discussion.  The right to vote 'is of the most fundamental significance under our constitutional structure,' and depriving a qualified voter of the right to cast a ballot because of failure to vote in an earlier election is almost inconceivable."  *Id.* at 727 (quoting *Burdick*, 504 U.S. at 433).  In *Partnoy v. Shelley*, *supra*, the court similarly invalidated a statutory requirement that no vote cast in California's gubernatorial recall election be counted unless the voter also voted on the recall question itself.  Applying *Burdick*'s "sliding-scale" approach, the court held that, "[b]ecause [the statute] will effectively bar Plaintiffs from having their otherwise valid vote . . . counted, or compel them to vote on a separate issue upon which they do not wish to vote," the statute "effects a severe restriction on their Constitutional right to vote."  277 F. Supp. 2d at 1075.  In so holding, the *Partnoy* court also rejected reliance on *Burdick*'s (and, by extension, *Lopez-Torres*'s) emphasis on ballot-access requirements: "Plaintiffs are not seeking to have any particular candidate put on the ballot.  Nor is this an issue of timing.  Plaintiffs' rights will be affected to the same degree regardless of when Plaintiffs seek to assert them."  *Id.*

Another unusual voting scheme was addressed in *Dudum v. City & County of San Francisco*, No. C-10-00504, 2010 WL 3619709 (N.D. Cal. Sept. 9, 2010), where the plaintiffs challenged a "restricted" instant runoff system employed in certain municipal elections whereby voters were required to rank up to three (3) candidates by order of preference:

> Once the polls close, the Departments counts all first choice rankings.  If a candidate receives a majority of votes, he or she wins the election.  If not, the candidate who received the fewest first choice rankings is eliminated.  The second choice rankings of voters who supported the eliminated candidate are then

redistributed and the Department "retabulates" all votes.  If no candidate with majority support emerges, the process repeats.

*Id.* at *2 (internal parenthetical omitted).  In raising a First Amendment challenge, the plaintiffs drew attention to the fact that, under this system, when more than four (4) candidates run in an election it is possible that a voter will rank the three (3) least popular candidates; thus, if no candidate receives majority support after three (3) rounds, this voter's candidates are eliminated and his or her ballot is thereby "exhausted."  *Id.*  After articulating the *Burdick* "sliding-scale" standard, *id.* at *7, the court concluded that even those voters who had their ballots "exhausted" were afforded an opportunity to meaningfully impact the election:

> Where a ballot is exhausted, it means the voter's lowest-ranked, longest surviving candidate lost the election.  It does not mean the voter's preferences were arbitrarily ignored or disregarded.  Just like the voter whose first-choice candidate finished second, the voter behind an exhausted ballot still participates and "affects" the election as much as any voter who participates in, but in the end fails to select a winning candidate, in a plurality system.

*Id.* at *11.  The key, in finding that the electoral scheme did not severely burden individuals' right to the franchise, was that the scheme did not "unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election."  *Id.* at *8 (quoting *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008)).  As seems self-evident, "a vote for a losing candidate is not the same as disenfranchisement."  *Id.* at *11.

By contrast, the plaintiff's members in the case at bar are simply never afforded an opportunity to cast a meaningful general-election ballot for the Marion Superior Court.  The right of some, but not all, persons to cast a meaningful ballot at the primary election is inadequate under any interpretation of precedent, and the State does not argue to the contrary.  The manner in which the challenged statute burdens the plaintiff's First Amendment freedoms is severe.

3.   The State's potential justifications for the challenged statute

32

Moreover, the State's interest in its unique scheme for electing judges to the Marion Superior Court is minimal at best.  Although the plaintiff is not necessarily in a position to provide the State's justifications for this system, two (2) potential rationales are apparent: the avoidance of voter confusion, and the maintenance of political neutrality on the Bench.  Even a cursory examination of these interests reveals that the challenged statute may not pass the most deferential scrutiny, let alone the heightened scrutiny mandated by the statute's severe impingement on the right to vote.

First, the State may assert that the statutory scheme is necessary in order to limit the number of candidates for judgeships on the general election ballot in order to avoid the voter confusion that might result from having to learn about more than twenty (20) candidates.  Of course, this is an argument that could be employed to limit the number of candidates permitting to run in any election, and one that does not appear to have been successfully employed.  Rather, the cases in which "voter confusion" has been recognized as a legitimate governmental objective have so recognized in the context of requirements designed to ensure that a candidate possesses a minimal level of support or seriousness before appearing on the ballot.  *See, e.g.*, *American Party of Texas v. White*, 415 U.S. 767, 782 n.14 (1974) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot.") (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)); *Lubin v. Panish*, 415 U.S. 709, 715 (1974) ("That function [assuring that the fragmentation of voter choice is minimized] is served, not frustrated, by a procedure that tends to regulate the filing of frivolous candidates.  A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the

seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process.").

This rationale, however, cannot serve to justify a system that takes the general election completely out of the hands of the voters.   In both *White* (which concerned third-party petitioning requirements for ballot access) and *Lubin* (which concerned a mandatory filing fee for candidates), reference to "voter confusion" was used as short-hand for simply ensuring that candidates were actually serious about gaining the office sought.   There is nothing in Indiana Code § 33-33-49-13 that can be said to even tangentially relate to the seriousness or frivolousness of a particular candidacy.   Indeed, it is certainly noteworthy in this regard that Indiana law does not limit the number of major-party candidates who may compete in primary elections for the Marion Superior Court.  *Cf., e.g.*, *Jones v. McGuffage*, __ F. Supp. 2d __, No. 12-C-09997, 2013 WL 432631, at *12 (N.D. Ill. Feb. 1, 2013) ("[T]he State was comfortable allowing 17 Democrats and 5 Republicans to crowd the primary ballots, so the Court will not overstate the obviously fleeting importance of this interest [in limiting the number of candidates on the general election ballot] to the State.").   However far a purported governmental interest in limiting "voter confusion" extends, it does not extend so far as to justify a system designed to render the general election non-competitive.

Nor may the State's second potential rationale—that in maintaining political neutrality on the Marion Superior Court—justify the burden that it has placed on voters in Marion County. Initially, any reliance on this rationale is immediately suspect given that counties throughout Indiana that elect judges (apart from Marion County) do so without the unique scheme at issue in this case.  To be sure, the challenged statute has the effect of apportioning half of the judgeships on the Marion Superior Court to judges associated with the Democratic Party and the other half

34

to judges associated with the Republican Party.  But this does not mean that it advances any supposed interest in maintaining political neutrality on the Bench.  After all, cases are not assigned generically to the Marion Superior Court, to be voted on and overseen by a complete panel of elected judges, but are assigned to one specific court and one specific judge.  *Cf., e.g.*, *Hatcher v. Consolidated City of Indianapolis*, 323 F.3d 513, 519 (7th Cir. 2003) (describing, in a different context, the importance and purposes underlying the assignment of federal cases to "individual judge[s]").  This judge, elected as a member of one of the major political parties, is no more politically neutral than is any other individual elected through partisan election.

More fundamentally, however, it is not even clear that the supposed interest in "maintaining political neutrality" is entitled to any weight whatsoever, even if the interest were advanced by the challenged statute.  There is, of course, no federal constitutional requirement that judges (or any other local officials) be elected, nor is there any such requirement that judicial elections be partisan: the State would not run afoul of the First Amendment were judgeships on the Marion Superior Court to be appointed positions or to be chosen by non-partisan election.  Both of these systems could conceivably remove the political element that comes with any partisan election.  However, having decided that judges on the Marion Superior Court should identify with political parties, the State may not now claim an interest in maintaining political neutrality.

*          *          *

Accordingly, the proper legal test reveals that the challenged statute is unconstitutional.

## CONCLUSION

For the foregoing reasons, the State's Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) (ECF No. 18), must be denied.

35

/s/ *Gavin M. Rose*
Gavin M. Rose
No. 26565-53


/s/ *Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN  46202
317-635-4059
Fax: 317-635-4105
kfalk@aclu-in.org
grose@aclu-in.org

*Attorneys for the Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2013, a copy of the foregoing was filed electronically with the Clerk of this Court.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

Dino L. Pollock
Kenneth L. Joel
Deputy Attorneys General
Dino.Pollock@atg.in.gov
Kenneth.Joel@atg.in.gov

/s/ *Gavin M. Rose*
Gavin M. Rose
Attorney at Law