UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:12-cv-01603-RLY-DML |
| | ) | |
| INDIANA SECRETARY OF STATE in | ) | |
| her official capacity, | ) | |
| Individual Members of the Indiana Election | ) | |
| Commission, in their official capacities, | ) | |
| Governor of the State of Indiana, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON STATE DEFENDANTS' MOTION TO DISMISS PURSUANT
TO RULE 12(b)(1) AND 12(b)(6)**

Plaintiff, Common Cause of Indiana, is a non-profit, non-partisan public interest

group that advocates for a number of causes, including the elimination of barriers to

voting.  Common Cause, whose membership in Marion County is approximately 250,

raises a First Amendment challenge under 42 U.S.C. § 1983 to the constitutionality of the

unique process by which judges are elected to the Marion Superior Court, as provided in

Indiana Code Section 33-33-49-13.  Defendants, the Indiana Secretary of State, in her

official capacity; the individual members of the Indiana Election Commission, in their

official capacities; and the Governor of the State of Indiana, in his official capacity, move

to dismiss Plaintiff's Amended Complaint under Rules 12(b)(1) for lack of standing and

1

Eleventh Amendment immunity, and under 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.  For the reasons explained below, the court **DENIES** Defendants' motion.

## I.  Background

Briefly, the challenged statute provides that, through the primary election process, "a political party may nominate" not more than half of the candidates eligible to sit on the Marion Superior Court.  *Id*. § 33-33-49-13(b).  The names of the party candidates nominated and certified to the Marion County election board are then placed on the general election ballot.  *Id*. § 33-33-49-13(c).  The candidates "run at large for the office of judge of the court and not as a candidate for judge of a particular room or division of the court."  *Id*. § 33-33-49-13(a).  According to Common Cause, because the nominees from the Democratic and Republican parties equal the exact number of open seats, the nominees are "automatically elected"[1]  to the Marion Superior Court in the general election.  (Amended Compl. ¶ 17).

In its Amended Complaint, Common Cause alleges that this statutory scheme has the effect of dramatically curtailing the ability of eligible Marion County voters to cast a meaningful vote for candidates for Marion Superior Court in the general election.  (*Id*. ¶¶ 17-19).  Common Cause seeks an injunction "prohibiting defendants from enforcing Indiana Code Section 33-33-49-13"; an injunction "ordering the Commission to advise

---

[1] Although the statute provides that a candidate wishing to run for judgeship on the Marion Superior Court as an independent or third-party candidate may do so by petitioning for candidacy under Indiana Code Section 3-8-6-1, *et seq*., no candidate has done so since 2002.  (Amended Compl. ¶ 16).

local election authorities that [the statute] is not to be enforced"; and an injunction prohibiting the Governor "from awarding any commissions to persons elected as judges in Marion County pursuant to [the statute]."  (*Id.*, Request for Relief).

## II.      Standard of Review

Rule 12(b)(1) requires dismissal if the court lacks subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  The court accepts the well-pleaded allegations from the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Estate v. Eiteljorg ex. rel. Eiteljorg v. Eiteljorg*, 813 F.Supp.2d 1069, 1073-74 (S.D. Ind. 2011) (citing *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002)).  "When considering a motion to dismiss under Rule 12(b)(1), the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  *Id.* (quoting *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993)).

When deciding a Rule 12(b)(6) motion to dismiss, the court must accept all well-pleaded facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Kirk v. City of Kokomo*, 772 F.Supp.2d 983, 988 (S.D. Ind. 2011) (citing *Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir. 1991)).  Factual allegations in the complaint must be sufficient to raise the possibility of relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Detailed allegations are not required, but the plaintiff must allege facts that state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

3

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## III. Discussion

### A. Standing

Defendants maintain that Common Cause does not have Article III or prudential standing to seek injunctive relief in federal court. Article III standing enforces the Constitution's case-or-controversy requirement, as outlined in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992). *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007). Prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Id.* (internal quotations and citation omitted). The court begins its discussion with Article III standing.

#### 1. Article III Standing

Article III standing has three elements: "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Id.* (quoting *Lujan*, 504 U.S. at 560-61). Defendants assume, for purposes of this motion, that Common Cause could show that some of its members have suffered injury in fact. The final two issues – causation and redressability – are in dispute. The element of causation requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (citations and internal quotations omitted). The element of redressability requires that "it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision."

4

*Id.* (citation and internal quotations omitted).  Defendants' primary argument is that neither the Secretary of State, the Indiana Election Commission, nor the Governor, have the duty nor the responsibility prescribed by law to enforce or otherwise negate the challenged statute.  Defendants' argument requires a basic understanding of Indiana's statutory framework regarding elections in Indiana.  That discussion follows.

### a.  Statutory Framework

By statute, the Secretary of State "is the state's chief election official."  IND. CODE § 3-6-3.7-1.  Among other duties, the Secretary is responsible for "perform[ing] all ministerial duties related to the administration of elections by the state," *id.* § 3-6-4.2-2(a), for "certify[ing] to the governor the candidate receiving the highest number of votes for each office," *id.* § 3-12-5-7, and specifically for certifying "[e]ach justice or judge retained or removed" at an election, *id.* § 3-12-5-1(d)(2).   The Secretary also serves as one of three members of the Indiana State Recount Commission.  *Id.* § 3-12-10-2.1.

The Indiana Election Commission is a bipartisan commission consisting of four members appointed by the Governor. *Id.* § 3-6-4.1-2.  The Commission is statutorily obligated to "administer Indiana election laws," "[g]overn the fair, legal and orderly conduct of elections," and "[a]dvise and exercise supervision over local election and registration officers."  *Id.*  § 3-6-4.1-14(a)(1), (2), (4).  Among its responsibilities, the Commission enforces campaign finance laws, *id.* § 3-6-4.1-24(a)(1) (administer and enforce campaign finance laws); investigates suspected election law violations and, if appropriate, refers those matters to the Attorney General of Indiana or the appropriate prosecuting attorney, *id.* § 3-6-4.1-21; conducts hearings, *id.* § 3-6-4.1-25; approves

standardized election forms for use in Indiana, *id.* § 3-6-4.1-14(a)(3); determines whether a challenger's name may appear on the ballot, *id.* § 3-8-8-4, 5; and approves and certifies electronic voting machines for use in Indiana, *id.* § 3-11-7.5-1, 3-11-7.5-4(d).

The Office of the Secretary of State contains the Indiana Election Division.  *Id.* § 3-6-4.2-1.  It assists the Commission and the Secretary of State in the administration of the Indiana election laws. *Id.* § 3-6-4.2-2.  It is statutorily obligated to, *inter alia*, implement the state plan in accordance with the requirements of Help America Vote Act ("HAVA"), *id.* § 3-6-4.2-12.1-1;  "instruct" county election boards "as to their duties under" Title 3 of the Indiana Code (governing elections) and federal law (HAVA and National Voter Registration Act ("NAVA")), *id.* § 3-6-4.2-14(a);  maintain maps and legal descriptions of all precincts in Indiana, *id*. § 3-6-4.2-12(1); maintain media watcher cards, *id.* § 3-6-4.2-12(3); certify the name and place of residence of each judicial candidate nominated for election to local officials before a general election, *id.*  § 3-8-7-16(b); provide information regarding voter registration procedures and absentee ballot procedures to absent uniformed voters and overseas voters, *id*. § 3-6-4.2-12(5); and, in conjunction with the county election board, print election ballots, *id.* § 3-8-7-25.

Each county in Indiana, except for Lake County and Tippecanoe County, has a county election board.  The county election board is comprised of three members: the circuit court clerk and two members appointed by the clerk from each major political party.  *Id*. § 3-6-5-2; *see also id.* § 3-6-5.2 *et al.* (Lake County) & § 3-6-5.4 *et al.*(Tippecanoe County). The duties of the county election board are, *inter alia*, to "conduct all elections and administer the election laws within the county," prepare and

distribute all ballots to the precincts in the county; and implement NVRA for the county. *Id*. § 3-6-5-14(a).  Like the Commission, a county election board may investigate suspected election law violations and may refer matters to the attorney general or county prosecuting attorney.  *Id*. §§ 3-6-5-31, 32.

Finally, the Governor, as the chief executive of the State of Indiana, is statutorily responsible for issuing commissions to all judges in Indiana. *Id*. § 4-3-1-5(4).

### b.    The Secretary

Notwithstanding the fact that the Secretary is the "chief election officer" in the State of Indiana, Defendants argue that only "[t]he county election boards are enlisted with the requisite powers to administer and enforce local judicial elections."  Thus, according to Defendants, Common Cause's injury cannot be fairly traced to the action or inaction of the Secretary because Title 3 of the Indiana Code ultimately delegates the authority to conduct elections  and administer Indiana election law to the county election board (in this case, the Marion County Election Board).  Defendants also argue that enjoining the Secretary would not redress Common Cause's injuries because she has no role in the enforcement of the challenged statute.

Title 3 of the Indiana Code reflects a delegation of authority from the state to the county level with respect to the administration and enforcement of Indiana election law. To say, therefore, that the Marion County Election Board is the only entity that possesses any power with respect to the administration and enforcement of the election of Marion Superior Court judges is simply inconsistent with Title 3.  Indeed, the Marion County Election Board is *duty-bound* to follow Indiana election statutes passed by the Indiana

7

legislature, including Indiana Code § 33-33-49-13.  It has no independent power to do otherwise.

The idea that the Secretary is a proper party in a constitutional challenge to a state statute governing elections is supported by Indiana case law, at least at the motion to dismiss stage.  For example, in *Indiana Democratic Party v. Rokita*, 375 F.Supp.2d 788 (S.D. Ind. 2005), Indiana's Secretary of State argued, in support of his motion to dismiss, that he was not a proper defendant in a constitutional challenge to Indiana's voter identification law.  *Id.* at 789.  While the court indicated that it appeared the Secretary "ha[d] no direct role in enforcing the [statute]", it proceeded to note as follows:

> However, that [then-Secretary] Rokita, as Indiana Secretary of State, is the
> state's chief election official for all purposes, is broadly charged with
> performing all ministerial duties related to the administration of elections
> by the state, and serves as one of the three members of the Indiana Recount
> Commission makes [the court] less certain that he has no role in this
> litigation.

*Id.* (internal parentheticals omitted).  Ultimately, the court took the matter under advisement, as local officials were also named as defendants, and the state itself had intervened to defend the constitutionality of the statute.  *Id.*  The idea that the Secretary is a proper party in a challenge to a state statute governing elections – even if primarily enforced at the local level – is also supported by the fact that the Indiana Supreme Court reached the merits of a subsequent state constitutional challenge to the voter identification statute in a case in which the Secretary was the *only* defendant.  *League of Women Voters of Indiana, Inc. v. Rokita*, 929 N.E.2d 758 (Ind. 2010).  *See also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008) (affirming the

8

district court's finding that the Secretary of State and Governor were proper parties to challenge allegedly inadequate voting systems in Ohio, reasoning that the Secretary "is the state's chief election officer *ex officio*" and "[t]he Governor is the state's chief executive officer" such that "[b]oth officials have the authority to control the [local officials] and are proper parties here"); *Voting for America, Inc. v. Andrade*, 888 F.Supp.2d 816, 828-29, 32) (S.D. Tex. 2012) (denying Secretary's motion to dismiss for lack of standing, noting that her "argument is at odds with numerous cases in which plaintiffs have sued secretaries of state when challenging voter registration laws even though states commonly delegate voter registration responsibilities to county officials"). The court therefore finds, at this stage of the litigation, that the Secretary's role as Indiana's chief election officer sufficiently connects the Secretary with the duty of enforcement to make her a proper party to this suit.

### c.   The Indiana Election Commission

Defendants argue the Commission has no authority to "advise local election authorities that Indiana Code § 33-33-49-13 is not to be enforced" because it has "no power either to enact the law or declare a law unconstitutional or unenforceable for any reason."  *See Dickinson v. Indiana State Election Bd.*, 740 F.Supp. 1376, 1380 (S.D. Ind. 1990), *rev'd on other grounds, Dickinson v. Indiana State Election Bd.*, 933 F.2d 497 (7th Cir. 1991).  In other words, according to Defendants, the Commission cannot be ordered to inform local authorities that the challenged statute is unconstitutional because it does not have the statutory authority to do so.

A constitutional challenge to the enforcement of a state statute is not a novel claim.  In simple terms, the plaintiff is insisting that, by following the terms of a duly enacted statute, a state official is violating its constitutional rights.  *Cf. Ex. Parte Young*, 209 U.S. 123, 155-56 (1908) ("The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state . . . may be enjoined by a Federal court of equity from such action.").  Were the court to find that the challenged statute was unconstitutional and thus, unenforceable, the Commission would be duty-bound to follow the court's order (assuming, for the sake of argument, that a stay to the court's order did not issue).  Thus, the Commission, whose authority surpasses that of the county election board, would be statutorily bound to advise the election board not to enforce that law.

Moreover, *Dickinson* involved a challenge to the 1981 reapportionment of Indiana by the Indiana General Assembly, in which the plaintiffs argued that the establishment of Districts 49 and 51 were the product of racial gerrymandering. 740 F.Supp. at 1378.  The district court found that the Commission (then known as the Indiana State Election Board) did not have the power to engage in reapportionment.  *Id*. at 1380.  Its statutory powers included the power to administer the election laws and the power to adopt rules to govern the fair, legal, and orderly conduct of election.  *Id*. (statutory citations omitted). Thus, the quote from *Dickinson* regarding the statutory duty of the Commission, read in context, simply stands for the proposition that reapportionment is not one of the Commission's responsibilities.  This, of course, is not a reapportionment case.

Citing various sections of Title 3, Defendants also argue that, because the county election board certifies the judicial election results to the Circuit Court clerk, *see* IND. CODE § 3-12-4-9, who then transmits a statement of the result to the Secretary's Indiana Election Division, *see* IND. CODE § 3-12-5-1, the "Commission plays virtually no role in the administration or enforcement of the election laws in Marion County, including Indiana Code [S]ection 33-33-49-13." Given the Commission's clear statutory duty to advise and supervise local election officers, and, more generally, to administer Indiana election laws, Defendants' argument that the Common Cause's injury cannot be fairly traceable and redressed by the Commission cannot stand. The Commission is a proper party to this action.

### d.    The Governor

Defendants argue that the Governor is not a proper party to this lawsuit because his statutory duty to issue commissions to all judges in Indiana is simply a formality. IND. CODE § 4-3-1-5(4). In support of this argument, Defendants cite Indiana case law standing for the proposition that the right to occupy a state office is not dependent on the issuance of a commission from the Governor. *See Shuck ex. rel. Cope*, 35 N.E. 993, 995 (Ind. 1893) ("It is the election by the people and the declaration of the board of canvassers that vest the title to an elective office. The governor's commission is nothing more than a convenient form of evidence that the title to an elective office has been vested in a person by the votes of the people. Such a commission is not conclusive evidence of anything except its own existence."); *State ex rel. Coleman v. Lewis*, 186 S.E. 625, 637 (S.C. 1936) ("[T]he Governor, in issuing a commission acts ministerially; the

11

commission does not confer the office, and neither the existence of the office nor term or time for which it exists depends upon the commission, which is only evidence of the appointment or election.").  Merely because the issuance of a commission is not mandatory in order for one to hold elected office does not mean that issuance of a commission, or the declination to issue a commission, is, as Defendants contend, an illusory act that cannot and should not be enjoined.  As noted above, it is, at the very least, evidence "that the title to an elected office has been vested in a person by the votes of the people."  *Shuck*, 35 N.E. at 995.

Defendants also argue that the court does not have jurisdiction to enjoin the Governor from issuing commissions to judges elected under the challenged statute.  Its sole support for this contention is the decision from the Southern District of Illinois in *Keogh v. Horner*, 8 F.Supp. 933 (S.D. Ill. 1934).  There, the plaintiff sought a writ of prohibition against the governor seeking to prohibit the governor from issuing commissions to Illinois's newly elected congressional representatives as a result of the state's failure to redistrict after 1901.  The district court held that it did not have the authority to issue a writ of prohibition, because the issuance of a commission by the governor was not "judicial or quasi-judicial in nature."  *Id*. at 934; *see also Burnett v. Terrell*, 905 N.E.2d 816, 829 (Ill. 2009).   The district court also held that it did not have the "authority to be the judge of the manner in which such members [of Congress] were elected, or to interfere with the Governor in furnishing them with a certificate or commission as to what the canvass shows with reference to their election."  *Id*. at 935.

*Keogh* is distinguishable from the present case in two respects.  First, the court has jurisdiction over Common Cause's claim that Indiana Code Section 33-33-49-13 is unconstitutional under 28 U.S.C. §1331.  Second, assuming for purposes of this motion to dismiss that the statute at issue is unconstitutional, as Common Cause alleges, the court has the power to enjoin the Governor from enforcing that statute.  *Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519, 542 (7th Cir. 2011) ("Presidents and governors are routinely enjoined from enforcing unconstitutional statutes . . . ."), *vacated in part on other grounds*, 651 F.3d 722 (7th Cir. 2011) (en banc)); *Hovey v. State*, 27 N.E. 175, 178 (Ind. 1891) ("It is within the province of the courts to expound and enforce such laws as the legislative department may enact within the constitutional limit, and to decline to enforce such as are in conflict with the constitution.").  It follows, then, that the court has the authority to enjoin the Governor from issuing a commission to one elected pursuant to that statutory scheme.  Accordingly, the court finds the Governor's connection to this case is sufficient to withstand a motion to dismiss for lack of Article III standing.

## 2.    Prudential Standing

Prudential standing "encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests sought to be protected by the law invoked."  *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007) (internal quotations and citations omitted).

Defendants argue that Common Cause's case is "a generalized grievance more appropriately addressed in the representative branches of government." (Def's Mem. at 17-18). The type of generalized grievances sought to be prohibited by prudential standing include "'generalized grievances about the conduct of government or the allocation of power in the Federal System.'" *Winkler*, 481 F.3d at 989 (Sykes, J., concurring) (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)). The factual allegations of Common Cause's Amended Complaint do not reflect the type of generalized grievance contemplated by the doctrine of prudential standing. Instead, Common Cause brings a constitutional challenge involving its members' and other Marion County voters' First Amendment right to cast a meaningful vote for Marion Superior Court judge and is advanced "in a form traditionally thought to be capable of judicial resolution." *Flast*, 392 U.S. at 106. Defendants' arguments against Common Cause for lack of standing under Article III are therefore rejected. Defendants' 12(b)(1) challenge is therefore **DENIED**.

## B.    Eleventh Amendment Immunity

Next, Defendants contend that the claims asserted in Common Cause's Amended Complaint are barred by the Eleventh Amendment. The Amendment bars federal jurisdiction over suits brought against the state, state agencies, and state officials acting in their official capacities. *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 336-37 (7th Cir. 2000). There are several exceptions to this rule, one of which is the exception carved out in *Ex Parte Young*. That exception allows private parties to sue individual state officials for prospective equitable relief for ongoing violations of federal law. *Id*. at 337 (citing *Ex Parte Young*, 209 U.S. at 159-60). Common Cause's claim for prospective

14

injunctive relief fits within the *Ex Parte Young* exception.  Accordingly, the court finds

the Defendants are not immune from suit under the Eleventh Amendment, and

Defendants' 12(b)(1) challenge is therefore **DENIED**.

### C.    **Failure to State a Claim**

#### 1.    **The *Lopez-Torres* Decision**

Lastly, in light of the Supreme Court's decision in *New York State Board of

Elections v. Lopez-Torres*, Defendants argue Common Cause's Amended Complaint

should be dismissed for failure to state a claim upon which relief can be granted. 552

U.S. 196 (2008).   Common Cause disagrees.

*Lopez-Torres* involved a First Amendment challenge to New York State's system

of electing trial court judges, called Supreme Court justices.  *Id*. at 201.  That system, in

place since 1921, employs a "delegate primary" convention selection system where the

judicial candidates for the Supreme Court are selected by a convention of delegates rather

than by open primary election.  *Id*. at 200-01.   In the "delegate primary," major party

members elect delegates from each of New York's 150 assembly districts.  *Id*. at 200.

Each delegate then attends a nominating convention in the judicial district (there are 12)

in which the delegate's assembly district is located.  *Id*.  There, the party within each

judicial district selects its candidate or candidates to run in the district's general election.

*Id.*  The nominees selected at the conventions are automatically placed on the district's

general election ballot, joined by any independent or third party candidates who are able

to timely obtain the requisite number of signatures on a petition.  *Id*. at 201.

Following the major parties' refusal to nominate the candidate-plaintiffs, they, the voters who claimed to have supported these candidates, and the New York branch of Common Cause, brought a Section 1983 claim against the New York State Election Board alleging "that New York's election law burdened the rights of challengers seeking to run against candidates favored by the party leadership, and deprived voters and candidates of their rights to gain access to the ballot and to associate in choosing their party's candidates."  *Id.*

The Supreme Court reversed the Second Circuit Court of Appeals, and held that New York's electoral system did not violate the plaintiffs' First Amendment right to political association.  In relevant part, the plaintiffs argued that the nominating convention that follows the delegate primary did not give them a realistic chance to secure the party's nomination because the party leadership "inevitably garners more votes for its slate of delegates" than the unsupported candidate can amass, and "effectively determines the nominees."  *Id.* at 204-05.  Rejecting this argument, the Court reasoned:

> [T]his says nothing more than that the party leadership has more widespread support than a candidate not supported by the leadership.  No New York law compels election of the leadership's slate – or, for that matter, compels the delegates elected on the leadership's slate to vote the way the leadership desires.  And no state law prohibits an unsupported candidate from attending the convention and seeking to persuade the delegates to support her.  Our cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements.  Here, [plaintiffs] complain not of the state law, but of the voters' (and their elected delegates') preference for the choices of the party leadership.
>
> … States [may] requir[e] party-candidate selection through processes more favorable to insurgents, such as primaries.  But to say that the State can require this is a far cry from saying the Constitution demands it.  None of

16

> our cases establishes an individual's constitutional right to have a 'fair shot'
> at winning the party's election.

*Id.* at 205.

The Court also rejected as "a novel and implausible reading of the First Amendment" the plaintiffs' argument that the existence of an entrenched "one-party rule" – i.e., Democrats in certain districts; Republicans in others – in the State's general election demands that the First Amendment be used to impose additional competition in the parties' nominee-selection process. *Id.* at 207. While, "[c]ompetiveness may be of interest to the voters in the general election, and to the candidates who choose to run against the dominant party," "those interests are well enough protected so long as all candidates have an adequate opportunity to appear on the general-election ballot." *Id.* The Court found the New York electoral process met that standard because it provided a means by which candidates who were not able to obtain a major party's nomination via the convention process could get on the general election ballot by obtaining the requisite number of signatures on a petition. *Id.* at 207-08.

In New York, therefore, the major parties each selected candidates – albeit through nominating convention rather than primary convention – to compete with one another at the general election. Although, as a practical matter, many races were uncontested,[2] this resulted not from the electoral scheme itself but from the natural consequences of electoral politics: the Republican Party may choose not to run a candidate in a heavily

---

[2] The Second Circuit's decision in *Lopez-Torres v. New York State Election Board* noted that, "Over a 12-year period between 1990 and 2002, almost half of the State's elections for Supreme Court Justice were entirely uncontested." 462 F.3d 161, 178 (2nd Cir. 2006).

Democratic district, or vice versa, simply because of an assessment as to the candidate's chance of victory.

By contrast, the electoral scheme set forth in Indiana Code Section 33-33-49-13 does not contemplate contested judicial races in the general election.  It provides that, at the primary election held in the relevant election year, "a political party may nominate not more than" half of the open judicial races for the Marion Superior Court.  A political party in Indiana is eligible to hold a primary if its "nominee received at least ten percent (10%) of the votes cast in the state for secretary of state at the last election. . . ."  Ind. Code § 3-10-1-2.  According to Common Cause's Amended Complaint, in actual practice, both the Republican and Democratic parties are the only parties that hold primary elections in Indiana, and each political party nominates exactly half of the open judicial positions available for the Marion Superior Court. (Amended Compl. ¶ 15).  This results in a system whereby the judicial candidates, who run at large, face no competition. For example, if 16 seats on the court are available (as in election year 2014); eight of the judicial nominees will be from the Republican Party, and eight will be from the Democratic Party.  *See* IND. CODE § 33-33-49-13(b).  Unlike *Lopez-Torres*, where this may have resulted from the party's decision not to run a candidate in certain districts (or the candidate's own decision), *see* 552 U.S. at 208, here, this fact results from operation of the challenged statute.

Defendants make much of the fact that an independent or third-party judicial candidate from Marion County may petition to appear on the general election ballot – an alternative the Supreme Court found constitutionally adequate in *Lopez-Torres*.  552 U.S.

at 207;  IND. CODE § 3-8-6 -2 ("A petition of nomination must be signed by the number of voters equal to two percent (2%) of the total votes cast in the last election for secretary of state in the election district that the candidate seeks to represent.").  Although Indiana's ballot access statute, cited above, has been found constitutionally adequate, *Hall v. Simcox*, 766 F.2d 1171 (7th Cir. 1985), the court is not convinced that the statute's constitutionality with respect to a candidate's access to the ballot applies here with equal force, where the claim is not ballot access, but whether a citizen's vote in the general election *matters*.  Taking the court's example above, if, as in 2002, one candidate petitions to appear on the general election ballot, and 16 seats are available, a ballot selecting 16 only meaningfully impacts the election for the last judgeship selected.  Thus, the potential for independent and third-party candidates to appear on the ballot does not alleviate the burden imposed by Indiana's electoral scheme:  when a person proceeds to the ballot box on Election Day, he or she must be afforded an opportunity to vote for the judge who will fill Marion Superior Court # 1, the judge who will fill Marion Superior Court # 2, and so forth.  Indiana law does not permit this.  The New York law at issue in *Lopez-Torres* did.  Accordingly, the Defendants reliance on *Lopez-Torres* decision does not persuade the court to rule in their favor.

### 2.    "Sliding Scale" Approach

Common Cause argues its constitutional claim should be analyzed under the sliding scale approach advanced in *Burdick v. Takushi*, 504 U.S. 428 (1992).  Defendants respond that the Supreme Court "refused" to use the *Burdick* balancing test in *Lopez-Torres*, and thus, this court is not bound by that test in analyzing Common Cause's claim.

19

The Supreme Court did not expressly overrule the approach utilized in *Burdick* and, in fact, Justice Kennedy's concurring opinion in *Lopez-Torres* cites to that case.  Moreover, the Supreme Court utilized the *Burdick* balancing test after *Lopez-Torres* issued.  *See Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) (holding Indiana's Voter ID law constitutional).  Accordingly, for purposes of this motion, the court elects to utilize that test.

The *Burdick* test is derived from a previous Supreme Court voting rights case entitled *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and provides:

> A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  If the challenged regulation severely burdens the First and Fourteenth Amendment rights of voters, the regulation must be narrowly drawn to advance a compelling state interest.  *Id*. (citation omitted).  If the challenged regulation imposes "'only reasonable, nondiscriminatory restrictions'" on those rights, "'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Id*. (quoting *Anderson*, 460 U.S. at 788).

Common Cause alleges that the challenged election statute severely burdens the rights of its own members and those eligible to vote in Marion County.  For example, if one is a registered Republican, he or she has "absolutely no opportunity to cast a meaningful vote for half the seats on the Marion Superior Court." (Amended Compl. ¶

20

19).  If one is not affiliated with the Republican or Democratic Parties, such that he or she

cannot vote in the primary, he or she has "absolutely no opportunity to cast a meaningful

vote for the Marion Superior Court."  (*Id*. ¶ 18).   Common Cause also alleges that

"[t]here is no justification for the impingement on the right to cast a meaningful ballot

that Indiana Code § 33-33-49-13 creates."  (Amended Comp. ¶ 20).  Common Cause's

allegations are sufficient to  state a plausible claim for relief.  Defendants' 12(b)(6)

challenge is therefore **DENIED**.

## IV.    Conclusion

For the reasons set forth above, the court finds Common Cause has Article III and

prudential standing to bring its claim; the Defendants are not immune from suit under the

Eleventh Amendment; and Common Cause states a plausible claim for relief.

Accordingly, Defendants' Motion to Dismiss Pursuant to Rules 12(b)(1) and 12 (b)(6) is

**DENIED**.


**SO ORDERED** this 6th day of September 2013.


RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.