UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-1603-RLY-DML |
| | ) | |
| INDIANA SECRETARY OF STATE, in her | ) | |
| official capacity; THE INDIVIDUAL | ) | |
| MEMBERS of the INDIANA ELECTION | ) | |
| COMMISSION, in their official capacities; | ) | |
| GOVERNOR of the STATE OF INDIANA, | ) | |
| in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

State Defendants, in their official capacities, respectfully submit this Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of their Motion for Summary Judgment.

## I.    Introduction

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections" because "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (further quotation omitted).  Common Cause, on behalf of its Marion County members, has sued the Indiana Secretary of State, the Members of the Indiana Election Commission, and the Governor and claims that Indiana Code § 33-33-49-13 facially violates the First Amendment because, the argument goes, this provision prevents Marion County voters

from having the ability to vote only for their desired candidates for the bench.  *See*, *e.g.*, ECF 12, ¶¶ 1, 19.  Common Cause has not met its summary judgment burden and, contrary to its arguments, Indiana's election laws -- including the one challenged here -- are constitutional under relevant precedent because these laws do not impose a significant burden either on ballot access or on voters and because they are justified by compelling state interests.  For these reasons, not only must Plaintiff's Rule 56 Motion be denied, but State Defendants' Motion for Summary Judgment should be granted.

## II.    State Defendants' Statement Of Material Facts In Dispute/State Defendants' Statement Of Material Facts Not In Dispute

State Defendants were permitted to provide a single Memorandum of Law responding to Plaintiff's Motion for Summary Judgment and supporting our Motion for Summary Judgment.  Thus, for the ease of this Court, State Defendants provide the following material facts to dispute, and respond to, those facts proffered by Plaintiff.  *See* S.D. Ind. L.R. 56-1(b).  The same material facts also support State Defendants' Rule 56 Motion.  *See* S.D. Ind. L.R. 56-1(a).[1]

### A.    Plaintiff's Legal Narrative

Plaintiff begins with pages of legal propositions.  *See* ECF 41 at 2-5 (setting forth the "statutory background" for Plaintiff's constitutional challenge and liberally quoting from Indiana Code § 33-33-49-13, Indiana Code § 33-33-49-6(a), Indiana Code § 3-10-1-16, Indiana Code § 3-10-1-2, Indiana Code § 3-10-1-6); ECF 41 at 6 (quoting Indiana Court of Appeals decision and talking about legislative history).  State Defendants will present their legal arguments below.

### B.    Plaintiff's Historic Facts Are Immaterial And Incomplete

Plaintiff's present a historic discussion of whether there have been successful third-party candidates for Secretary of State, the parties of those who have made the general election ballot

---

[1]       State Defendants have provided this Court with a Designation of Evidence and have attached to that Designation the evidentiary materials that support the facts noted below.

for Marion County Superior Court judge in previous election cycles, and the party affiliation of previous third-party candidates for Marion County judge.  ECF 41 at 4-6.  While State Defendants cannot dispute election results, these facts are not particularly material to the facial claim that Indiana Code § 33-33-49-13 purportedly deprives Plaintiff's Marion County members a "meaningful vote" for Marion County Superior Court judge.

For example, and as further discussed below, in *Burdick v. Takushi*, 504 U.S. 428, 442-43 (1992), Justice Kennedy's dissent focused on historic facts associated with the outcomes of elections in Hawai'i; however, Justice Scalia's majority opinion looked not to such facts but to whether the statutes at issue provided "constitutionally sufficient ballot access."  *Id*. at 441.  *See also New York State Bd. Of Elections v. Lopez Torres*, 552 U.S. 196, 207-09 (2008) (rejecting the challengers' call to make New York's system more competitive:  "[o]nce again, we decline to enter the morass" and concluding that since the statutes at issue provided "an adequate opportunity to appear on the general-election ballot" the law "easily pass[es] constitutional muster").  Indeed, in *Lopez Torres*, the Court further noted that "[o]ur cases invalidating ballot-access requirements have *focused on the requirements themselves*, and *not on the manner in which political actors function under those requirements*."  *Id*. at 205 (emphasis added).  In any event, Plaintiff's facts are incomplete and State Defendants fill in the gaps below.[2]

Indeed, over the years, there has been no shortage of Marion Superior Court judicial candidates who make it onto the primary ballots or who qualify for inclusion on the primary ballot.  Indeed, just this year, the Democratic primary had 11 candidates competing for the eight slots and two other candidates qualified for inclusion on the primary ballot but then withdrew

---

[2]      As further discussed below, courts do not typically analyze electoral history nor do courts require a state to prove (from an evidentiary standpoint) that particular election problems exist as a justification for elections laws. Nevertheless, the facts and law demonstrate that there is no substantial burden on Common Cause's members because ample ways exist for candidates to access ballots and, thus, for voters to meaningfully participate in the process.  As such, the precedent discussed below makes clear that the well-recognized justifications for election laws support the law that has been challenged.  To the extent needed, then, the facts and reasons identified and discussed herein also serve to supplement the discovery responses previously provided in this litigation.

from the primary election.  Declaration of J. Bradley King ("King Decl.") ¶¶ 2(a), 4; Declaration of Trent Deckard ("Deckard Decl.") ¶¶ 2(a), 4.  In the 2012 primary election, there were 12 Democratic candidates competing for 10 Democratic spots (a 13th had qualified for the primary ballot and had timely withdrawn) and 12 Republican candidates competing for 10 Republican spots -- and one of the non-endorsed Republicans missed succeeding in the primary by less than 4,000 votes, both non-endorsed Republicans garnered over 23,000 votes in the primary election, and the 10th place candidate in the Republican primary election received just over 30,000 votes. King Decl. ¶ 2(b), 4; Deckard Decl. ¶ 2(b), 4.  In 2008, there were nine Democratic candidates competing for eight spots and, in that year, one candidate who was not endorsed by the Democratic Party received the second highest vote total and not only made it to the general election ballot but was elected, and the ninth candidate in the primary election garnered over 63,000 votes.  King Decl. ¶ 2(d); Deckard Decl. ¶ 2(d).  In 2006, there were 12 Democratic candidates vying for 10 spots in the primary and, once again, the non-endorsed candidate received the highest vote total in the Democratic primary and was ultimately elected and the 10th place vote-getter in the primary received over 20,000 votes.  King Decl. ¶ 2(e); Deckard Decl. ¶ 2(e).  Also in 2006, there were nine Republican candidates competing for 10 spots in the primary.  *Id*.  In 2002, a minor-party candidate (Libertarian) made it onto the general election ballot.  King Decl. ¶ 2(g); Deckard Decl. ¶ 2(g).

Over the years, moreover, the state-wide votes cast for Secretary of State have been:  (1) 2002 -- 1,477,614; (2) 2006 -- 1,637,098; and (3) 2010 -- 1,709,734.  King Decl. ¶¶ 2(c), 2(f), 2(g); Deckard Decl. ¶¶ 2(c), 2(f), 2(g).  And, 10% of those state-wide votes equal:  (1) 2002 -- 147,761; (2) 2006 -- 163,709; and (3) 2010 -- 170,973.  *Id*.  Further, 2% of those state-wide votes equal:  (1) 2002 -- 29,552; (2) 2006 -- 32,741; and (3) 2010 -- 34,194.  *Id*.  For Marion County votes for Secretary of State, the numbers follows:  (1) 2002 -- 199,003; (2) 2006 -- 198,781; and

4

(3) 2010 -- 212,654.  *Id*.  And, 2% of those Marion County numbers are:  (1) 2002 -- 3,980; (2) 2006 -- 3,975; and (3) 2010 -- 4,251.  *Id*.  While the number can obviously change over time, as of May 6, 2014, there were 647,809 registered voters in Marion County.  King Decl. ¶ 5; Deckard Decl. ¶ 5.

## III.    Argument

Plaintiff likens Marion County to North Korea and contends that the election for Marion County Superior Court judges is "not an election at all" because "every candidate is guaranteed election."  ECF 41 at 1, 10.  Plaintiff submits that this is the "direct and intended product of Indiana Code § 33-33-49-13" and, because of this, Plaintiff facially challenges this provision of Indiana law.  Of course, the material facts noted above -- for example, the fact that oftentimes there are more candidates on the primary ballot than will move on to the general election, the fact that some non-endorsed candidates have succeeded in the primary election and have been elected through the general election, and the fact that minor-party candidates have successfully made the general election ballot -- disprove Plaintiff's rhetoric.  And, rhetoric aside, the single provision challenged passes constitutional muster because Indiana's election laws provide ample ways for candidates to get on the primary election ballot and the general election ballot and, consequently, voters in Marion County have ample opportunities to meaningfully participate in the election process.

### A.      Plaintiff Bears A Heavy Burden In This Constitutional Challenge

Initially, it bears repeating that Plaintiff is an organization that is litigating the voting rights of its Marion County members.  *See* ECF 41 at 6-7 (citing frequently to the Affidavit of Julia Vaughn for statements such as Common Cause is "dedicated to working so that citizens can make their voices heard in the political process" and is "committed to ensuring that citizens have the right to cast meaningful votes" and that the "method of electing judges to the Marion

5

Superior Court, challenged in this case, is particularly objectionable to … its members" and the members of Common Cause "desire to have the opportunity to cast a meaningful vote for all seats on the Marion Superior Court").

No "aggrieved" candidate or voter is a party to this litigation and Plaintiff does not bring this challenge as applied to a particular candidate or election or voter. Rather, the challenge is a "broad attack on the constitutionality" of Indiana Code § 33-33-49-13 and, as such, Plaintiff "bear[s] a heavy burden of persuasion" because it seeks "relief that would invalidate the statute in all its applications." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 200 (2008). *See also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-51 (2008) (noting that a challenge not in the context of an actual election is facial in nature and that such challenges are "disfavored for several reasons" including the fact that they "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint" and because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with Constitution").

## B. Supreme Court Precedent In Relevant Voting Cases

Given Plaintiff's heavy burden, it is important to set the stage for this challenge by reviewing the case law that actually addresses First Amendment challenges to the constitutionality of laws that purportedly restrict "ballot access" or "meaningful vote" -- the latter being analytically no different than the former since ballot access translates into the opportunity for meaningful participation. *See Burdick v. Takushi*, 504 U.S. 428, 438 (1992) ("in *Bullock v. Carter*, we minimized the extent to which voting rights cases are distinguishable from ballot access cases, stating that 'the rights of voters and the rights of candidates do not lend themselves to neat separation.' 405 U.S. at 143"); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) (recognizing that "[r]estrictions upon the access of political parties to

6

the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively").

The Supreme Court has regularly upheld statutes against First Amendment challenges where there are alternative avenues for candidates to access the ballot -- and, thus, for voters to have meaningful participation. These cases provide the appropriate rubric for analyzing the single provision of Indiana's election law that is challenged here. Defendants turn there now and, to show the evolution of case law relating to such challenges, Defendants chronologically present these cases.[3]

### 1.    *Jenness v. Fortson*

In *Jenness v. Fortson*, 403 U.S. 431 (1971), the issue was whether a Georgia law that required candidates -- who had not entered and won a political party's primary election but who nevertheless want to get on the general election ballot -- to file a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question. *Id*. at 432.   The Supreme Court had no trouble in concluding that this requirement was constitutional:   "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot -- the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."  *Id*. at 442.[4] Moreover, and as it related to the First Amendment challenge, the Court did not analyze past

---

[3]      Plaintiff's argument -- stitched together with language from various inapposite cases -- necessarily misses the mark.  To that end, equal protection cases involving apportionment -- such as *Reynolds v. Sims*, 377 U.S. 533 (1964) or *Wesberry v. Sanders*, 376 U.S. 1 (1964) -- are inapplicable to this action.  *See* ECF 30 at 10 ("[t]his, of course, is not a reapportionment case").  Similarly, *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) is of no moment as that case challenged, on equal protection grounds, the constitutionality of a poll tax.  *Ayers-Schaffner v. DiStefano*, 37 F.3d 726 (1st Cir. 1994) involved a "do-over" election that only allowed voters who voted in the first election to participate in the "mulligan" election -- clearly, not the situation here.  And, *Greenville County Republican Party Executive Committee v. South Carolina*, 824 F. Supp. 2d 655 (D. S.C. 2011) again involved equal protection claims; however, that court found there to be no constitutional violation.

[4]      Likewise, while not directly at issue, the Court noted that Georgia's law -- that set the bar for becoming a political party at receiving 20% of the votes cast in the previous election -- was not constitutionally problematic.  *Id*. at 439-40.

election results in upholding the 5% provision that had been challenged nor did it require the state to prove past electoral problems that would justify the law; instead, it looked at the interaction of various statutes. *See id*. at 438-40.[5]

### 2.    *Rosario v. Rockefeller*

In *Rosario v. Rockefeller*, 410 U.S. 752 (1973), a challenge was made to New York's closed primary election system -- a system by which only enrolled members of a political party were allowed to vote in that party's primary.  A voter could register for a party up until 30 days before a general election and then was restricted to voting in that party's subsequent primary.  *Id*. at 753.  Thus, a voter was required to register for a party eight months before a presidential primary and 11 months before the non-presidential primary.  *Id*. at 760.  The challengers claimed this was unconstitutional because it required "party enrollment before prospective voters have knowledge of the candidates or issues to be involved in the next primary election[]."  *Id*. at 760.  Despite what the Court described as a "lengthy" span of time between registration and the next primary election, New York argued (and the Court agreed) that the delayed-enrollment system would help inhibit party raiding and that this helps preserve the integrity of the electoral process and, consequently, was constitutional.  *Id*. at 760-61.  Again, neither actual election results nor past electoral problems were specifically assessed in the context of the constitutional analysis.

### 3.    *Storer v. Brown*

In *Storer v. Brown*, 415 U.S. 724 (1974), a California law prohibited a person from getting on the ballot as an independent candidate if she voted in the immediately preceding primary or if she had a registered affiliation with a qualified political party at any time within one year prior to the immediately preceding primary election.  *Id*. at 726.  Would-be candidates

---

[5]     The Court briefly mentioned a recent election in the context of the equal protection challenge.  *Id*. at 440-42.  Common Cause, however, has not raised this constitutional claim.  And, in any event, even in the context of the equal protection claim, the *Jenness* Court found that because there "alternative routes are available to getting [one's] name on the ballot" there was no constitutional violation.  *Id*. at 440-41.

and their supporters brought the First Amendment challenge.  *Id*. at 727.  The Supreme Court upheld this disaffiliation provision because it helped to maintain the compelling interest in the integrity of the various routes to the ballot.  Specifically, the Court recognized that the direct party primary is an integral part of the entire election process and is the first step in a two-step process by which voters winnow and choose public officials.  *Id*. at 735.  And, California's disaffiliation provision constitutionally furthers this by having the primary election be the time for parties to settle their differences and by having the general election be the time for major struggles that are free from sore losers who may otherwise continue the struggle into the general election.  *Id*. at 735.  Further, as it related to the disaffiliation challenge, the Court did not discuss historic election results or past problems; rather, its conclusion was grounded on the text of the statutes as well as its previous "pattern of decisions."  *Id*. at 733.[6]

### 4.    *Munro v. Socialist Workers Party*

In *Munro*, the First Amendment challenge was brought by a candidate, his political party, and two voters.  479 U.S. at 192-93.  The law at issue was a Washington statute that required a minor-party candidate for partisan office to receive at least 1% of all votes cast for that office in the State's primary election before the candidate's name will be placed on the general election ballot.  *Id*. at 190.  The argument pressed was that this law abridged the challengers' First Amendment rights.  *Id*. at 192-93.

---

[6]     Because this disaffiliation provision was constitutional -- and because these two candidates were, thus, appropriately excluded from the ballot because of it -- the Court did not address other provisions challenged by these particular candidates and their supporters.  *Id*. at 737-38.  The Court, however, did address a separate challenge that had been brought by other candidates and their supporters to the number of votes needed by an independent candidate to obtain a place on the general election ballot.  The Court concluded that, on its face, requiring the collection of 325,000 signatures -- which equated to about 5% of the entire vote in the previous general election -- in 24 days to appear on the presidential ballot did not appear to be excessive.  *Id*. at 738.  Nevertheless, the Court opined that it needed additional information because, under California law, voters who had voted in the previous primary election could not sign petitions for independent candidates.  *Id*. at 739.  Thus, depending on how many voters had voted in the previous primary election, the pool from which signatures could be legally obtained may push the percentage to over 5% -- which would be more than the Court had ever approved in the past.  *Id*. at 739.  This restriction does not exist in Indiana so the pool of those who may sign a petition for non-party candidates to get on the general election ballot is every registered Marion County voter -- at last count, 647,809.  The approximately 4,000 signatures needed equates to about 0.6% of this figure.

The Supreme Court reversed the Ninth Circuit and upheld the challenged provision because "it is now clear that States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." *Id*. at 193 (citing *Jenness v. Fortson*, 403 U.S. 431 (1971)); *see also id*. at 194 ("*Jenness* and *American Party* establish with unmistakable clarity that States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot") (internal quotations omitted but quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 n.1 (1983)).  Along with this "admittedly vital" interest, the Court affirmed that states also have a "compelling interest in maintaining the integrity of its political process" and in the "stability of its political system." *Id*. at 195.

In so holding, the Supreme Court did not require Washington to make a "particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Id*. at 194-95. Indeed, the Court noted that in prior cases it had "conducted no inquiry into the sufficiency and quantum of the data supporting the reasons for" the regulation at issue. *Id*. at 195. Indeed, the Court recognized that to "require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Id*. at 195.

And, even though the provision reduced the number of minor-party candidates on the ballot, that fact was not determinative because, while only 1 of 12 minor-party candidates had

appeared on the ballot since the legislative change, the fact only meant that the provision challenged did "not provide in insuperable barrier to minor-party ballot access." *Id*. at 197. In the end, Washington was "not required to afford such automatic access and would have been entitled to insist on a more substantial showing of voter support. Comparing the actual experience before and after 1977 [told the Court] nothing about how minor parties would have fared in those earlier years had Washington conditioned ballot access to the maximum extent permitted by the Constitution." *Id*. at 197.

### 5.   *Burdick v. Takushi*

In *Burdick v. Takushi*, a voter objected to the fact that only one candidate filed nominating papers to run for the seat representing the challenger's district. He subsequently challenged Hawai'i's prohibition on write-in candidacies on the grounds that it violated his rights under the First Amendment. 504 U.S. at 430. At bottom, the voter wanted to vote in the primary and the general election for a person who had not filed nominating papers and he wished to vote in future elections for persons whose names may not appear on the ballot. *Id*. at 430.

The Supreme Court was clear that the "function of the election process is to winnow out and finally reject all but the chosen candidates." *Id*. at 438 (further quotations omitted). Put another way, the election process is "not to provide a means of giving vent to short-range political goals, pique, or personal quarrels[s]." *Id*. at 438 (further quotations omitted). Indeed, it has long been held that the State has a legitimate interest in regulating the election process even though any regulation "will invariably impose some burden upon individual voters." *Id*. at 433. "Common sense, as well as constitutional law, compels the conclusion that government must plan an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Id*. at 433 (internal quotations omitted but

quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Turning, then, to the challenged provision, the Court examined its constitutionality by looking at all of the ways that a candidate could appear on the ballot and, thus, how a voter could meaningfully cast his/her ballot.

The Court concluded that, under Hawai'i law, there were three ways for a voter's candidate-of-choice could get on the ballot. First, a party petition, containing signatures from 1% of the State's registered voters, could be filed 150 days before the primary and then, 60 days before the primary, candidates could file nominating papers certifying that they qualify for the office sought and that they are members of the party that they seek to represent in the general election. *Id*. at 435. Second, candidates can appear through the "established" party route. These established parties are those that have qualified by petition for three consecutive elections and received a specified percentage of the vote in the preceding election. The candidates for "established" parties also need to file their nominating papers 60 days before the primary. *Id*. at 435-36. Third, candidates can be placed on the non-partisan ballot by filing nominating papers with the requisite signatures 60 days before the primary. Those candidates who receive 10% of the primary vote or the number of votes that was sufficient to nominate a partisan candidate (whichever is lower) moves on to the general election. *Id*. at 436.

This system, the Court concluded, "provides easy access to the ballot until the cutoff date for the filing of nominating petitions, two months before the primary." *Id*. at 436. Thus, the restriction was limited and to "conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot." *Id*. at 437 (further quotations omitted); *see also id*. at 438-39 (in light of the "adequate ballot access afforded under Hawai'i's election code, the State's ban on write-in voting imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote").

12

Turning then to the interests asserted by Hawai'i to justify the burden, the Court found the State to have a valid interest in "avoiding the possibility of unrestrained factionalism at the general election" and in reserving "the general election ballot … for major struggles … and not a forum for continuing intraparty feuds." *Id*. at 439 (further quotations and citations omitted). Hawai'i also has an interest in avoiding sore-loser candidacies and the State's two-stage primary/general election process properly winnows out candidates. *Id*. at 439. And, the State has an interest in preventing party raiding. *Id*. at 439-40. No history of such problems was discussed.

In the end, the Court looked at the various provisions of Hawai'i's election laws and concluded that, together, they provided ample access to candidates and, thus, provided ample opportunities for voters to cast meaningful ballots. The "prohibition on write-in voting, considered as part of an electoral scheme that provides constitutionally sufficient ballot access, does not impose an unconstitutional burden upon the First and Fourteenth Amendment rights of the State's voters." *Id*. at 441-42.

### 6.      *Timmons v. Twin Cities Area New Party*

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) involved a Minnesota law that prohibited a candidate from appearing on the ballot as the candidate of more than one party. *Id*. at 353-54. This anti-fusion law was challenged on the grounds that it violated the rights guaranteed by the First Amendment. The Court noted that, while the New Party certainly had the right to choose its standard-bearer, it did not follow that the party was "absolutely entitled to have its nominee appear on the ballot as that party's candidate." *Id*. at 359. As such, the ban "simply precludes one party's candidate from appearing on the ballot, as that party's candidate, if already nominated by another party." *Id*. at 360.

The Court rejected the basic argument that the anti-fusion law prevented minor political parties from developing and thriving in Minnesota.  *Id*. at 360-62.  Indeed, the Court reasoned that even if fusion benefitted minor parties, Minnesota need not permit it because the Constitution does not require states to remove "all of the many hurdles third parties face in the American political arena today" nor does the Constitution require that "Minnesota compromise the policy choices embodied in its ballot-access requirements to accommodate the New Party's fusion strategy."  *Id*. at 361-62, 365, 367.  In sum, the Court concluded that Minnesota (like all states) has an "interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."  *Id*. at 364.  Minnesota (like all states) has an interest in "the stability of their political systems" and that interest permits it to "enact reasonable election regulations that may, in practice, favor the traditional two-party system" and that "temper the destabilizing effects of party-splintering and excessive factionalism."  *Id*. at 367; *see also id*. at 367 (the "constitution permits the Minnesota legislature to decide that political stability is best served through a healthy two-party system").

### 7. *New York State Board of Elections v. Lopez Torres*

The Supreme Court, once again, addressed a ballot access/meaningful vote issue in *New York State Board of Elections v. Lopez Torres*, 552 U.S. 196 (2008).  In 1921, New York enacted a law that required political parties to select their candidates for Supreme Court (New York's trial court) "by a convention composed of delegates elected by party members."  *Id*. at 200.  A political party, under New York law, is any political organization whose candidate for Governor received 50,000 or more votes in the most recent election.  *Id*.  In New York, party members elect party delegates and those delegates attend the party's judicial convention.  *Id*.  A person can run to become a delegate by submitting a petition with a certain number of signatures by a certain date and the judicial nominating convention takes place shortly after the delegate

primary.  *Id*.  Nominees from the judicial convention appear automatically on the general election ballot.  *Id*. at 201.  These candidates may be joined by others who timely submit nominating petitions with between 3,500 and 4,500 signatures or signatures representing 5% of the votes cast for Governor in that district in the prior election -- whichever is less.  *Id*.

Lopez Torres was elected as a judge in 1992 but she was later opposed by the local party because, according to her, she refused to make patronage hires for the party.  *Id*.  Along with the New York branch of Common Cause and two supporters, Lopez Torres sued and the challengers contended that New York's judicial election system violated the First amendment because it burdened the rights of challengers who sought to run against party-favored candidates and because it burdened the rights of supporters of those candidates.  *Id*.  The plaintiffs sought an injunction forcing the establishment of a direct primary system to select the nominees for judge. *Id*. at 202.  The District Court agreed with the challengers as did the Second Circuit.  In so doing, the Second Circuit reasoned that "voters and candidates possess a First Amendment right to a realistic opportunity to participate in a political party's nominating process, and to do so free from burdens that are both severe and unnecessary."  *Id*. at 202 (internal quotations omitted). And, based on this reasoning, New York's law was unconstitutional not only because of the "quantity of signatures and delegate recruits required to obtain a Supreme Court nomination at a judicial convention" but also because of the "apparent reality that party leaders can control delegates."  *Id*.  *See also id*. at 203-04 (the challengers contend that "New York's electoral system does not go far enough -- does not go as far as the Constitution demands -- in ensuring that they will have a fair chance of prevailing in their parties' candidate selection process").

The Court began by noting that the challengers' "contention finds no support in our precedents."  *Id*. at 204.  Indeed, the Court concluded that New York could require persons to demonstrate a significant modicum of support before permitting access not only to the general

election ballot but also to the primary election ballot.  *Id*.  And, the signatures required to gain access to the electoral process was "far from excessive."  *Id*. at 204 (citing *Norman v. Reed*, 502 U.S. 279 (1992) (approving requirement of 25,000 signatures or approximately two percent of the electorate); *American Party of Texas v. White*, 415 U.S. 767 (1974) (approving of requirement of 1% of the vote cast for Governor in the preceding general election -- about 22,000 signatures)).

The challengers' recasting of the issue as one of meaningful participation did not aid their cause.  *Id*. at 204-05 (noting that the real complaint is that the "convention process that follows the delegate election does not give them a realistic chance to secure the party's nomination" because the party "leadership effectively determines the nominees").  As to this, the Court was quite clear:  "this says nothing more than that the party leadership has more widespread support than a candidate not supported by the leadership.  No New York law compels election of the leadership's slate -- or, for that matter, compels the delegates elected on the leadership's slate to vote the way the leadership desires.  And no state law prohibits an unsupported candidate from attending the convention and seeking to persuade the delegates to support her."  *Id*. at 205.  "Selection by convention has never been thought unconstitutional, even when the delegates were not selected by primary but by party caucuses" and New York could legitimately believe that leaving "judicial selection to voters uninformed about judicial qualifications" and placing "a high premium upon the ability to raise money" justify not having a primary process.  *Id*. at 206.

In the end, the challengers' focus on wanting elections to be more competitive was just not of constitutional consequence:

> To begin with, it is hard to understand how the competitiveness of the general election has anything to do with respondents' associational rights in the party's selection process.  It makes no difference to the person who associates with a party and seeks its nomination whether the party is a contender in the general election, an underdog, or the favorite.  Competitiveness may be of interest to the voters in the general election, and to the candidates who choose to run *against* the

> dominant party.  But we have held that those interests are well enough protected so long as all candidates have an adequate opportunity to appear on the general-election ballot.   In *Jenness* we upheld a petition-signature requirement for inclusion on the general-election ballot of five percent of the eligible voters, see 403 U.S. at 442, and in *Munro v. Socialist Workers Party*, 479 U.S. 189, 199 (1986), we upheld a petition-signature requirement of one percent of the vote in the State's primary.   New York's general-election balloting procedures for Supreme Court Justice easily pass muster under this standard.  Candidates who fail to obtain a major party's nomination via convention can still get on the general-election ballot for the judicial district by providing the requisite number of signatures of voters resident in the district.

Id. at 207-08 (emphasis in original).  Specifically:  "The reason one-party rule is entrenched may be (and usually is) that voters approve of the positions and candidates that the party regularly puts forward.  It is no function of the First Amendment to require revision of those positions or candidates….The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference….It does not call on the federal courts to manage the market by preventing too many buyers from settling upon a single product."  *Id*. at 208.

## C.      Indiana's Superior Court Judge Election Laws

To qualify for the statutorily created Superior Court judicial posts, persons must be "admitted to the practice of law in Indiana upon filing a declaration of candidacy or petition of nomination, or upon the filing of a certificate of candidate selection."  Ind. Code § 3-8-1-17.  In addition to the general requirements for candidates found in Indiana Code § 3-8-1-1, Indiana Code § 3-8-1-4, and Indiana Code § 3-8-1-5, to be eligible to hold the office of Superior Court judge, the person must be a "resident of the county in which the court is located" and must be "admitted to practice law in Indiana."  Ind. Code § 33-29-1-3(b).  As it relates to Marion County Superior Court judges, the "person must be at the time a declaration of candidacy or a petition or nomination under IC 3-8-6 is filed a resident of Marion County and an attorney who has been admitted to the bar of Indiana for at least five (5) years" and, during the term of office, the

17

"judge of the court must remain a resident of Marion County."  Ind. Code § 33-33-49-6 (internal punctuation omitted).  Candidates for Superior Court judgeships must file a statement of economic interest with the State Court Administration.  Ind. Code § 33-23-11-14; Ind. Code § 33-23-11-15.

In Indiana, parties whose candidates for Indiana Secretary of State receive 10% of the votes cast in the last general election, hold primary elections.  Ind. Code § 3-10-1-2.  To be included on the primary ballot, all a candidate (with the qualifications noted above) need do is timely file a declaration of candidacy in person or by mail.  Ind. Code § 3-8-2-5.  A declaration of candidacy can be filed between early January and early February of the year of the primary election.  Ind. Code § 3-8-2-4; Ind. Code § 3-8-2-5.  The party affiliation of the candidate is determined either by how the person voted in the last Indiana primary or by the county chair who can certify that the person is a member of that party.  Ind. Code § 3-8-2-7.  Candidates can withdraw from being a candidate from the primary and, if done by a certain date, the person will not be included as a candidate on the primary ballot.  Ind. Code § 3-8-2-20; Ind. Code § 3-8-2-21.  Candidates can also withdraw from the general election ballot if done by a certain date.  Ind. Code § 3-8-7-28.  As it relates to Marion County, any political party may nominate, through the primary election, up to eight (or 10 depending on the year) candidates to the general election ballot.  Ind. Code § 33-33-49-13.

Other candidates can also gain access to the general election ballot.  For example, Libertarian Party candidates (or candidates from other minor-parties whose candidate for Secretary of State received between 2% and 10% of the vote in the previous general election) are not nominated in a primary election; however, these minor-parties may nominate their candidates at a party's state convention.  Ind. Code § 3-8-4-10.  Once nominated, these candidates proceed directly to the general election ballot.

Candidates who are not affiliated with any political party (independent candidates) or minor-party candidates representing a party that has not yet obtained 2% of the vote for Secretary of State can also access the general election ballot.  Such persons must file a written consent to become a candidate and a certified petition of nomination.  Ind. Code § 3-8-6-12; Ind. Code § 3-8-6-14(a).  These would-be candidates must meet the same statutory requirements (noted above) including the filing of a statement of economic interest.  Ind. Code § 3-8-6-14.  To get on the general election ballot, these candidates must obtain signatures of registered voters in the election district and Indiana law provides that the number of signatures needed is equal to 2% of the total votes case in the district in the last election for Secretary of State.  Ind. Code § 3-8-6-2.  As noted, the most recent count shows that there are over 647,000 voters from whom to obtain these signatures so the actual signatures needed (typically about 4,000) only amounts to 0.6% of the available pool.  These independent or minor-party candidates have much more time (several months -- as compared to the timing of the filings for Democratic/Republican candidates) to submit their petitions to the county voter registration office for certification and, once certified, these candidates have another month to submit the certified petition and candidate consent and statement of economic interest to the State.  Ind. Code § 3-8-6-12; Ind. Code § 3-8-6-10; Ind. Code § 3-8-6-12.  Petition nominated persons can withdraw by filing a written notice by a certain date.  Ind. Code § 3-8-7-28.

Persons can also file a declaration of intent to be a write-in candidate.  Ind. Code § 3-8-2-2.5.  A person has several months in which to file this declaration.  Ind. Code § 3-8-2-2.5; Ind. Code § 3-8-2-4; Ind. Code § 3-8-2-5; Ind. Code § 3-11-2-11.5.  Once declared, these write-in candidates are eligible to receive votes in the general election.  Ind. Code § 3-12-1-1.7(a).  As with other candidates, write-in candidates can withdraw from the general election by filing a written notice by a certain date.  Ind. Code § 3-8-7-28.

### D.      Indiana Code § 33-33-49-13 Is Constitutional

Without doubt, then, Indiana provides several avenues for persons to gain access to the primary election ballot and the general election ballot -- and, thus, to seek a position as a judge on the Marion County Superior Court.  And, because there are several ways for a candidate to gain access the primary election ballot and the general election ballot, voters have many ways to meaningfully participate in the process for electing these judges.  For all candidates, one must be admitted to practice law in Indiana for five years, must be a resident of Marion County, must remain a resident of Marion County, and must file papers including a statement of economic interest.  Common Cause presses no argument about these qualifications.

Any party that has a primary election -- currently, the Democratic Party and the Republican Party -- will hold the primary election and, from that vote, a certain number of candidates will move onto the general election.  It is not difficult to gain access to the primary election ballot and, indeed, historically there have been more candidates in the primary election than the spots that will move on and in some elections the non-endorsed candidates have actually beaten the endorsed candidates and, thus, have moved on to the general election. Unquestionably, voters have a full chance to participate in their party's primary and cast their vote for whomever they want.[7]  In fact, there is no "party registration" in Indiana so voters who did not even vote in the last general election are eligible to cast a vote in either the next Democratic primary or next Republican primary.  Ind. Code § 3-10-1-6.[8]

---

[7]        As noted, a party that has a candidate for Secretary of State that receives 10% of the votes for Secretary of State in the last election must go the primary election route.  Ind. Code § 3-10-1-2.  This 10% rule is well within what the Supreme Court has upheld as being constitutional.  *See Jenness v. Fortson*, 403 US. 431 (1971) (primary elections where candidate had received 20% or more of the vote at the last gubernatorial or presidential election). And, the provision challenged is not limited to existing parties -- any party can nominate up to eight (or, depending on the year, 10) persons for the general election ballot.  Ind. Code § 33-33-49-13.

[8]        Even voters who did vote in the previous general election for a majority of the regular nominees of the party may not actually be prevented from voting in either primary since voting is anonymous.  *See Griffin v. Roupas*, 385 F.3d 1128, 1132 (7th Cir. 2004) (voting rights case that rejected the argument that lax enforcement of law denies equal protection by hurting those who follow the law).  Thus, Plaintiff's suggestion that Indiana's primary elections are "closed" overstates their case.  ECF 41 at 4.

The Supreme Court has regularly upheld the primary election structure as an integral and constitutional part of an overall election process. *See Rosario*, 410 U.S. at 760-61 (approving of a closed primary system that required voter registration with a party months before the primary because it helped to inhibit party raiding, which helps to preserve the integrity of the electoral process). *See also Lopez Torres*, 552 U.S. at 203 (noting that it is "too plain for argument that a State may prescribe party use of primaries or conventions to select nominees who will appear on general-election ballots"); *Clingman v. Beaver*, 544 U.S. 581 (2005) (upholding Oklahoma's "semi-closed" primary system); *Burdick*, 504 U.S. at 438-39 (recognizing that a two-stage primary/general election format is a legitimate way of winnowing candidates: "function of the election process is to winnow out and finally reject all but the chosen candidates"); *California Democratic Party v. Jones*, 530 U.S. 567, 577 (2000) (invalidating California blanket primary law because it allowed non-party members to determine the candidate bearing the party's standard in the general election); *Timmons*, 520 U.S. at 361-62, 365, 367 (the Constitution does not require states to remove "all of the many hurdles third parties face in the American political arena today" nor does the Constitution require that "Minnesota compromise the policy choices embodied in its ballot-access requirements to accommodate the New Party's fusion strategy" and Minnesota can constitutionally enact laws that further the "stability of [its] political systems" even regulations that "may, in practice, favor the two-party system"); *Storer*, 415 U.S. at 735 (upholding disaffiliation statute for candidates and reasoning that the direct party primary is an integral part of the entire election process and is the first step in a two-step process by which voters winnow and choose public officials and that the disaffiliation provision constitutionally furthers this by having the primary election be the time for parties to settle their differences and by having the general election be the time for major struggles that are free from sore losers who may otherwise continue the struggle into the general election).

For those who are not members of the Democratic or Republican Party, the same qualifications (licensed to practice law in Indiana for 5 years, resident of Marion County, and filing of papers including statement of economic interest) exist.  Libertarians, or any other party whose candidate for Secretary of State receives between 2% and 10% of the vote in the previous general election, can nominate candidates directly to the general election ballot at the party's state convention.[9]  Thus, persons who wish to be the standard bearer for these minor-parties (and voters who want to support such candidates) have an opportunity to do so and, historically, Libertarians have regularly appeared in various Indiana elections and have even appeared as candidates for Marion County Superior Court judge.[10]  Persons who are not members of the Democratic Party, the Republican Party, the Libertarian Party, or other minor parties can be included on the general election ballot by submitting a petition with the signatures of 2% of those who voted in the last general election for Secretary of State.  As noted, this figure has hovered around 4,000 for the past decade-plus and there are over 647,000 persons from whom to secure signatures.

Once again, this figure is well under the constitutional ceiling set by the Supreme Court and is justified because, requiring candidates to demonstrate a significant modicum of support before gaining access to the ballot, is a compelling state interest and serves to minimize confusion.  *See*, *e.g.*, *Lopez Torres*, 552 U.S. at 201, 207-08 (approving judicial electoral system where those nominated through party judicial nomination convention could be joined by others who timely submit nominating petitions with between 3,500 and 4,500 signatures or signatures

---

[9]      The nominating convention is not particular to the Libertarian Party; if any party's candidate for Secretary of State receives between 2% and 10% of the votes cast for Secretary of State, it is able to nominate judicial candidates directly to the general election ballot.

[10]     Plaintiff notes that the Libertarian candidate for Marion County Superior Court judge made the general election ballot in 2002 and combines that fact with the fact that Indiana Code § 33-33-49-13 was amended after that date -- true but irrelevant.  The ability for Libertarians to gain access to the Marion County Superior Court judge race has been the same for years.  Thus, the same opportunity exists for such candidates to gain access to the general election ballot and the amendment of Indiana Code § 33-33-49-13 does not speak to that ability at all.  If anything the results for minor-party candidates before the amendment of Indiana Code § 33-33-49-13 shows nothing more than candidates and parties self-select whether to enter certain races.  *See Lopez Torres*, *supra*.

representing 5% of the votes cast for Governor in that district in the prior election -- whichever is less); *Munro*, 479 U.S. at 190, 192-97 (upholding provision that required minor-party candidate to get 1% of the vote in a primary election to be included on the general election ballot and reasoning that "it is now clear that States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office" and this furthers a "vital" interest in "maintaining the integrity" of the "political process" and the "stability" of the "political system" and helps to prevent voter confusion, ballot overcrowding and the presence of frivolous candidacies); *Jenness*, 431 U.S. at 432, 442 (constitutionally approving 5% requirement for general election ballot access and reasoning that there "is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot -- the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election").  *See also Hall v. Simcox*, 766 F.2d 1171 (7th Cir. 1985) (upholding 2% floor as it was well within the limit set by the Supreme Court); *Populist Party v. Orr*, 595 F. Supp. 760 (S.D. Ind. 1984) (same).

And, beyond all of this, Indiana allows write-in candidates so long as they have declared their write-in candidacy and no minimum number of signatures is required for this avenue. *Compare Burdick*, 504 U.S. at 436-40 (upholding Hawai'i's prohibition on write-in candidates because there were ample other ways for candidates to appear on the ballot and, therefore, for voters to have meaningful vote and the State had a valid interest in "avoiding the possibility of unrestrained factionalism at the general election" and in reserving "the general election ballot … for major struggles … and not a forum for continuing intraparty feuds" and in avoiding sore-loser candidacies).

In sum, Indiana law provides numerous constitutionally sound avenues for candidates to access either the primary election ballot or the general election ballot.[11]   Therefore, there is no significant burden on a candidate's ability to access the ballot and, in turn, there is no significant burden on voters who want to meaningfully participate in the election process.   The "restrictions" noted above -- for example, the primary election system, who can vote in the primary election, the percentage that requires a primary system, the ability for other minor-party candidates to get into the general election, and the ability for non-party candidates and even write-in candidates to get into the general election -- have been upheld by the Supreme Court not only because these "restrictions" do not significantly burden ballot access or voter rights but also because there are compelling state reasons for them (preventing voter confusion, using the election process to winnow the field, reserving to the general election battles on major issues, political stability, significant modicum of support, etc.).[12]

Plaintiff's Motion for Summary Judgment must be denied and State Defendants' Motion for Summary Judgment must be granted.   *See also Republican Party of North Carolina v. Martin*, 980 F.2d 943, 960 (4th Cir. 1992) ("[t]he First Amendment guarantees the right to participate in the political process" but it "does not guarantee political success").

---

[11]      If anything, this Indiana system allows for minor-party or non-party candidates to "knock-off" those endorsed by Democrats and Republicans.   To get on the general election ballot, the non-Democratic and non-Republican candidates need far fewer signatures than Democratic and Republican candidates need votes in the primary.   And, once on the general election ballot, all these candidates need do is not finish last in a field of 16 or 20.   In other words, such candidates have 16 or 20 shots at a judgeship -- depending on the year.

[12]      Contrary to Common Cause's contention, Indiana need not justify its laws by making a "particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194-95.   Indeed, to "require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate.   Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action.   Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Id*. at 195.

**E.     Plaintiff's Arguments To The Contrary Fail**

Common Cause does not, because it cannot, argue that the laws regulating Indiana's primary election system or the laws allowing minor-party and non-party candidates to access the general election ballot are unconstitutional.   Notwithstanding the constitutionally available means for ballot access/meaningful participation, Common Cause still argues that Indiana Code § 33-33-49-13 deprives Marion County voters of a meaningful vote.   Plaintiff's argument is rooted in the fact that this provision allows (but does not require) any political party to nominate, through the primary process, up to eight (or, depending on the year, 10) candidates to the general election ballot when there will be 16 (or, depending on the year, 20) judges elected.   According to Common Cause, this means that the general election is a foregone conclusion and, therefore, Indiana Code § 33-33-49-13 violates the First Amendment.

Whether minor-party candidates have ever actually been elected to the Marion County Superior Court bench is not material.   To that end, the cases discussed above all make clear that a factual analysis of election results (presumably to show the "competitiveness" of elections) is not material to a First Amendment claim challenging an election law on the basis of "ballot access" or "meaningful vote" because what matters is whether the statutory framework provides avenues for access.   Indeed, in *Lopez Torres*, a similar argument was pressed by the challengers.   To that end, they maintained that the Constitution required New York's laws to not only allow them access to the ballot but to also have a fair shot in the competition.   *See* 552 U.S. at 204 ("[t]he weapon wielded by these plaintiffs is their *own* claimed associational right not only to join, but to have a certain degree of influence in the party" and they "contend that New York's electoral system does not go far enough -- does not go as far as the Constitution demands -- in ensuring that they will have a fair chance of prevailing in the parities' candidate-selection process") (emphasis in original); *see also id*. at 204-05 (the "real complaint is not that they cannot vote in

25

the election for delegates, nor even that they cannot run in that election, but that the convention process that follows the delegate election does not give them a realistic chance to secure the party's nomination" because the party leadership "inevitably garners more votes for its slate of delegates" and, thus, the "leadership effectively determines the nominees").

The Court flatly rejected this argument as it "finds no support in our precedents." *Id*. at 204. In fact, the Court reasoned that "this says nothing more than that the party leadership has more widespread support than a candidate not supported by the leadership. No New York law compels election of the leadership's slate -- or, for that matter, compels the delegates elected on the leadership's slate to vote the way the leadership desires. And no state law prohibits an unsupported candidate from attending the convention and seeking to persuade the delegates to support her. Our cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements." *Id*. at 205 (collecting cases).

In the end, the Court concluded that "[n]one of our cases establishes an individual's constitutional right to have a 'fair shot' at winning the party's nomination. And with good reason. What constitutes a 'fair shot' is a reasonable enough question for legislative judgment, which we will accept so long as it does not too much infringe upon the party's associational rights. But it is hardly a manageable constitutional question for judges -- especially for judges in our legal system, where traditional electoral practice gives no hint of even the existence, much less the content, of a constitutional requirement for a 'fair shot' at party nomination." *Id*. at 205-06. "Competitiveness may be of interest to the voters in the general election, and to the candidates who choose against the dominant party. But we have held that those interests are well enough protected so long as all candidates have an adequate opportunity to appear on the general-election ballot." *Id*. at 207.

Common Cause also argues that a Democratic/Republican voter does not have a meaningful vote because she cannot vote in the opposite party primary and, according to Common Cause, she would only ever want to vote for 16 or 20 (depending on the year) candidates of her own party and Indiana's system prevents that.[13]  As for independents, Plaintiff argues that they have no meaningful vote because they cannot vote in either primary.  Thus, the argument goes, a meaningful vote only occurs where an electoral system allows a Democratic/Republican/Independent voter to actually impact the election results by electing judges from her political stripe.  This concept is belied by *Lopez Torres* and the other cases that have upheld election provisions even in the face of "evidence" that minor-parties/non-parties are typically unsuccessful in elections and even in the face of one-party entrenchment.  Indeed, if likelihood of electoral success were the constitutional standard, it is likely that no election law would be constitutional because history tells us that candidacies by minor-parties/non-parties are rarely successful -- in terms of ultimately being elected -- given our predominantly two-party system.  *See Lopez Torres*, *supra*; *Timmons*, *supra*.[14]

There is no constitutional requirement that a State must allow Democrats the ability to vote in Republican primaries, Republicans the opportunity to vote in Democratic primaries, or independents the chance at voting in their primary of their choice.  In fact, parties clearly have constitutionally protected rights of association and have the constitutional right to choose their

---

[13]     Of course, the vote tallies belie Plaintiff's suggestion that all Republicans vote the same and all Democrats vote the same.  *See generally* King Decl.; Deckard Decl.

[14]     This seems to be a very "partisan" position advocated by the "non-partisan" Common Cause.  *See* ECF 41 at 6-7 (Common Cause purporting to be an "independent, non-partisan organization" and, its "independent voter members are persons who do not, from election to election, regularly vote for a majority of nominees of the Democratic Party or Republican Party and who do not wish to declare themselves as either a Democrat or Republican"); ECF 41 at 7 (Ms. Vaughn testifying that:  "she does not follow a specific party line or candidate slate when voting and will vote for candidates from different parties").  Of course, comments about what Common Cause members told Ms. Vaughn are hearsay and, thus, inappropriately before this Court.  *See*, *e.g.*, ECF 40-6, ¶¶ 10, 12.  It is also worth noting that neither the Democratic Party nor the Republican Party has ever sought to invalidate Indiana Code § 33-33-49-13; thus, the parties, which have associational rights protected by the First Amendment, must be satisfied that it provides an appropriate means for electing judges in Indiana's most populace county.  Put simply, there is no constitutional requirement that each Marion County courtroom have a separate election nor is there any constitutional requirement that a voter must have a chance to put all members of his/her party into every slot that is up for election.

own standard-bearer in a general election. *See Jones*, 530 U.S. at 577 (invalidating California's blanket primary law because it allowed non-party members the ability to determine the candidate bearing the party's standard in the general election); *Timmons*, 520 U.S. at 359 (political parties certainly have the right to choose their standard-bearers).  And, in any event and as discussed above, Indiana's primary system is not as "closed" as Common Cause argues. *See also* ECF 40-6, ¶ 11 (Ms. Vaughn testifying that she regularly votes and does not follow a specific party line or slate of candidates but that she votes in primaries).

Further, as noted above, there are ways for other candidates to make the general election ballot.  Parties whose candidates for Secretary of State have garnered between 2% and 10% of that vote in the last general election can hold a nominating convention and nominate candidates directly to the general election ballot.  Others can gain access to the ballot by securing the signatures of Marion County voters equaling 2% of the vote that was cast in Marion County for the Secretary of State in the previous general election.  Still others can declare as a write-in candidate.  These floors are constitutional and, in fact, the historic data shows that 2% has equated to about 4,000 -- far below the figures that party candidates have needed to move on from the primary election to the general election.

The mere fact that any political party can nominate eight (or, depending on the year, 10) candidates to the general election to vie for 16 (or, depending on the year, 20) judgeships in Marion County simply does not mean that Indiana's electoral framework is unconstitutional. *See* ECF 41 at 8 ("[e]lectoral uniqueness does not, of course, necessarily spell unconstitutionality"). Indiana provides many other ways for other political party candidates, minor-party candidates, and non-party candidates to gain ballot access -- and, therefore, for voters to meaningfully participate in the electoral process.  There is simply no constitutional requirement that every

voter gets to cast her ballot for a particular candidate or for a voter to elect all members of her party to all open slots.  *See Lopez Torres*, *supra*; *Burdick*, *supra*.

And, beyond the repeatedly recognized legitimate reasons advanced above for this provision -- for example, using the primary system to winnow candidates, allowing minor-parties to nominate candidates, permitting non-party candidates to make the ballot upon a modest showing of support, and even sanctioning the ability of write-in candidates who have not shown any support -- this Court must remember that this case involves the election of judges and not members of the legislative or executive branch.  In our system, judges are supposed to be impartial such that they judge the case before them based on the applicable law and the facts that have been developed through our adversarial system.  Indeed, the Supreme Court has recognized the critical distinction between judges, on the one hand, and legislators/executives, on the other.

In *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) no fewer than six Justices remarked about the distinct nature of judicial officers.  For example, the dissenting opinion of Justices Ginsberg, Stevens, Souter, and Breyer, began by noting that "judges perform a function fundamentally different from that of the people's elected representatives.  Legislative and executive officials act on behalf of the voters who placed them in office; '[j]udges represent[t] the Law.'"  *Id*. at 803 (quoting *Chisom v. Roemer*, 501 U.S. 380, 411 (1991) (Scalia, J., dissenting)).  "Unlike their counterparts in the political branches, judges are expected to refrain from catering to particular constituencies or committing themselves on controversial issues in advance of adversarial presentation.  Their mission is to decide 'individual cases and controversies' on individual records, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 266 (1995) (Stevens, J., dissenting), neutrally applying legal principles, and, when necessary, 'stand[ing] up

to what is generally supreme in a democracy:  the popular will.'  Scalia, The Rule of Law and a Law of Rules, 56 U. Chi. L. Rev. 1175, 1180 (1989)."  *Id*. at 803-04.[15]

The concurring opinions agreed with much of this sentiment.  For example, Justice O'Connor wrote "separately to express [her] concerns about judicial elections generally" because the State clearly has a compelling interest in having an "actual and perceived … impartial judiciary."  *Id*. at 788.  Justice O'Connor recognized the need for an impartial judiciary and believed that "if judges are subject to regular elections they are likely to feel that they have at least some personal stake in the outcome of every publicized case.  Elected judges cannot help being aware that if the public is not satisfied with the outcome of a particular case, it could hurt their reelection prospects."  *Id*. at 788-89.  And, "[e]ven if judges were able to suppress their awareness of the potential electoral consequences of their decisions and refrain from acting on it, the public's confidence in the judiciary could be undermined simply by the possibility that judges would be unable to do so."  *Id*. at 789.  Further, Justice O'Connor acknowledged that "contested elections generally entail campaigning" and "campaigning for a judicial post today can require substantial funds."  *Id*.  This reality results in the need for substantial fund raising, which can further erode the actual and perceived impartiality of the judiciary.  *Id*. at 790.  *See also id*. at 793 ("Minnesota has sought to justify its speech restriction as one necessary to maintain the integrity of its judiciary" and "[n]othing in the Court's opinion should be read to

---

[15]      *See also id*. at 804-06 (using language like:  "[l]egislative and executive officials serve in representative capacities" whereas judges "are not political actors" and "do not sit as representatives of particular persons, communities, or parties" and it is the business of "judges to be indifferent to popularity"; judges are an "essential bulwark of constitutional government" and "a constant guardian of the rule of law"; it is the "guarantee of an independent, impartial judiciary enables society to 'withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts"; and even when developing common law or interpreting texts, "judges act only in the context of individual cases, the outcome of which cannot depend on the will of the public") (quoting *Chisom*, 501 U.S. at 401 n.29; *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943)).

cast doubt on the vital importance of this state interest" and "[j]udicial integrity is, in consequence, a state interest of the highest order") (Kennedy, J., concurring).[16]

Thus, even if Common Cause were correct that Indiana Code § 33-33-49-3 always guarantees the election of the party-chosen candidates, it is constitutional because it furthers the compelling state interests noted above (significant modicum of support, reducing factionalism, integrity of the primary/general electoral process) as well as the vital state interest in judicial impartiality and integrity.[17]   It certainly could be that this system will reduce campaigning between candidates for a judgeship, which, in turn, reduces the need to raise money as well as the perception that judicial decisions are influenced by politics and money.  Further, this system can help to prevent one-party entrenchment of the judiciary in Indiana's most populous county.[18]

###### F.      Eleventh Amendment/Standing/Immunity

###### 1.      Common Cause Lacks Standing

Article III limits the "judicial power" of the United States to the resolution of "cases" and "controversies." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471 (1982).  While courts have the power to determine whether a

---

[16]      While Justice Scalia thought that Justice Ginsburg "greatly exaggerates the difference between judicial and legislative elections" (*id*. at 784) the concurring opinions of Justice O'Connor and Justice Kennedy confirm that six of the nine Justices believe that representative positions are fundamentally different than judicial positions.

[17]      Common Cause argues that this system makes judicial elections more political because it focuses the contest on the primary election.  *See* ECF 41 at 14-15.  However, it has provided no evidence to support the claim that the primary process is "intensely partisan" or that voters "do not view the trial bench as a single monolith comprised of all of its members."  ECF 41 at 15 n.6.  In any event, the Supreme Court found no constitutional flaw in New York's system where the facts demonstrated that elected judicial delegates nominated judicial candidates consistent with party leadership because the statutory framework allowed other delegate candidates to constitutionally access the ballot.  *See Lopez Torres*, *supra* (upholding law even though, over a 12-year period, half of the elections were uncontested because all that shows is that a party decides, for political reasons, not to run candidates in certain districts).  And, the Supreme Court has approved of an outright prohibition on write-in candidates in Hawai'i where there was historically one-party domination in certain races.  *Burdick*, *supra*. Plaintiff's argument is no different.

[18]      For example, Common Cause suggests that each courtroom should be subject to a separate election.  Such a system would likely increase the need to raise money and campaign because there could only be one winner for each courtroom -- despite the fact that Indiana's primary election process and easy access to the general election ballot could allow countless candidates for any one seat.  Moreover, Marion County Superior Court is not limited to an area or neighborhood of the County; thus, State Defendants do not understand what Plaintiff means when it argues that a court-by-court election would "allow voters to focus on judicial elections of particular interest" since any matter could be assigned to any judge.  ECF 41 at 16.

statute is constitutional, this power arises only when the question is presented in an actual case or controversy between parties; courts do not have the power to issue advisory opinions. *Wisconsin's Envtl. Decade, Inc. v. State Bar of Wisconsin*, 747 F.2d 407, 410 (7th Cir. 1984), *cert. denied*, 471 U.S. 1100 (1985) (citing *Muskrat v. U.S.*, 219 U.S. 346, 361-62 (1911)).  A plaintiff must demonstrate standing. *Valley Forge*, 454 U.S. at 471.  To have standing a plaintiff must demonstrate: 1) a personal injury; 2) fairly traceable to the defendant; 3) that is likely to be redressed in the event of a favorable ruling from the Court.  *Plotkin v. Ryan*, 239 F.3d 882, 884 (7th Cir. 2001).  The second and third prongs require "a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  Such considerations are especially important when state laws are at stake because the federal courts must ensure that the principles of federalism are not contravened. *Id.* at 854.

The party invoking federal jurisdiction bears the burden of establishing standing and, since standing is an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff ultimately bears the burden of proof. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Scanlan v. Eisenberg*, 669 F.3d 838, 841-42 (7th Cir. 2012) (reviewing a 12(b)(1) motion to dismiss for lack of standing and holding that the "burden to establish standing is on the party invoking federal jurisdiction").  Thus, since we presently are at the summary judgment stage, Common Cause must provide undisputed facts to demonstrate that it has standing to litigate its constitutional challenge. *Lujan*, 504 U.S. at 561.

Even without Indiana Code § 33-33-49-13, there will be no change to the primary election process for Marion County Superior Court judges.  Thus, there will be no change to how a candidate gets on the primary election ballot and no change in terms of who can (and cannot) vote in the primary election.  In other words, whatever "restrictions" exist as to the ability of

Republican/independent voters to vote in Democratic primaries or Democrat/independent voters to vote in Republican primaries will still exist and there will be no increased ability to meaningfully participate in that process.  Likewise, there will be no change to the ability of minor-party candidates to access the general election ballot or for non-party candidates to do so and, thus, there will be no increase in the ability to meaningfully participate in that process.

The Democratic and Republican primary (and any other primary) will occur and votes will be cast for however many candidates appear on that ballot.  There will be nothing mandating that either party move the top 16 (or, depending on the year, 20) candidates onto the general election and there is no guarantee that 16 (or 20) candidates will even appear on the primary election ballot -- in fact, in the past 12 years, this has never occurred.  Thus, invalidating Indiana Code § 33-33-49-13 will not provide the means for Marion County Democrats to elect all Democratic judges nor will the invalidation of Indiana Code § 33-33-49-13 provide the means for Marion County Republicans to elect all Republican judges.  Needless to say, invalidation of Indiana Code § 33-33-49-13 will provide nothing more to an independent voter in terms of electing judges who are independents and, given Plaintiff's logic, if the Democratic Party and Republican Party actually move 16 (or 20) onto the general election ballot, there will be even less of a "meaningful vote" for independent voters.  Indeed, the positions of "Democratic, Republican, and independent" members of Common Cause are actually in conflict because if one candidate wins, another necessarily loses.  In sum, invalidating this provision will not provide relief to the voters that Common Cause believes is constitutionally required.

## 2.      Eleventh Amendment/Standing/Immunity -- The Governor

Indiana's election laws do not impose any particular duty on the Governor as it relates to the provision that has been challenged.  "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *1st*

*Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 113-14 (3d Cir. 1993) (holding that the school district officials, not the Attorney General or state Secretary of Education, were the proper defendants in a challenge to a contractor residency requirement); *see also Rubin v. City of Santa Monica*, 308 F.3d 1008, 1019 (9th Cir. 2002), *cert. denied*, 540 U.S. 875 (2003) (federal courts lacked jurisdiction over a city ballot text dispute brought against the California Secretary of State because the city was not required to follow the Secretary's directions when running its municipal elections); *Libertarian Party of Indiana v. Marion County Board of Voter Registration*, 778 F. Supp. 1458, 1459 (S.D. Ind. 1991) (holding that there is no subject matter jurisdiction to adjudicate lawsuits against Indiana State Defendants who have no authority to provide the relief Plaintiffs seek).

Put another way, case law is clear that the Governor cannot be sued merely for signing a bill into law.  *See Bogan v. Scott–Harris,* 523 U.S. 44, 53-55 (1998) (also concluding that the signing of a bill into law is a legislative act that is protected by absolute immunity); *Supreme Court of Virginia v. Consumers Union of the U.S., Inc.,* 446 U.S. 719, 732-33 (1980) (applying this immunity to claims for damages and injunctive and declaratory relief).  *See also Hearne v. Board of Education of the City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999) (union could not bring a claim for declaratory and injunctive relief pursuant to *Ex parte Young* for alleged civil rights violations against a governor where the governor's sole official act was signing a bill into law restricting employees' collective bargaining rights; the governor had no role to play in the enforcement of the challenged statutes and did not have the power to nullify the legislation once it had entered into force).

And, the fact that the Governor has a general duty to uphold laws or appoint agency heads or approves rules does not enable Plaintiffs to name the Governor as a defendant in this litigation.  *See also Ex Parte Young*, 209 U.S. 123, 157 (1908) (rejecting the theory that the

34

constitutionality of a statute could be tested merely by bringing a suit against the governor or the attorney general, based on the theory that they have the general duty to execute and enforce the laws: "[t]hat would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law" but "it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons"); *Shell Oil Co. v. Noel*, 608 F.2d 208, 211(1st Cir. 1979) ("[t]he mere fact that a governor is under a general duty to enforce state law does not make him a proper defendant in every action attacking the constitutionality of a state statute.").

IV.     **Conclusion**

        For the above reasons, the State Defendants respectfully request that this Court deny Plaintiff's Motion for Summary Judgment and grant State Defendants' Motion for Summary Judgment.

                                        Respectfully submitted,

                                        GREGORY F. ZOELLER
                                        Attorney General of Indiana
                                        Atty. No. 1958-98

Date:  May 30, 2014            By:     */s/ Kenneth L. Joel*
                                        Kenneth L. Joel, Atty. No. 30271-49
                                        Dino L. Pollock, Atty. No. 28009-64
                                        Deputy Attorneys General
                                        Office of the Indiana Attorney General
                                        Indiana Government Center South – 5th Fl.
                                        302 W. Washington St.
                                        Indianapolis, IN 46204-2770
                                        Phone: (317) 233-8296
                                        Fax:    (317) 232-7979
                                        Email:  Kenneth.Joel@atg.in.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2014, a copy of the foregoing *State Defendants'*

*Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support*

*of State Defendants' Motion for Summary Judgment* was filed electronically.  Notice of this

filing will be sent to the following parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Gavin M. Rose
ACLU OF INDIANA
grose@aclu-in.org




   */s/  Kenneth L. Joel*
Kenneth L. Joel
Deputy Attorney General




Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Phone:  (317) 232-6291
Fax:  (317) 232-7979
Email:  kenneth.joel@atg.in.gov