UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:12-cv-1603 RLY-DML |
| | ) | |
| INDIANA SECRETARY OF STATE, | ) | |
| in her official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Reply in Support of Motion for Summary Judgment and
Response in Opposition to Defendants' Cross-Motion for Summary Judgment**

**INTRODUCTION**

Lacking from the lengthy summary judgment memorandum of the defendants ("State") is any recognition of the unique – and uniquely unconstitutional – nature of Indiana Code § 33-33-49-13. The statute absolutely precludes the Democratic or Republican Party from nominating any more than one-half of the judges to be elected in Marion County. This results, in most elections, in an Election Day when every single candidate must win, regardless of the number of votes he or she receives. After the candidates are selected in the primary election, Election Day, and the fundamental right to vote, becomes largely meaningless. The statute simply cannot be rescued from a finding of unconstitutionality by arguing, as the State does, that third-party candidates and write-in candidates can infiltrate the field of judicial candidates. There has not been a third-party candidate since 2002, when only one appeared on the ballot, and the mere possibility that there could be such candidates in future elections does not change the unalterable and distinct nature of the statute – it is designed to deny persons the opportunity to have any say on all the candidates in a general election. And, if a person does not vote in the primary election,

he or she may have no say in the election at all. Given that "[w]here a state . . .  has decided to make certain public offices elective, it has also chosen to vest the electorate with the power to select one candidate over another," *Stegmaier v. Trammell*, 597 F.2d 1027, 1040 (5th Cir. 1979), and given that Indiana Code § 33-33-49-13 denies this basic right, the statute is unconstitutional. There are no contested issues of fact and summary judgment should be entered for plaintiff, Common Cause Indiana ("Common Cause").

ARGUMENT

## I.      Common Cause has standing to prosecute this action

At the conclusion of its memorandum, the State argues that Common Cause lacks Article III standing to prosecute this action.  (State's Br., at 31-33).  Given that this is a jurisdictional argument it should be addressed first, not last.  Common Cause clearly has standing.

 Of course, in order to possess standing, a party must demonstrate that it (a) has suffered an injury (b) fairly traceable to the defendants (c) that is likely to be redressed by a favorable decision on the merits.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Although it is not entirely clear from its memorandum which of these elements the State believes Common Cause fails to meet, it argues that standing is lacking insofar as a favorable decision will not alter either the ballot-access requirements for primary elections for judgeships on the Marion Superior Court or the requirements to vote in these primary elections (and that few candidates may choose to run for office).  (State's Br., at 32-33).  While this is all admittedly true, it does not follow that Common Cause lacks standing.

As explained previously, the challenged statute virtually guarantees that candidates prevailing at the primary elections conducted by the Democratic and the Republican parties are elected at the general election.  At the most, persons eligible to vote in these primary elections

will have an opportunity to cast a meaningful ballot for only half of the judgeships on the Marion Superior Court; and persons not eligible to vote in these elections will have no say whatsoever in electing judges in Marion County. Through this action, Common Cause is seeking only one thing: for the general election to mean something. At present, votes cast are meaningless insofar as, by virtue of the unique electoral scheme challenged in this case, every candidate who advances to the general election ultimately is elected to office. Given this, standing is self-evident: the members of Common Cause have been and are being injured by their inability to cast a meaningful vote for the Marion Superior Court, and this injury is fairly traceable to the challenged statute and may be remedied by an injunction against the enforcement of that statute.[1]

The State appears to suggest that Common Cause lacks standing because it cannot guarantee that candidates sufficient to fill all judgeships up for election will run for office in any given year.[2] There are multiple flaws in this argument. Most obviously, the fact that more

---

[1]     The State does not directly challenge Common Cause's standing to raise the interests of its members. In order to obtain such associational standing, an organization must meet the three-prong test set forth in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977):

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343. Clearly this test is met here: Common Cause has members in Marion County who are Democrats, Republicans, and independent voters that would have standing to sue in their own right; Common Cause's interests in ensuring that voters have the ability to cast a meaningful ballot are certainly germane to its purpose; and there is no need for the participation of individual members in this facial challenge to Indiana law. (In arguing that Common Cause lacks standing, the State briefly insists that its members have a conflict of interest with one another. The Seventh Circuit has addressed this issue under the "germaneness" prong of the *Hunt* test, and this issue is addressed immediately below. *See infra* note 4.)

[2]     The State notes that, in the past twelve (12) years, neither party has had enough candidates appear on the primary ballot to fill all positions on the Marion Superior Court. (State's Br., at 33). Of course, this is likely the result of the challenged statute itself (combined with a reluctance to run against a party's "slate," "the endorsement of the county party's leadership," *see Mulholland v. Marion County Election Board*, 746 F.3d 811, 813 (7th Cir. 2014)). Regardless, as both the intervention request of Christopher

people have not sought to run is a product of the challenged statute that caps the possible number of judgeships for Democrats and Republicans at one-half of the seats available. Presumably if twice the number of positions were potentially available to each party twice as many people would run. Moreover, the fact that voters might have a limited choice in candidates (or even no choice in candidates) by virtue of individual decisions not to seek office is far removed from this case, where the complete lack of choice is by statutory design.  This Court previously described this distinction in contrasting this case with *New York State Board of Elections v. López Torres*, 552 U.S. 196 (2008):

> Although, as a practical matter, many races were uncontested [in *López Torres*], this resulted not from the electoral scheme itself but from the natural consequences of electoral politics: the Republican Party may choose not to run a candidate in a heavily Democratic district, or vice versa, simply because of an assessment as to the candidate's chance of victory.
>
> By contrast, the electoral scheme set forth in Indiana Code Section 33-33-49-13 does not contemplate contested judicial races in the general election. . . .  This results in a system whereby the judicial candidates, who run at large, face no competition. . . .  Unlike *Lopez-Torres*, where this may have resulted from the party's decision not to run a candidate in certain districts (or the candidate's own decision), here, this fact results from operation of the challenged statute.

(ECF No. 30, at 17-18 [internal citation omitted]).  This distinction was underscored in *López Torres* itself, where the Court emphasized that "[n]o . . . law compels the election of the [party] leadership's slate" and that "cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements."  552 U.S. at 205.  The State simply does not address the clear difference between

---

Starkey (ECF No. 46) and the undisputed facts of this case make clear, routinely candidates appear on a party's primary election ballot in a number greater than half of the judgeships to be elected at the general election: in 2014, eleven (11) Democrats ran for eight (8) nominations (ECF No. 60-1, at 5); in 2012, twelve (12) Democrats and twelve (12) Republicans ran for ten (10) nominations per party (ECF No. 60-1, at 6); in 2008, nine (9) Democrats and nine (9) Republicans ran for eight (8) nominations per party (ECF No. 60-1, at 8); and in 2006, twelve (12) Democrats ran for ten (10) nominations (ECF No. 60-1, at 9).  (All citations in this paragraph refer to the page number assigned by this Court's ECF system.)

a limitation on voter choice brought about by virtue of governing statutes and one brought about by political factors, and its standing argument is therefore doomed from the outset.

Aside from failing to recognize this distinction, the State's argument suffers from another flaw: it ignores the fact that some semblance of a meaningful vote at the general election will occur if each party nominates candidates in a number greater than half but fewer than all judgeships up for election. While, as explained both previously and below, this would not be a constitutionally adequate solution (if the limitation were imposed by virtue of state law) insofar as a voter wishing to cast a ballot for all Democratic judges would still be prohibited from doing so, it does not follow that Common Cause lacks standing to challenge a system permitting *no* voter choice simply because the alternative might be a system permitting *some but not enough* voter choice. Common Cause and its members are injured by the unique statutory scheme in this case, and that injury may be redressed by a favorable decision. That is all that is necessary for standing.[3]

Finally, the State insists that Common Cause lacks standing because "the positions of its 'Democratic, Republican, and independent' members . . . are actually in conflict because if one candidate wins, another necessarily loses." (State's Br., at 33). But this case—and the interest of Common Cause in the challenged statute—is not about the *outcome* of elections. To the contrary, Common Cause seeks to ensure that each voter, whatever his or her political stripe, is able to cast a meaningful ballot for elected office. Certainly, as with any organization

---

[3]     The State insists in passing that, in the event of a judgment in favor of Common Cause, "[t]here will be nothing mandating that either party move the top 16 (or, depending on the year, 20) candidates onto the general election." (State's Br., at 33). The State does not explain this assertion. While the precise form of relief is ultimately within the Court's discretion, allowing each major party to nominate candidates for each judgeship to be elected at the general election is certainly one alternative: the flaw in Indiana Code § 33-33-49-13 is that it "caps" the number of candidates that may be nominated by each party at half the number of those to be elected at the general election, and perhaps the easiest remedy for the statute's constitutional flaws would be "capping" that number at the number of judges to be selected during the election cycle.

representing more than a handful of persons, Common Cause's members do not cast identical ballots.  But the fact that different members may prefer different elected officials is wholly unrelated to their membership in Common Cause, a non-partisan organization "dedicated to working so that citizens can make their voices heard in the political process" that "advocates for the elimination of barriers to voting and election fairness."  (Aff. of Julia Vaughn [ECF No. **XX**], ¶ 5).  This interest in electoral integrity and in ensuring voters' ability to cast meaningful votes is shared by all of Common Cause's members and is germane to Common Cause's purpose.  The fact that some members have different political inclinations wholly apart from their membership in Common Cause does not create a conflict affecting standing here.  If it did, it would be the rare case in which a conflict between an organization's members could *not* be alleged to affect associational standing.[4]

---

[4]      The State does not frame its argument in terms of the traditional test for organizational standing. To be sure, the Seventh Circuit has held that an organizational plaintiff fails to meet *Hunt*'s "germaneness" prong "where there is a serious conflict of interest between the organization and its members."  *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 864 (7th Cir. 1996).  As is pertinent here, this concern only "arises where the association's suit, if successful, would cause a direct detriment to the interests of some of its members and the litigation was not properly authorized."  *Id.* at 864.  Any such concern, however, is "allayed where the litigation was properly authorized in accordance with the association's procedures."  *Id.* at 865.

The circumstances where a conflict will be deemed sufficiently serious to defeat organizational standing appear limited to situations where an economically-oriented association advances litigation that, if successful, would financially harm some of its membership.  *See, e.g., id.* at 865-66 (police association challenged settlement agreement concerning pension funds even though some members benefited from that agreement); *Maryland Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1252-53 (4th Cir. 1991) (association of contractors challenged statute designed to ensure that minority-owned businesses receive a fair share of state contracts even though some of the association's members were minority-owned businesses benefiting from the statute); *Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*, 611 F.2d 684, 691 (8th Cir. 1979) (association of contractors challenged a "stabilization agreement" as violative of antitrust laws and state labor laws even though some members stood to benefit from the agreement).  In those circumstances, the conflict arises on an issue directly pertinent to the organization's interests.  As indicated above, that is not so here.

Regardless, however, this action was properly authorized in accordance with Common Cause's procedures.  (Supp. Aff. of Julia Vaughn [attached as Exhibit 1], ¶ 3).  Pursuant to the rule announced in *Retired Chicago Police Association*, that is also sufficient to render the State's argument meritless.

Common Cause has standing to prosecute this action, and the State's arguments to the contrary must be rejected.

## II.    The Governor is a proper party

In earlier seeking dismissal of this cause, the State argued that each of the defendants in this action was an improper party.  (*See* ECF No. 19, at 5-14).  On summary judgment, it has abandoned this argument with respect to the Indiana Secretary of State and the members of the Indiana Election Commission.  However, it continues to maintain that the Governor is an improper party.  (State's Br., at 33-35)  Given that the State has not advanced a similar argument with respect to the other defendants, this Court must reach the merits of Common Cause's claim. Regardless, this Court previously rejected the argument that the Governor is an improper party in the context of the State's Motion to Dismiss (ECF No. 30, at 11-13); the same result must issue now.

As noted previously, whether characterized as an argument that the plaintiff lacks standing to sue the Governor or characterized as an argument that the Governor is immune from suit, the question to be asked is whether the Governor "has some connection with the enforcement of the [challenged statute]."  *Ex parte Young*, 209 U.S. 123, 157 (1908).  However, it is not

> necessary that such duty . . . be declared in the [challenged statute]. . . .  The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specifically created by the act itself, is not material so long as it exists.

*Id.*  To be sure, and as noted by the State, under most circumstances the "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to

litigation challenging the law." (State's Br., at 33 [quoting *1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 113-14 (3d Cir. 1993)]).

The problem for the State, however, is that the Governor has not been named as a defendant based on some general duty to enforce the laws (or for "merely . . . signing a bill into law") (State's Br., at 34); he has been named because he has a specific connection to the challenged statute here insofar as he is statutorily responsible for issuing commissions to all judges in Indiana, Ind. Code § 4-3-1-5(4). This Court previously held that this statutory duty is sufficient to render the Governor a proper party:

> Merely because the issuance of a commission is not mandatory in order for one to hold elected office does not meant that issuance of a commission, or the declination to issue a commission, is . . . an illusory act that cannot and should not be enjoined. . . . [I]t is, at the very least, evidence "that the title to an elected office has been vested in a person by the votes of the people."

(ECF No. 30, at 12 [internal citation omitted]). This is precisely what Common Cause seeks against the Governor: an injunction prohibiting him from issuing commissions to any judges elected under the unconstitutional statutory scheme. This is not an injunction arising merely out of the Governor's general duty to enforce the laws.

Notwithstanding the fact that the breadth of the injunction sought against the Governor was previously made clear by both Common Cause and the Court, the State offers only boiler-plate law holding that a state official may not be sued based on a general duty to enforce the laws or on the act of signing a bill into law. Common Cause does not dispute these principles, but they are simply irrelevant to this case, where the Governor has been sued based on a specific duty connecting him to the challenged statute. The State's argument is without merit, and Common Cause's claim against the Governor must be resolved on the merits.

## III.   Indiana Code § 33-33-49-13 is unconstitutional

## A.      Introduction

In its original memorandum Common Cause demonstrated that the challenged statute imposes a severe burden on the right to vote that cannot be justified by any narrowly-tailored compelling governmental interest.  (ECF No. 41 at 11-16).  Moreover, Common Cause also established that even if the most deferential scrutiny to election laws was applied, the statute still fails.  The State fails to respond to this latter argument at all.  It also fails to articulate in any detailed manner the compelling interests addressed by this specific statute.  And, it is unable to show that an electoral scheme that guarantees that voters will have no say in a general election on all, or virtually all, of the candidates running, is anything but a severe burden.  The statute is unconstitutional.

## B.      The statute creates a severe burden on the right to vote

The State does not disagree that the  proper analysis of the constitutionality of an election law is set out in *Anderson v. Celebrezze,* 460 U.S. 780, 788-89 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  This standard requires that this Court "'weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justification for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89).  Nor does the State dispute that under this test a severe burden must be justified by a narrowly drawn and compelling interest. *Id.*   However, it erroneously argues that the law does not impose a severe burden.  It does.

It is undeniable that "[t]he foundation of our 'democratic process' is the right of all qualified voters to cast their votes effectively."  *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 729

(1st Cir. 1994) (citing *Burdick,* 504 U.S. at 433; *Anderson*, 460 U.S. at 787; *Wesberrry v. Sanders*, 376 U.S. 1, 17-18 (1964); *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964)). The State appears to recognize that, using the 2012 Marion County judicial elections as an example, 20 candidates running for 20 positions, *see* ECF No. 40-3, Ind. Code § 33-33-49-13 (2006) (noting that voters can vote for 20 candidates with each party nominating no more than 10 candidates), does not provide an opportunity for "effective" voting. However, the State argues that even though Democrats and Republicans are limited to nominating candidates for exactly one-half of the judicial positions, the fact that third-party, independent, and write-in candidates may access the election day ballot saves the statute from imposing a severe burden on the right to vote.

While it is true that Indiana law has constitutional procedures that allow for non-Democrats and non-Republicans to gain access to the Marion Superior Court judicial ballot, this does not in any way minimize the unconstitutionality of the challenged statute.[5] First, the statute is designed to ensure that partisans of the major parties will not be able to vote to fill all judicial positions with members of that party. No matter how many independent candidates might elect to run, a Democrat will only be able to vote to elect Democrats to one-half of the open positions,

---

[5]     In its original brief Common Cause stated that county judicial positions are not one of the offices for which candidates can be selected through the convention process. (ECF No. 41 at 5, citing Ind. Code § 3-8-4-2). This is not entirely accurate and counsel apologizes for the error. While this is true of political parties whose nominees received more than 10% of the total vote cast for secretary of state at the last election, *see* Ind. Code §§ 3-8-4-1, 3-8-4-2, 3-8-4-10), parties that received at least 2% of this vote, but less than 10% may nominate judicial candidates at a convention. Ind. Code § 3-8-4-10, 3-8-4-10(b)(5). The only party in this 2% to 10% category since 2002 is the Libertarian Party. *See* ECF No. 60-2 (Exs. C [2010 election]; Ex F [2006 election]; Ex. G [2002 election]). However, the challenged statute provides that political parties that have primaries (*i.e.* the Democratic and Republican parties) are to each nominate candidates for one-half of the judicial positions, and that "[o]ther candidates may qualify under IC 3-8-6 to be voted on at the general election." Ind. Code § 33-33-49-13(b). The cited statute, Ind. Code § 3-8-6 concerns itself only with nominations by petitions for independent candidates or candidates representing a political party not qualified to nominate candidates either though a primary or by a convention. Ind. Code § 3-8-6-1(a). Therefore, it is not entirely clear how Libertarians are entitled to run for Marion County judicial elections. Given the obvious unconstitutionality of the challenged statute this apparent anomaly of Indiana's election law is not relevant.

and the same with a Republican partisan. *See* Ind. Code § 3-8-6-1 (limiting the ability to petition to independent candidates or representatives of political parties who do not nominate in primaries or conventions). And, if a person is a truly independent voter and therefore precluded from voting in either party primary, *see* Ind. Code § 3-10-1-6, the voter will not, assuming that the same number of persons are running as there are judicial positions, have any say in the election whatsoever.[6]   And, it is uncontested that since one Libertarian candidate made it on the ballot in 2002, in every subsequent election the only candidates running were Democrats or Republicans. (ECF 40-3).  Thus, in every judicial election since 2002, every candidate running was elected.

In response to this historical fact the State argues, repeatedly, that history is not relevant. It is certainly true, as noted above, that the Supreme Court has held that "[o]ur cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements." *López Torres*, 552 U.S. at 205 (citing *Bullock v. Carter*, 405 U.S. 134 (1972); *Williams v. Rhodes*, 393 U.S. 23 (1968); *Anderson, supra*).  However, this does not prevent a court from acknowledging reality in assessing an election scheme.  Indeed, in *Williams v. Rhodes*, which struck down Ohio's highly restrictive requirements for third-party ballot access, the Court, in discounting Ohio's claims that the restrictions were necessary to stop ballots from being overwhelmed with third-party

---

[6]     The State seems to discount the conundrum of the independent voter who cannot satisfy the requirements of Indiana Code § 3-10-1-6 to vote in either the Democratic or Republican Primary. (*See* State's Br., at 20 n.8).  The State appears to suggest that these voters can access primary ballots by lying inasmuch as they will not be caught and cites to *Griffin v. Roupas*, 385 F.3d 1128, 1132 (7th Cir. 2004). *Griffin* most decidedly does not support this argument as in that case the court rejected an argument predicated on the fact that other persons might lie in order to be able to cast absentee ballots.  The court did not accept an argument based on the supposition that a state-election law might be "enforced laxly, or perhaps is difficult to enforce at all." *Id.* This appears to be the precise argument that the State is making.

candidates, noted that "the experience of many States, including that of Ohio prior to 1948, demonstrates that no more than a handful of parties attempts to qualify for ballot positions even when a very low number of signatures, such as 1% of the electorate, is required." 393 U.S. at 33 (footnote omitted).  Thus, it is perfectly appropriate to look at historical experience to assess the constitutionality of the statute.

Moreover, the State's argument misses the point.  This is not a ballot access statute where it is easier for some parties to access the ballot than for other parties or persons and the question is whether this difficulty is constitutionally permissible where it is more arduous for third-parties to access the ballot.  This is a statute which affords as a "default" position no choice for voters. This is the statute's intended purpose – to provide no voter choice.  It explicitly limits each party to one-half of the positions.  The fact that third-parties or individuals may gain access to the ballot, although they have not since 2002, does not alter the unique structure of the statute.  In 2012 there were, by explicit statutory design, 20 candidates for 20 positions, consisting of 10 Republicans and 10 Democrats.  This structure clearly amounts to a severe burden on the right to vote – "the power to select one candidate over another." *Stegmaier*, 597 F.2d at 1040.[7]

The State obviously does not recognize this.  Nowhere is this clearer than in its continued reliance on *López Torres.* In *López Torres* the Court rejected the argument that the fact that some judicial elections were, because one of the two major parties chose not to field a candidate, "uncompetitive" rendered the nomination process unconstitutional. 552 U.S. at 207-08.  This "one-party entrenchment," *id.* at 208, was not the result of any statutory scheme, but the result of

---

[7]      And, as noted in this Court's Order denying the State's motion to dismiss, adding an independent candidate to the list of judicial candidates would hardly change the "non-election" nature of the election. "[I]f, as in 2002, one candidate petitions to appear on the general election ballot, and 16 seats are available, a ballot selecting 16 only meaningfully impacts the election for the last judgeship selected. Thus, the potential for independent and third-party candidates to appear on the ballot does not alleviate the burden imposed by Indiana's electoral scheme."  (ECF No. 30 at 19).

what the First Amendment envisions – "an open marketplace where ideas, most especially political ideas, may compete without government interference. . . [The Constitution] does not call on the federal courts to manage the market by preventing too many buyers from settling on a single product." *Id.*

In *López Torres*, therefore, voters were given the opportunity to choose among competing candidates on election day and if a party chose not to field a candidate, that was the private choice of the candidate and the parties.  It was not mandated in any way by the challenged statutory scheme, nor was it a consequence of the statute..  The contrast here is clear.  As this Court has already noted, the lack of competitive races in *López Torres* was a function of private decisionmaking whereas the lack of contested judicial races in Marion County "results from operation of the challenged statute." (ECF No. 30 at 18).

The operation of the statute is what denies the meaningful right to vote here. Common Cause, despite the State's argument to the contrary, is not arguing that the law is unconstitutional because it denies an equal and full opportunity to all for electoral success, *see, e.g.,* State's Br., at 27.[8]  This is not a case about electoral success.  It is not a case about the ability of an individual candidate's ability to run and win. It is about a system that is designed to guarantee electoral success to all who run, regardless of the voters, assuming that each candidate votes for himself or herself.

The question is whether this system, mandated by the challenged statute, imposes a severe burden on the right to vote.  If the right to vote means a right to a meaningful vote, as it

---

[8]     During the course of its memorandum, the State argues that "[t]his seems to be a very 'partisan' position advocated by the 'non-partisan' Common Cause. (State's. Br. at 27 n.14).  This just highlights the misplaced nature of the State's argument.  Common Cause is not saying that all the superior court judges should be Democrats or that all should be Republican.  Common Cause exists to advocate for electoral fairness, ECF No. 40-6 ¶ 5, and that is exactly what Common Cause is advocating for in this case – an electoral system where voters have a say in the election of all of the judges.

certainly does, *see* ECF No. 41 at 10-11, then the answer is easy. The statute, by its explicit terms, denies the right to a meaningful vote.  It is difficult to postulate a more severe burden than an electoral process that denies the voters the ability to meaningfully affect or impact the election.

### C.        The statute is not justified by a narrowly tailored compelling state interest

Given that the challenged statute imposes a severe burden on the right to vote, it is incumbent upon the State to articulate the "precise interests" that justify this burden and the burden must represent a compelling governmental interest that is narrowly tailored to serve the interests. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  The States summarizes what it contends are the compelling interests justifying the statute here as: "[insuring a] significant modicum of support, reducing factionalism, [assuring] integrity of the primary/general electoral process." (*Id.* at 31).   The State argues further that the statute furthers "the vital state interest in judicial impartiality and integrity."  *Id.*

As an initial matter,  it must be reemphasized that the State's responsibility at this point is to advance "the precise interests . . . for the burden imposed by" the statute. *Anderson*, 460 U.S. at 789.  It must, therefore, "adduce proof of its actual, compelling governmental interest." *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 826 (N.D. Ohio 2006) (citing *Thompson v. Western States Medical Center*, 535 U.S. 357, 373 (2002)).  Even giving the State considerable leeway in articulating its interest, postulating something as "it certainly could be" appears to be far removed from an "actual" interest.  This is particularly true given that the three defendants in this case denied knowing the intent of the challenged state and declined, in response to discovery requests, to offer any justification for the statute.  *See,* ECF Nos. 40-1 at ¶¶ 2, 40-5 at ¶ 2, 40-6.

More importantly, at no point does the State attempt to demonstrate how those reasons are precisely furthered by this statue.  They are not.

### Significant modicum of support

In *Lîpez Torres* the Court stated that "[j]ust as States may require persons to demonstrate 'a significant modicum of support' before allowing them access to the general-election ballot, lest it become unmanageable. . . they may similarly demand a minimum degree of support for candidate access to a primary ballot."  552 U.S. at 204 (citing *Jenness v. Forston*, 403 U.S. 431, 442 (1971); *Norman v. Reed*, 502 U.S. 279, 395 (1992); *American Party of Texas v. White*, 415 U.S. 767, 783 (1974)).  Common Cause is not complaining about the method of gaining access to the judicial election ballot.  It is complaining that, whatever method is used, the election is an illusion – there is no choice as all nominees are destined to be elected.  The exact same statutes that limit access to the ballots could be used with the system that prevails in most other Indiana counties where separate candidates vie separately for Superior Court No. 1, No. 2, No. 3, *etc.* The challenged statute has nothing whatsoever to do with assuring that candidates have a significant modicum of support.

### Reducing factionalism

In *Burdick* the Court reasoned that Hawaii had an interest in avoiding unrestrained factionalism at the general election and this justified its ban on write-in votes at the general election. 504 U.S. at 439.[9]  As the Court noted in *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986), in upholding the constitutionality of a Washington statute limiting placement of the general election ballot to candidates who received at least 1% of primary votes, a state is justified

---

[9]     The Court did not conclude that the desire to reduce factionalism was a compelling governmental interest as it found that this helped to justify the write-in voting ban only after concluding that the ban "imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote." *Burdick,* 504 U.S. at 438-39.

in employing means "to simplify the general election ballot, and to avoid the possibility of unrestrained factionalism at the general election." *Id.* at 196.

While this may be interesting as a didactic matter, it is unclear what it has to do with the challenged statute. On the one hand, the election process is made simpler by not affording any choice.  But it is absurd to argue that this is what "reducing factionalism" means.  Again, the election ballot would be no more "factionalized" if separate elections were held for each division or if some other system was used to actually give voters a meaningful choice and vote in the election of the judges.

*Preserving the integrity of the primary and general election process*

In *Munro*, the Court summarized earlier cases, stating that "the State's interest in preserving the integrity of the electoral process and in regulating the number of candidates on the ballot was compelling" and therefore "a State may require a preliminary showing of significant support before placing a candidate on the general election ballot." 479 U.S. at 194 (citing *White*, 415 U.S. at 782).  Again, while this may be a compelling interest, the State does not explain how the challenged statute furthers it.  Common Cause is not objecting to the fact that candidates are restricted to those who have demonstrated "significant support."   Instead, Common Cause is objecting to the fact that the challenged statute is designed to not require that the winning candidates have any electoral support. And while regulating the number of candidates on a ballot may be compelling, there is no authority for the proposition that that interest can be constitutionally met by affording the electorate no meaningful say in the election.

*Assuring judicial impartiality and integrity*

What the State is left to argue is that Marion County's unique system of electing judges is justified because of the "critical distinction between judges, on the one hand, and

legislators/executives, on the other." (State's Br., at 29).   The State notes that the statute will serve:

> the vital interest in judicial impartiality and integrity. It certainly could be that this system will reduce campaigning between candidates for a judgeship, which, in turn, reduces the need to raise money as well as the perception that judicial decisions are influence by politics and money. Further, this system can help prevent one-party entrenchment of the judiciary in Indiana's most populous county.

(*Id.* at 31).   There are numerous problems with the State's attempt to assert this as a compelling interest.

The State does not explain how the challenged statute furthers any of these interests. Although the current system certainly reduces judicial campaigns for the November election in Marion County as the election is a foregone conclusion, it does not prevent primary fights, a fact that the State highlights in its memorandum. (State's Br. at 3-4).[10]   Nor is it reasonable to conclude that the current system lessens the public perception that judicial decisions are influenced by politics and money given the fact that the candidates must still be selected to run in the primary. Indeed, it has been widely reported that under the current system Marion County judicial candidates are expected to pay between $12,000 and $14,000 to either the Democratic or Republican parties in order to have a chance to be slated as candidates. Indianapolis Star, *Editorial: System for picking judges needs overhaul*, Mar. 19, 2014, available at http://archive.indystar.com/article/20140319/OPINION08/303190049/Editorial-System-picking-judges-needs-overhaul.[11]   Moreover, as a common sense matter, when a voter on election day is

---

[10]     Despite the State adducing proof demonstrating that there are primary fights for Marion County superior court positions, the State argues that there is no evidence that the primary process is intensely partisan. (State's Br., at 31 n.17).   This makes no sense.   The Democratic primary is for Democratic partisans and the Republican primary is for Republican partisans.

[11]     Common Cause is not introducing the facts noted in this editorial as facts in this case for purposes of summary judgment. However, the State has opined as to public perception and this Court can certainly

faced with, for example, 10 Democratic candidates for judges and 10 Republican candidates for judges there is no reason to believe that the person will think that the judges are less political merely because all 20 are elected.

The State also asserts that the challenged statute can help prevent "one-party entrenchment" in the judiciary in Indiana's most populous county.  While it is undeniable that Marion County is Indiana's largest county, the State does not explain the danger inherent in a system that could allow for "one-party encroachment" in the judiciary or the benefit of having a judiciary that is evenly split between Democrats and Republicans. Certainly having a bench consisting of one party will not make any individual judge any less impartial. And, a person facing a judge will necessarily focus on that judge and not the party status of all other judges.  If a person is a Democrat and inclined to believe the Republican judge whom she is before is biased against her because of her party affiliation, she will believe this even if all the other 35 judges, who she is not before, are Democrats.   Moreover, this problem of one-party entrenchment is simply not recognized in other counties in Indiana where superior court judges are elected and may very well be all of one party because of the demographics of the county. Indiana law specifically notes that except as otherwise provided standard superior courts will be split into separate courtrooms with the judges of the courts being nominated and elected by courtroom. Ind. Code §§ 33-29-1-1;  33-29-1-3, 33-29-4-1, 33-29-4-2.  Thus, for example, the six superior court judges of Hamilton County, Indiana, which is contiguous to Marion County, Ind. Code § 33-33-29-2(a), are nominated and elected separately.  Ind. Code §§ 33-33-29-2(b); 33-29-4-2.  One-party encroachment does not seem to be a concern in the rest of the State.

take judicial notice of this editorial as something that affects public perception. *See, e.g., Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 586 (N.D. Ill. 2010) (taking judicial notice of the existence of newspaper articles, not the facts alleged in them).

It is true, of course, that because of the uniquely non-political nature of judicial decisionmaking, the method of selecting judges has been a difficult problem with which various jurisdictions struggle. (ECF No. 41 at 13-14). But, again, the State fails to explain how the unique method created by the challenged statute addresses any of those problems.  How will a voter faced with a general election ballot for superior court judge that fails to afford any choice, thus making it clear that the inevitably-elected jurist was selected by a clearly political method, but one removed from popular choice at the general election, perceive that this advances impartiality and integrity?  And, how will this process, so heavily dependent on the primary and party slating, actually advance impartiality and integrity?

There certainly is no constitutional right to have judges elected. (ECF No. 41 at 14). Indeed, in both Lake and St. Joseph counties judges are selected through an entirely different system involving a judicial nominating commission, gubernatorial appointment and retention votes.  *See* Ind. Code §§ 33-33-45-25 through 33-33-45-42 (Lake County); Ind. Code §§ 33-33-71-29 through 33-33-71-43 (St. Joseph County). Indiana, however, has not chosen to abandon judicial elections in Marion County.  Nor has it adopted the lesser restrictive alternative to the politicization of judicial elections, adopted in, for example, Vanderburgh County, of allowing contested elections for each of its seven superior courts, but making the elections nonpartisan, listing the candidates without party designation.  Ind. Code § 33-33-82-31.[12]

Certainly these alternatives could have been adopted and arguably these alternative would address some of the concerns advanced by the State. But, the challenged statute does not represent any such alternative.  At no point does the State attempt to argue why having an illusory election, one without choice, is the least restrictive alternative to meet any of its

---

[12]       However, there is no guarantee, under either the appointed system or the non-partisan system, that "one-party entrenchment" will be avoided as there is still no guarantee that all the judges will not be of the same party.

articulated concerns.  As Common Cause noted in its earlier memorandum, "[t]here is room for debate about whether the election of state court judges is a good idea or a bad one.  Yet there is no room for debate that, if a States opts to select its judges through popular elections, it must comply with the First Amendment in doing so."  *Carey v. Wolnitzek*, 614 F.3d 189, 209 (6th Cir. 2010).

The State has not advanced any narrowly tailored compelling interests justifying the challenged statute.  It is unconstitutional.

### D.    Even if the statute did not impose a severe burden on the right to vote it is unconstitutional

Even if the challenged statute did not impose a severe burden on the right to have a meaningful election, the statute must, at a minimum, be reasonably related to Indiana's important regulatory interests.  *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) (plurality); *Burdick*, 504 U.S. at 434.  There simply is no state interest served by this unusual statute that is designed to present a ballot full of persons who have, in effect, already been elected. Even at the lowest level of scrutiny the statute fails.

### CONCLUSION

The fact that Indiana Code § 33-33-49-13 creates an electoral method that is perhaps unique in the United States does not mean it is unconstitutional. It is unconstitutional because, having opted for a system to elect Marion County superior court judges, the State of Indiana must utilize a method that actually affords voters a meaningful choice on Election Day.  The statute most decidedly does not do this and is void.  Accordingly, summary judgment must be entered for Common Cause.   This Court should enter all appropriate orders to enable constitutional judicial elections in Marion County at the earliest opportunity.

/s/ *Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49

/s/ *Gavin M. Rose*
Gavin M. Rose
No. 26565-53
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN  46202
317-635-4059
Fax: 317-635-4105
kfalk@aclu-in.org
grose@aclu-in.org

*Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of June, 2014, a copy of the foregoing was filed electronically with the Clerk of this Court.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

Dino L. Pollock
Kenneth L. Joel
Deputy Attorneys General
Dino.Pollock@atg.in.gov
Kenneth.Joel@atg.in.gov

Christopher K. Starkey
starkeyck@msn.com

/s/ *Kenneth J. Falk*
Kenneth J. Falk
Attorney at Law