UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COMMON CAUSE INDIANA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:12-cv-1603-RLY-DML |
| ) | |
| INDIANA SECRETARY OF STATE, in her ) | |
| official capacity; THE INDIVIDUAL ) | |
| MEMBERS of the INDIANA ELECTION ) | |
| COMMISSION, in their official capacities; ) | |
| GOVERNOR of the STATE OF INDIANA, ) | |
| in his official capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**STATE DEFENDANTS' REPLY BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction**

"Election laws will invariably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects -- at least to some degree -- the individual's right to vote and his right to associate with others for political ends.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

To combat this maxim, time and time again, Common Cause argues, with absolutely no proof, that Indiana Code § 33-33-49-13 was actually and nefariously "designed to deny persons the opportunity to have any say" in the election of Marion County Superior Court judges. *See*, *e.g.*, ECF 63 at 1, 4, 12, 13 (arguing that the statute's "intended purpose" is to "provide no voter choice" and that the "complete lack of choice is by statutory design" and that the "system" is

"designed to guarantee elector success to all who run, regardless of the voters"); *see also* ECF 63 at 1, 2, 3, 15, 19 (all suggesting that the "votes cast are meaningless insofar as, by virtue of the unique electoral scheme challenged in this case, every candidate who advances to the general election ultimately is elected to office").

Hyperbole aside, and whether directed at standing or substance, Common Cause's facial challenge is fundamentally flawed in many respects. For example, it is based on: (1) the isolated misreading of a single sub-section of a single law -- Indiana Code § 33-33-49-13(b); (2) overstated rhetorical gloss as to what was intended by this single provision; (3) the review of irrelevant past election results; (4) the factually unsupported speculation as to what will always happen in the future; and (5) cases that are inapposite to the challenge at issue. Such is not the basis for invalidating a law that was duly enacted by the General Assembly and signed by the Governor. And, in the end, Plaintiff's rhetoric and speculative arguments do not aid their cause.[1] As the Supreme Court has regularly concluded, a state's provision of an election law does not violate the First Amendment where, as here, state laws -- *in their totality* -- provide ballot access to candidates and, in turn, necessarily provide the opportunity for voters to participate in the process.[2] This court must deny Plaintiff's Motion for Summary Judgment and grant State Defendants' Rule 56 Motion.

## II. Reply -- Common Cause's Arguments Are Fundamentally Flawed

### A. Common Cause Presses Only A Facial Challenge To Indiana Code § 33-33-49-13(b)

Common Cause does not challenge any particular election result on behalf of any particular candidate or on behalf of any particular voter. Instead, Common Cause, as a group interested in the notion of voting rights, facially challenges Indiana Code § 33-33-49-13(b) as it

---

[1] At least in this filing, Common Cause no longer directly likens Marion County to North Korea. *See* ECF 41 at 1, 10.
[2] State Defendants previously set forth significant analysis of this Supreme Court precedent and will not belabor those points here. *See* ECF 58 7-17.

2

is written.  Common Cause, therefore, "bear[s] a heavy burden of persuasion" because it seeks "relief that would invalidate the statute in all its applications."  *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 200 (2008); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-51 (2008) (noting that a challenge not in the context of an actual election is facial in nature and that such challenges are "disfavored for several reasons" including the fact that they "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint" and because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with Constitution").

In cases like this, moreover, the Supreme Court has regularly eschewed past electoral results when resolving the facial constitutionality of ballot access/meaningful vote laws.[3]  For example, in *Jenness v. Fortson*, 403 U.S. 431 (1971), the Court did not analyze past election results in upholding the 5% provision that had been challenged nor did it require the state to prove past electoral problems that would justify the law; instead, it looked at the interaction of various statutes.  *See id*. at 438-40.  Similarly, in *Storer v. Brown*, 415 U.S. 724 (1974), the Court did not look at historic election results but, rather, it grounded its conclusion that the challenged provision was constitutional on the text of the statutes as well as its previous "pattern of decisions."  *Id*. at 733.

More recently, in *Burdick*, the dissent went to great lengths to analyze prior election results but the majority looked only to the language of the laws and the fact that Hawai'i law, in its totality, provided ample means for persons to access the ballot and, thus, for voters to meaningfully participate.  *Compare Burdick*, 504 U.S. at 438-39 (majority opinion not mentioning historic election results but holding that constitutionally adequate ballot access was

---

[3]   Common Cause's use of *Williams v. Rhodes*, 393 U.S. 23 (1968) does not alter this maxim as the Court did not rely on historic election results there either.

afforded under Hawai'i's statutes and, thus, the write-in prohibition was constitutional); *Burdick*, 504 U.S. at 442-44 (Kennedy, J., dissenting) (relying on statistics from past elections to show the dominance of the Democratic Party in Hawai'i and also to argue that voting results show that voters are dissatisfied with the choices available and, thus, cannot meaningfully vote).  *See also* ECF 63 at 11 (Common Cause acknowledging that it "is certainly true, as noted above, that the Supreme Court has held that '[o]ur cases invalidating ballot-access requirements have focused on the requirements themselves, and not on the manner in which political actors function under those requirements'") (quoting *New York Board of Elections v. Lopez Torres*, 552 U.S. 196, 205 (2008)).

In fact, in *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986), the Supreme Court held that a state need not provide specific evidence of electoral problems to justify electoral restrictions.  In so holding, the Supreme Court did not require Washington to make a "particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Id*. at 194-95.  Indeed, the Court recognized that, in prior cases, it had "conducted no inquiry into the sufficiency and quantum of the data supporting the reasons for" the regulation at issue.  *Id*. at 195.  In the end, to "require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate.  Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action.  Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Id*. at 195.

### B. Common Cause Only Has Challenged Indiana Code § 33-33-49-13(b) Yet It Misreads This Single Provision

Common Cause has not pressed, because it cannot press, any constitutional challenge to: (1) Indiana Code § 33-33-49-13(a), which provides for a 6-year term for the judges, the dates of that term, and that the judges run at-large; (2) Indiana Code § 33-33-49-13(c), which allows those nominated through a primary process (and others who appropriately qualify) to be placed on the general election ballot and to be elected to the open spots over two election cycles; or (3) Indiana Code § 33-33-49-13(d), which provides that those candidates with the highest vote totals in the general election are elected. Likewise, Common Cause has not challenged any other provision of Indiana's election laws regulating the requirements and processes for primaries, write-in candidates, third-party/minor-party candidates, independent candidates, etc. Thus, Indiana Code § 33-33-49-13(a), Indiana Code § 33-33-49-13(c), and Indiana Code § 33-33-49-13(d) -- as well as all other provisions of Indiana's election laws -- will survive regardless of the outcome of the present litigation.[4]

As made clear in its filings, Common Cause's challenge is only to Indiana Code § 33-33-49-13(b) and the nominee "cap" that it imposes on political parties that hold primaries. For example, Common Cause contends that the provision "absolutely precludes the Democratic or Republican Party from nominating any more than one-half of the judges to be elected in Marion County." ECF 63 at 1. *See also* ECF 63 at 10-11 ("the statute is designed to ensure that partisans of the major parties will not be able to vote to fill all judicial positions with members of that party" and a "Democrat will only be able to vote to elect Democrats to one-half of the open positions, and the same with a Republican partisan"); ECF 63 at 5 n.3 (noting that the problem with Indiana law is that it '"caps" the number of candidates that may be nominated by each party

---

[4] Common Cause, therefore, is mistaken that if the numeric "cap" were eliminated through this litigation each Marion County Courtroom will be separately elected -- and, this Court lacks the power to rewrite Indiana's election laws to Common Cause's liking.

at half the number of those to be elected at the general election" and suggesting that this Court to increase the "cap" to the "number of judges to be selected during the election cycle"). In short, it is the "cap" that Common Cause is complaining about and not the other provisions of Indiana's election laws.

Moreover, the rhetoric used by Common Cause suggests that Indiana Code § 33-33-49-13(b) is intended to allow only the Democratic Party and Republican Party to always fill half of the open judicial slots with their candidates. *See*, *e.g.*, ECF 63 at 2 ("the challenged statute virtually guarantees that candidates prevailing at the primary elections conducted by the Democratic and the Republican parties are elected at the general election"); ECF 63 at 1 (on Election Day, "every single candidate must win"). Common Cause is wrong, however, as the actual text of the statute provides as follows:

> At the primary election held in 2008 and every six (6) years thereafter, *a political party may nominate* not more than eight (8) candidates for judge of the court. At the primary election held in 2006 and every six (6) years thereafter, *a political party may nominate* not more than ten (10) candidates for judge of the court. The candidates shall be voted on at the general election. *Other candidates may qualify* under IC 3-8-6 to be voted on at the general election.

Ind. Code § 33-33-49-13(b) (emphasis added).

Thus, this provision relates to any political party that holds a primary election and numerically "caps" the nominees at a particular number. There has been no challenge to Indiana's requirements relating to the support needed for a party to hold primary elections and much higher percentages have been held to be constitutional. *See Jenness v. Fortson*, 403 U.S. 431, 439-40 (1971) (upholding Georgia's law that set the bar for becoming a political party at 20% of the votes cast in the previous election). Put simply, if *any* political party achieves 10% support, it will be required to hold primaries and, pursuant to Indiana Code § 33-33-49-13(b), it will be allowed to nominate not more than eight (or 10) candidates to the general election. So, for example, if any other political party achieves this, it will get to nominate eight (or 10)

6

candidates as will the Democratic Party and the Republican Party and there will be at least 24 (or 30) candidates competing for 16 (or 20 positions). In short, any political party that garners this constitutionally sound level of support will hold primary elections and be allowed to nominate eight (or 10) candidates to vie for 16 (or 20) spots. The fact that other parties have not mustered sufficient support in the past does not provide a reason to invalidate textually neutral laws that clearly allow for robust competition for judicial spots and, since Common Cause cannot show that this framework is unconstitutional in every circumstance, its facial challenge necessarily fails.[5]

### C. Ballot Access Cases Provide The Appropriate Constitutional Framework For Resolving This Challenge And Those Cases Demonstrate That Indiana Code § 33-33-49-13(b) Does Not Significantly Restrict The First Amendment Rights Of Common Cause's Members

Another problem with Common Cause's arguments is its desire to avoid controlling precedent. To that end, State Defendants previously analyzed Supreme Court precedent dealing with the ability of candidates to access ballots because the Supreme Court has recognized that this is the appropriate rubric for assessing challenges brought by voters claiming that laws deprive them of a meaningful vote. *See Burdick v. Takushi*, 504 U.S. 428, 438 (1992) ("in *Bullock v. Carter*, we minimized the extent to which voting rights cases are distinguishable from ballot access cases, stating that 'the rights of voters and the rights of candidates do not lend themselves to neat separation.' 405 U.S. at 143"); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) (recognizing that "[r]estrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively").

---

[5] Common Cause argues, in essence, that Indiana Code provides the following: the Democratic Party and the Republican Party each shall select 50% of the candidates to appear on the general election ballot and that no other candidate may appear on the general election ballot. These parties have primaries and non-endorsed candidates have been nominated and others have appeared on the general election ballot; thus, it is wrong to argue that these two parties select the candidates. Common Cause's reading of the relevant statutes is plainly wrong and this is not the existing system in Indiana.

7

For example, *Stegmaier v. Trammel*, 597 F.2d 1027 (5th Cir. 1979) is a 35 year old civil rights case from the Fifth Circuit that concerned an employee's allegations that his employer had threatened to terminate his employment because the employee did not support the clerk during the election. Likewise, *Mulholland v. Marion County Election Board*, 746 F.3d 811 (7th Cir. 2014) dealt with *Younger* abstention. In *Ayers-DiStefano*, 37 F.3d 726 (1st Cir. 1994), the issue was whether Rhode Island's refusal to allow otherwise eligible voters to vote in a "do-over" election because they had not voted in the flawed election was constitutional. And, in *Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Oh. 2006), the Ohio District Court was faced with an equal protection challenge to a law that required naturalized citizens to have identification to be allowed to vote but did not require identification of citizens who had been born in the United States. These cases do not aid Common Cause because they are not apposite to the issue at hand.[6]

In fact, Common Cause readily concedes that *Burdick* -- a ballot-access case -- provides the appropriate test for analyzing Indiana Code § 33-33-49-13(b). *See* ECF 63 at 9. And, *Burdick* alone compels not only the rejection of Plaintiff's Motion for Summary Judgment but also the granting of State Defendants' Rule 56 Motion. In *Burdick*, a voter brought a First Amendment claim because he was dissatisfied with the fact that only one person was running to be his representative in the Hawai'i House of Representatives. 504 U.S. at 430. According to the plaintiff, he wanted to write-in the candidate of his choice (in the current election and in future elections) so that he could meaningfully participate in the process. *Id*.

The Supreme Court was clear that the "function of the election process is to winnow out and finally reject all but the chosen candidates." *Id*. at 438 (further quotations omitted). Put

---

[6] Equally unavailing is Plaintiff's attempt to heighten the burden in this election case. *See* ECF 63 at 19-20 (arguing that Indiana must provide the "*least restrictive* alternative to meet any of its articulated concerns"). As thoroughly discussed before, election cases are different than other First Amendment challenges in that the Supreme Court has regularly recognized a state's inherent right to impose restrictions on various aspects of the election process. *Brudick*, *supra*.

8

another way, the election process is "not to provide a means of giving vent to short-range political goals, pique, or personal quarrels[s]." *Id*. at 438 (further quotations omitted). Indeed, it has long been held that the State has a legitimate interest in regulating the election process even though any regulation "will invariably impose some burden upon individual voters." *Id*. at 433. "Common sense, as well as constitutional law, compels the conclusion that government must plan an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Id*. at 433 (internal quotations omitted but quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Turning, then, to the challenged provision, the Court examined its constitutionality by looking at all of the ways that a candidate could appear on the ballot and, thus, how a voter could meaningfully cast his/her ballot.

The Court recognized that, under Hawai'i law, there were other ways for a voter's candidate-of-choice could get on the ballot. After looking at each, the Court concluded that Hawai'i's election system "provides easy access to the ballot until the cutoff date for the filing of nominating petitions, two months before the primary." *Id*. at 436. Thus, the particular restriction that had been challenged was limited and to "conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot." *Id*. at 437 (further quotations omitted); *see also id*. at 438-39 (in light of the "adequate ballot access afforded under Hawai'i's election code, the State's ban on write-in voting imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote"). In other words, even the absolute prohibition on one type of voting did not deprive a voter of a "meaningful" vote because the state had provided other constitutionally sound ways to participate in the electoral process.

9

The same is true here. Indiana provides easy access to the primary ballot and many other ways for candidates to access the general election ballot. These ways are constitutionally sound and Common Cause has offered no argument to the contrary. As previously noted, Indiana Code § 3-8-6 allows any minor party to nominate its candidates as a team to the general election ballot -- the signatures required can apply to a slew of candidates and each candidate need not collect a different set of signatures -- and it allows independent candidates access to the general election ballot. Indiana Code § 3-8-4 permits the Libertarian Party to nominate 16 or 20 candidates directly to the general election ballot. And, Indiana Code § 3-8-2-2.5 provides the opportunity for write-in candidates. Accordingly, Indiana Code § 33-33-49-13(b), "considered as part of an electoral scheme that provides constitutionally sufficient ballot access, does not impose an unconstitutional burden upon the First and Fourteenth Amendment rights of the State's voters." *Id.* at 441-42. *See also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 361-62, 365, 367 (1997) (rejecting First Amendment challenge to Minnesota's anti-fusion law because the Constitution does not require states to "compromise the policy choices embodied in its ballot-access requirements to accommodate the New Party's fusion strategy" and the "constitution permits the Minnesota legislature to decide that political stability is best served through a healthy two-party system").

Common Cause's repeated use of the word "meaningful" is of no assistance either. Of course, "meaningful" is a qualitatively amorphous concept and Plaintiff's filings reflect that it means many things to many people. For example, Common Cause states that, for Democratic and Republican voters, "meaningful" means the ability to elect all judges of one's political stripe. ECF 63 at 10 ("the statute is designed to ensure that partisans of the major parties will not be able to vote to full all judicial positions with members of that party"). Common Cause continues that since truly independent voters may not be able to vote in primary elections, "meaningful" to

them must mean the ability to have more candidates on the general election ballot than there are spots available for election. Either way, Common Cause's core argument is that the constitution is not satisfied unless voters have "the ability to *meaningfully affect or impact the election*." ECF 63 at 14 (emphasis added).[7]

The problem with this, though, is that this qualitative argument was rejected by the Supreme Court in *New York State Board of Elections v. Lopez Torres*, 552 U.S. 196 (2008). New York's system consisted of a "delegate primary" where party members would elect delegates from the various judicial districts and there were ways for persons to get onto the delegate primary ballot. *Id*. at 200 (noting that to get on this ballot one needed to submit a designating petition signed by 500 enrolled party members residing in the district (or 5%, whichever is less)). Two weeks after the delegate primary, the parties would then hold a nominating convention where the elected delegates would nominate the judicial candidates who would then run at-large in the particular district. *Id*. at 200-01. Nothing in New York law commanded how the delegates would vote at the nominating convention and New York permitted other candidates (independents and those from minor-parties) to join the general election race by timely submitting petitions with 3,500 or 4,000 signatures from voters in that district or signatures from 5% of the number of votes cast for Governor in the that district in the prior election. *Id*. at 201.

Common Cause, a candidate, and the candidate's supporters challenged New York's process for selecting trial court judges. The challengers argued that this system resulted in candidates being picked by party leadership and, therefore, they were deprived a "meaningful" opportunity to compete for the judicial positions. *Id*. at 201. In other words: "The weapon

---

[7] According to Common Cause, Defendants have discounted the "conundrum of the independent voter who cannot satisfy the requirements of Indiana Code § 3-10-1-6." ECF 63 at 11 n.6. Common Cause suggested in its opening papers that Indiana's primary system was "closed" and State Defendants merely pointed out that such a conclusion was overstated and not tethered to the text of the statute. In any event, Common Cause has not challenged Indiana's primary system or the laws governing that process.

wielded by these plaintiffs is their own claimed associational right not only to join, but to have a certain degree of influence in the party. They contend that New York's electoral system does not go far enough -- does not go as far as the Constitution demands -- in ensuring that they will have a fair chance of prevailing in their parties' candidate-selection process." *Id*. at 203-04. In other words, put in the vernacular of the present case, the challenge was that New York's laws did not provide voters "the ability to meaningfully affect or impact" the electoral process. *See* ECF 63 at 14.

Finding that this theory has "no support in our precedents" the Court concluded that New York's electoral system was constitutional. And, significantly for this case, the Court reasoned that it would be improper for any court to sit and decide what constitutes a "fair shot" or, in this case's terminology, what constitutes "meaningful." *Id*. at 205-06; *see also id*. at 208-09 (discussing two-party stifling of competing opinions and declining "to enter the morass"). "Competitiveness may be of interest to the voters in the general election, and to the candidates who choose to run against the dominant party. *But we have held that those interests are well enough protected so long as candidates have an adequate opportunity to appear on the general-election ballot*." *Id*. at 207 (emphasis added). In other words, because Indiana provides a constitutionally permissible primary system and many other constitutionally sound ways for candidates to get on the general election ballot, Indiana Code § 33-33-49-13(b) does not deny voters a "meaningful" opportunity to participate in the election process.[8]

---

[8] In every election cycle, primaries are used to constitutionally winnow the field of candidates who then move to the general election. Under Plaintiff's logic, supporters of those who lost at the primary stage could be said to lack a "meaningful vote" at the general election because they cannot vote for their candidate of choice. This position is not supported by the Constitution and would nullify the primary process. Moreover, Common Cause does not quantify how many "more" candidates are needed on the ballot (as compared to slots available) to satisfy their notion of "meaningful" -- however, given their reference to the 2002 election, it would seem that the number must be more than one because, according to Common Cause, merely having the chance to affect one judicial position is not "meaningful." ECF 63 at 12 n.7. As the Supreme Court made clear in *Lopez Torres*, this Court should decline Common Cause's invitation to enter into that qualitative morass.

### D.     Legitimate Reasons Exist For Indiana Code § 33-33-49-13(b)

Plaintiff argues that we have not articulated how Indiana Code § 33-33-49-13(b) furthers admittedly legitimate purposes such as requiring candidates to muster a significant modicum of support, the prevention of electoral factionalism, the reduction of confusion for voters, ensuring the integrity of the primary/general election process, and the unique nature of judicial positions. Plaintiff's contention on this point suffers from the same flaws as do its other positions -- it divorces Indiana Code § 33-33-49-13(b) from the other constitutional provisions of Indiana's election laws.  And, perhaps the easiest way to see the legitimate reason for this single provision is to look at what an election may be like if it were stricken.

First, there will be no change to the number of Marion County Superior Court judges -- there will be 36 of them. Ind. Code § 33-33-49-13(c). Second, there will be no change to the election cycles of the Marion County Superior Court judges -- 16 will be elected in 2014, 2020, 2026, and every six years thereafter and 20 will be elected in 2018, 2024, 2030, and every six years thereafter.  *Id*.  *See also* Ind. Code § 33-33-49-13(a). And, third, there will be no change to the at-large election of Marion County Superior Court judges. Ind. Code § 33-33-49-13(a, d).

While there will be no change to the primary process for political parties that are required to hold primaries, such political parties will be able to nominate up to the number of open slots for that election. In other words, any political party holding a primary could be able -- but will not be required -- to nominate 20 candidates for 2018, 2024, 2030, and every six years thereafter and 16 candidates for 2020, 2026, and every six years thereafter.[9] Currently, this would be the Democratic Party and the Republican Party; however, as Indiana Code § 33-33-49-13(b) is not limited to these two parties, if the support is there, other parties will be able to hold primaries and nominate 16 (or 20) candidates to the general election ballot.

---

[9]     State Defendants have omitted 2014 since the primaries have already occurred.

Beyond this, invalidation of Indiana Code § 33-33-49-13(b) will not alter the ability of the Libertarian Party to nominate candidates for the general election ballot; however, without this "cap" the Libertarian Party will be able to immediately nominate 16 (or 20) candidates through its convention process.  To this mix an unlimited number of independent candidates can join the general election ballot as can write-in candidates and other third-party/minor-party judicial hopefuls, which could nominate a team of 16 (or 20) candidates merely by having a single petition -- listing 16 (or 20) names -- signed by about 4,000 voters.

In short, invalidation of Indiana Code § 33-33-49-13(b) could cause the names on the general election ballot to mushroom with candidates, like Mr. Starkey, that have little actual support even within their own party.  This could lead to a destructive primary process as well as the dilution of votes at the general election such that no elected judge actually has any significant modicum of support.  Further, given this "free-for-all" system, one would expect the campaigning to be even more intense and more partisan and more expensive as candidates will need to differentiate themselves from the dozens of others vying for 16 or 20 slots.  Also, including scores of candidates certainly could lead to voter confusion and voter fatigue and the inability of voters to understand what any particular candidate stands for.  Put another way, given the relative ease that candidates can access both the primary ballot and the general election ballot, and given the at-large requirement for the election of Marion County Superior Court judges, and given the numbers of judges that are elected in each cycle, Indiana Code § 33-33-49-13(b) is a way to make the election process more manageable in Indiana's most populated county.[10]  Such concerns are even more apparent as this case involves the election of judges who

---

[10] Common Cause asks what Marion County's population has to do with this case.  Put simply, the number of Superior Court judges in Marion County is certainly a function of the Court's overall criminal and civil case-load, which is impacted by the population of the county and the transactions that are conducted in the county and by the crime in the county.

are supposed to be non-partisan in the administration of justice. *See Republican Party of Minnesota v. White*, 536 U.S. 765 (2002).

### E. Speculation Cannot Substitute For Injury/Redress

Despite all of the rhetoric about being non-partisan and interested only in "meaningful" -- whatever that means -- participation, Plaintiff acknowledges that politics is about winning and elections are "zero-sum" games -- if your candidate wins, my candidate loses. *See*, *e.g.*, ECF 63 at 2-3 (arguing that "persons eligible to vote in these primary elections will have an opportunity to cast a meaningful ballot for only half of the judgeships on the Marion Superior Court); ECF 63 at 10 ("the statute is designed to ensure that partisans of the major parties will not be able to vote to fill all judicial positions with members of that party"; ECF 63 at 12 (the statute "explicitly limits each party to one-half of the positions"); ECF 63 at 14 (equating the concept of meaningful participation to the ability to "affect or impact the election"). With this in mind, then, Common Cause has not established its standing to prosecute this constitutional challenge.

Common Cause suggests that, absent Indiana Code § 33-33-49-13(b), the primaries for the Democratic Party and the Republican Party will necessarily include far more candidates and the parties will necessarily move the top 16 (or, depending on the year, 20) primary candidates to move onto the general election ballot.[11] While this might occur, Common Cause is necessarily speculating about what may happen if Indiana Code § 33-33-49-13(b) were invalidated. Indeed, even the language used by Common Cause concedes this point. *See* ECF 63 at 4 (suggesting, with no proof whatsoever, that more people not running in the primary election is "a product of the challenged statute" and continuing that "[p]resumably, if twice the number of positions were potentially available to each party twice as many people would run"); ECF at 3 n.2 (arguing that

---

[11] The 2006 Republican primary election, there were nine candidates competing for 10 slots; thus, Plaintiff's supposition about the impact of Indiana Code § 33-33-49-13(b) misses the mark. As noted, moreover, the language of this provision is not tied to the Democratic Party or the Republican Party and does not compel any political party to advance a set number. *See* Ind. Code § 33-33-49-13(b) (using the word "may" and the phrase "political party").

the fact that neither the Democrats nor the Republicans have had enough candidates enter the primary to fill all open judicial positions "is likely the result of the challenged statute itself … combined with a reluctance to run against a party's 'slate'").[12]

Common Cause offers no proof for its suppositions.[13] Indeed, it is equally possible that, even without Indiana Code § 33-33-49-13(b), party candidates will not flood to the primaries and political parties will not automatically support everybody during the election process. For example, party leaders could make clear that they will only support certain candidates and nothing in the Constitution requires otherwise. *See also New York State Board of Elections v. Lopez Torres*, 552 U.S. 196 (2008).[14] Also, if such party flooding occurs, it might be that independent/third-party/minor-party candidates will be less inclined to participate as their chances may be lessened by more party candidates. In any event, Common Cause must demonstrate that Indiana Code § 33-33-49-13(b) imposes an "injury in fact" onto the members of Common Cause and that it is "likely, as opposed to merely speculative" that this "injury in fact"

---

[12] Plaintiff's reference to the "slate" and a news article are not properly before this Court and are immaterial as no provision of Indiana law compels such a process. ECF 63 at 17 & n.11. In any event, invalidating Indiana Code § 33-33-49-13(b) will not force a political party to support any certain number of candidates and the Constitution does not require a party to support all of its candidates. *Lopez Torres*, *supra*. Finally, Plaintiff is incorrect when it states that the party "selects" who gets onto the primary ballot. State Defendants previously set forth the requirements to get on the primary ballot and also put forth evidence showing that candidates who were not supported by the party not only were included on the primary election ballot but also succeeded in that process.

[13] As discussed above, if Indiana Code § 33-33-49-13(b) were invalidated, the other laws regulating elections will remain intact. Political parties will still hold primary elections and voters eligible to vote in those primaries will still have the ability to shape those elections. Third-party/minor-party candidates will still be allowed to be placed directly on the general election ballot through the convention process and petition process. Independent candidates and others will still be permitted to directly access the general election ballot and even write-in candidates will still have the opportunity to access the general election ballot. Invalidation of Indiana Code § 33-33-49-13(b) changes nothing in terms of the many ways for candidates to access the ballots and for voters to participate in that process and, thus, provides no redress to the members of Common Cause. Thus, it is possible that Common Cause's futuristic scenario may come to be -- even though this is truly speculation.

[14] Apparently, Common Cause wants this Court to re-write Indiana's election law even though it only seeks the invalidation of Indiana Code § 33-33-49-13(b). *See* ECF 63 at 5 n.3 (arguing that this Court has the discretion to impose the precise form of relief). While this Court may have discretion in fashioning relief, it certainly does not have the ability to impose a particular cap as suggested by Plaintiff or to require each court to be independently elected. *See also* ECF 63 at 18. As noted, invalidation of Indiana Code § 33-33-49-13(b) will not affect the other portions of § 33-33-49-13, which call for Marion County Superior Court judges to be elected at-large. Thus, Plaintiff's success could result in a pointless primary and a general election where countless candidates are running for 16 (or, depending on the year, 20) at-large posts. Indiana certainly has a legitimate interest in preventing this unwieldy process.

will "be redressed" by the invalidation of Indiana Code § 33-33-49-13(b). *Plotkin v. Ryan*, 239 F.3d 882, 884 (7th Cir. 2001) (internal quotations omitted but quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiff has not met this burden.

But even if Common Cause were correct that invalidation of Indiana Code § 33-33-49-13(b) would always result in an increased number of Democratic candidates and Republican candidates on the general election ballot (but no other candidates will appear on the general election ballot), it is clear that Democratic members of Common Cause may lose if Common Cause is successful (because more Republican judges may be elected) or, the opposite may happen. As for independent members of Common Cause (who, presumably cannot vote in primary elections), it is hard to see how flooding the general election ballot with more Democratic candidates and Republican candidates will increase their ability to "meaningfully affect or impact the election." ECF 63 at 14. Given the test articulated by Plaintiff -- that organizational standing is precluded where the suit, "if successful, would cause a direct detriment to the interests of some of its members and the litigation was not properly authorized" (ECF 63 at 6 n.4) -- it seems clear that this conflict prevents Common Cause from establishing the requisite standing to continue this suit.[15]

And, finally, as it relates to the Governor, the fact is that Common Cause does not dispute the law relied on in our recent submission. *See* ECF 63 at 8. Nor does Common Cause dispute the fact that the substance of this dispute is about the election process for Marion County Superior Court judges and the "cap" on the ability of any political party to nominate candidates to the general election ballot. As to this challenge, then, Common Cause articulates absolutely

---

[15] Common Cause argues that because Vaughn has tendered a supplemental affidavit noting that the litigation was authorized by Common Cause, standing is met. Because words matter, the test articulated by Common Cause requires not only proper organizational authorization but also that successful litigation will not result in a direct detriment to the interests of some members. *See* ECF 63 at 6 n.4 (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 865 (7th Cir. 1996)). Given the importance of the right to vote (as compared to mere dollars and cents), it seems undeniable that litigation success that could negatively impact a person's right to impact an election (given present voting demographics) should constitute a sufficient conflict.

no reason why the Governor is included or what the Governor has with this "cap" or the enforcement of this provision. Put simply, there is no reason to continue this litigation against the Governor.

### III. Conclusion

For the above reasons, the State Defendants respectfully request that this Court deny Plaintiff's Motion for Summary Judgment and grant State Defendants' Motion for Summary Judgment.

                                            Respectfully submitted,

                                            GREGORY F. ZOELLER
                                            Attorney General of Indiana
                                            Atty. No. 1958-98

Date: July 25, 2014               By:    /s/ Kenneth L. Joel
                                            Kenneth L. Joel, Atty. No. 30271-49
                                            Dino L. Pollock, Atty. No. 28009-64
                                            Deputy Attorneys General
                                            Office of the Indiana Attorney General
                                            Indiana Government Center South – 5th Fl.
                                            302 W. Washington St.
                                            Indianapolis, IN 46204-2770
                                            Phone: (317) 233-8296
                                            Fax:   (317) 232-7979
                                            Email: Kenneth.Joel@atg.in.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2014, a copy of the foregoing *State Defendants' Reply Brief in Support of Motion for Summary Judgment* was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Gavin M. Rose
ACLU OF INDIANA
grose@aclu-in.org

                                     /s/ *Kenneth L. Joel*
                                     Kenneth L. Joel
                                     Deputy Attorney General

Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 232-6291
Fax: (317) 232-7979
Email: kenneth.joel@atg.in.gov